690 So.2d 1018 (1997)
Frank PALISI, et al.
v.
CITY OF NEW ORLEANS FIRE DEPARTMENT.
No. 95-CA-1455.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1997.
Order Denying Rehearing April 15, 1997.
*1033 Neil J. Kohlman, Assistant City Attorney, Milton Osborne, Jr., Deputy City Attorney, Avis Marie Russel, City Attorney, New Orleans, for Appellant The City of New Orleans.
Frank A. Bruno, New Orleans, for Plaintiffs/Appellees.
Before BYRNES, ARMSTRONG and WALTZER, JJ.
BYRNES, Judge.
This case involves the consolidated workers' compensation claims of fifty-one unrelated plaintiffs, based on unrelated injuries, sustained at unrelated times and places. The plaintiffs are: Jack Alexander, Paul Joseph Alline, Gerald A. Barattini, Maurice Robert Blondeau, Robert Buisson, William F. Dillenkoffer, Robert H. Dudenhefer, John F. Duncan, Edward Eiermann, Ed Gallagher, Francis Paul LaSalle, George Francis, Peter Gondrella, Jr., James Hennegan, Lawrence Hendrickson, Lucien LeBlanc, Ronald Hughes, Joseph Jevic, Jerry Ladner, John Marcade, Charles Marque, John Niehues, Frank Palisi, Donald Perkins, Paul Raschke, Eugene Ravain, John Renaud, Harold Rodrigue, Raymond Schwarkhardt, Louis Serpas, John Varnado, Ralph L. West, Jr., Albert Baldwin, Robert Anthony Bouterie, Charles Casrill, Donald Conrad, Reno Jean Daret, III, Lester Dufrechou, Branch John Ehrhardt, Sam Joseph Fradella, Jr., Don W. Lindsey, Samuel A. Montalbano, Warren Martin, Patrick McGittigan, Jerry A. Meyer, E.W. Sanders, Terry R. Smith, Ray Squires, Burnell Stewart, Charles Wagner, and Joseph M. Williams.

CONSOLIDATION ISSUE
The plaintiffs have in common the fact that they were all employees of the defendant, the New Orleans Fire Department, hereinafter frequently referred to simply as the "City." The City has objected to the consolidation of these claims.
The hearing officer consolidated these claims because he felt that the question of the applicability of the Cousins v. City of New Orleans, 608 So.2d 978 (La.1992), decision to the City's claim to the right of offset provided a common question of law that transcended all other issues presented by the cases. We also note that there is one common defendant and common representation on both sides.
LSA-C.C.P. art. 1561 provides that two or more separate suits involving a common issue of law or fact pending in the same court may be consolidated. We find no instance in the jurisprudence allowing consolidation where the facts of each case were as disparate *1034 and distinct as they are here. There appears to be an even greater diversity among the claims of the various plaintiffs in this case than there was in the companion case of Rapp v. City of New Orleans, 95-CA-1638 (La.App. 4 Cir. 9/18/96); 681 So.2d 433.[1]
There is evidence in the record to support the City's complaint that the hearing officer failed to take individual factual differences into account in certain instances. However, if the decision of the hearing officer to consolidate was error, we find that it was harmless error, or at least not an error requiring a remand in toto and complete retrial on the merits because the separate record made for each plaintiff enables us to address errors on appeal. Each plaintiff was given the opportunity to present his case separately. Although the hearing officer rendered one judgment, that judgment was, in effect, a series of mini-decrees addressing each plaintiff's claim individually, separately and by name.
Therefore, regardless of the original wisdom of the decision of the hearing officer to consolidate, it would serve no useful purpose and would not be in the interest of judicial economy to deconsolidate at this stage of the proceedings.
The plaintiffs answered the appeal requesting additional attorneys fees and penalties for the "preparation and defending" of this appeal. Plaintiffs also filed a supplemental and amended answer to this appeal alleging errors in the calculations for Burnell Stewart and Joe Williams.
PRESCRIPTION DOES NOT BEGIN TO RUN WHEN BENEFITS WERE SUBJECTED TO THE LSA-R.S. 23:1225 OFFSET
LSA-R.S. 23:1209 provides that an action for Supplemental Earnings Benefits (SEB) be commenced within three years from the date benefits were last paid. The City contends that the claims of Joseph Jevic and William Dillenkoffer have prescribed because the times of making the last payments of benefits pursuant to R.S. 23:1221(3) were, respectively, September 19, 1987 and March 21, 1988. However, this Court would characterize what happened on those dates as implementation of offsets rather than cessations of benefits.
Offsets can be distinguished from terminations of benefits. A termination of benefits ordinarily indicates that the employer made the determination that the employee had no right of recovery, or that the employer refused to pay benefits regardless of that right. On the other hand, implicit in the offset is an acknowledgement that benefits are in fact due the employee, but the employer is entitled to credit for payments the employee receives from certain statutorily designated collateral sources. Therefore, the exercise of the right of offset is a tacit acknowledgement of an entitlement to benefits that continues as long as the offset continues. Consistent with our recent holding in the companion case of Rapp v. City of New Orleans, supra, we find that this continuing acknowledgement interrupts prescription on the employee's underlying claim for benefits as long as the offset persists. Therefore, we find that the claims of Jevic and Dillenkoffer have not prescribed.[2]
In its memorandum in support of its application for rehearing in Rapp the City argued that the Louisiana Supreme Court case of Gary v. Camden Fire Ins. Co., 96-0055 (La.7/2/96); 676 So.2d 553, which was handed down subsequent to the time that Rapp was argued, stands for the proposition that the voluntary payment of compensation benefits does not interrupt prescription. In anticipation of the City's raising this same argument in this case, we note that Gary dealt only with the question of whether voluntary compensation payments by the employer are sufficient *1035 to interrupt prescription as to the claim of the injured employee against a third party tort feasor. The Gary court found not. However, the Gary court was not dealing with the question of whether voluntary payments by the employer interrupt prescription as to the employee's compensation claim against the employer. The effect of the City's argument would be to require an injured employee to file suit against his employer for compensation payments he is already receiving voluntarily or risk having the employer cease paying them as soon as the prescriptive period has run. The Gary court clearly could not have intended such an absurd result. There would be no reason for the Workers' Compensation legislation to encourage voluntary claims payment by the employer if, in effect, it mandated the filing of suit by the employee in order for the employee to be protected from the loss of benefits through prescription.

PRESCRIPTION OF MEDICAL BENEFITS
The City filed an exception of prescription for the first time in this Court for the claims for reinstatement of medical benefits for Palisi, Hennegan, Jevic, Sanders, Montalbano, Raschke, Blondeau, Dudenhefer, Dufrechou, Serpas, Alline, Casrill, Eiermann, Francis, Hughes, LaSalle, Meyer, Smith, Rodrigue, West, Marque, Stewart, and Williams.
An exception of prescription may be considered for the first time in the appellate court pursuant to LSA-C.C.P. art. 2163:
The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record.
If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand that the case be remanded to the trial court for trial of the exception.
The applicable prescriptive period in connection with this aspect of the plaintiffs' claims is three years from the time of making the last payment of medical benefits under LSA-R.S. 23:1209C. Cf. Rapp, supra.[3]
As the instant case involves trials on the merits with a complete transcript we have decided this issue after reviewing the record in connection with each plaintiff individually.
We note as a matter of general application throughout this opinion, that the burden of proof rests on the party pleading prescription. Rivard v. Petroleum Transport Co., 95-0431 p. 6 (La.App. 4 Cir. 9/28/95); 663 So.2d 755, 759.
PRESUMPTION OF WORK-RELATED CAUSATION: HEART AND LUNG DISEASE
LSA-R.S. 33:2581 states in pertinent part:
Any disease or infirmity of the heart or lungs which develops during a period of employment in the classified fire service in the state of Louisiana shall be classified as a disease or infirmity connected with employment... regardless of whether the fireman is on duty at the time he is stricken with the disease or infirmity. Such disease or infirmity shall be presumed, prima facie, to have developed during the employment and shall be presumed, prima facie, to have been caused by or to have resulted from the nature of the work performed whenever same is manifested at any time after the first five years of employment. [Emphasis added.]
In the trial court the City argued strenuously that the hearing officer did not have the authority to extend the presumption of work-related causation created by this statute to those plaintiffs herein claiming worker's compensation benefits based on heart or lung ailments. The City appears to have abandoned that line of argument on appeal. In the event that the City has not abandoned this argument, then we find that there is no merit to the City's argument. Rapp, supra.

MEDICAL RECORDS
Plaintiffs argue in brief concerning the admissibility of certain medical records. The *1036 hearing officer ruled in favor of plaintiffs and admitted those records over the City's objection. The City has not re-urged its objection on appeal. Therefore, this Court will treat the records as properly admitted.

THE MEANING OF COUSINS

The City claims the right to offset the disability benefits plaintiffs receive against their compensation benefits. LSA-R.S. 23:1225C(1)(c).
In Cousins v. City of New Orleans, supra, the Louisiana Supreme Court held that the indemnity benefit set-off to which an employer is entitled under LSA-R.S. 23:1225C(1)(c) is not available when the employee, despite having received the very disability benefits described in that statute, is vested in and could alternatively receive equal payment amounts through a tenure-based retirement benefit plan.
Additionally the City contends that regardless of Cousins the City is still entitled to the right of offset for all claimants who were not eligible for regular retirement at the time of their injuries (those who had less than 20 years of service and those hired on or after January 1, 1968[4] who were not 50 years old with 20 years of service.). The City contends that the following claimants are not entitled to the benefits of Cousins because they did not qualify for regular retirement benefits equal to their disability pensions:
Jack Alexander, Albert Baldwin, Robert Bouterie, Charles Casrill, Donald Conrad, Reno Daret, Lester Dufrechou, Branch Erhardt, Sam Fradella, James Hennigan, Joseph Jevic, Don Lindsey, Warren Martin, Patrick McGittigan Jerry Meyer, Paul Raschke, E.W. Sanders, Louis Serpas, Terry Smith, Burnell Stewart, Charles Wagner, Joseph Williams.

DUPRE MAKES THE EFFECT OF COUSINS RETROACTIVE
The plaintiffs's claims arose before Cousins was decided. The City entreats this Court not to give retroactive effect to Cousins. But this Court has ruled that Cousins is retroactive in its effect. Dupre v. City of New Orleans Through New Orleans Fire Dept., 94-1185 (La.App. 4 Cir. 12/28/94); 648 So.2d 503, 508. We are not persuaded that Dupre should be overruled as to the retroactivity.
The hearing officer ruled that the City's failure to implement the Cousins decision on a retroactive basis was arbitrary and capricious, *1037 warranting an award of attorney's fees and penalties. LSA-R.S. 23:1201.2. At the time the hearing officer rendered the decision and reasons for judgment that are the subject of this appeal, this Court had not yet rendered its decision in Dupre declaring that Cousins should be applied retroactively. Dupre held that the failure of the City to recognize the retroactive nature of Cousins was neither arbitrary nor capricious:
Because a legitimate question existed as to the retroactivity of the Cousins decision, the City was not arbitrary or capricious in waiting for this issue to be resolved before reinstating full worker's compensation payments without offset to these plaintiffs.

Dupre, p. 7, 648 So.2d at 508.
As the City had no definitive notice of the Dupre holding prior to the hearing officer's actions in this case, the City is no more arbitrary nor capricious in this case than it was in Dupre. Rapp, supra.
THE CITY OF NEW ORLEANS BORE ITS BURDEN OF PROOF REGARDING THE AMOUNT OF OFFSET TO WHICH IT WAS ENTITLED
Pursuant to LSA-R.S. 23:1225C(1)(c) the City is entitled to a credit for disability retirement benefits in the proportion funded by the employer, but this does not include retirement benefits based on tenure. Matthews v. City of Alexandria, 619 So.2d 57, 60 (La.1993).
In Matthews v. City of Alexandria, 619 So.2d at 60-61 the Supreme Court dealt with the firemen's pension plan for the city of Alexandria, which was a "pay-as-you-go" plan similar to the old plan in the instant case. The Supreme Court reasoned in Matthews:
The main issue, then, is whether the City proved the proportion in which it contributed to the plan and thereby the amount of the credit to which it was entitled. The court of appeal based its decision on a 10-year average of contributions by the employees and the City ending in 1987, when the plaintiffs retired. The plaintiffs contend that the City failed to carry its burden of proof because the records relied on by the City did not extend to the full period of the plaintiffs' employment and did not disclose the amounts the fund paid out in regular retirement and death benefits, as well as disability retirement.
Clearly, the disability benefits are principally funded by the employer/City. In the ten years prior to plaintiffs' disability, the City paid $4,887,759 in to the pension and relief fund as compared to $1,671,435 paid in by employees. Thus, the City's proportionate part of the funding over this period of time was 74.52%. The percentage of payments into the fund varied from year to year, and there are no records available prior to fiscal year 1978, including the first four years Nugent worked for the City. The records do cover virtually the entire length of Matthews' employment. There is no reason to believe the proportionate contributions during the four years prior to 1978 varied in any substantial degree from the proportionate contributions during the next ten years.
The City has borne its burden of proof that a substantial portion of the disability benefits was funded by it. Taking an average of the proportionate contributions for the prior ten years is a fair and reasonable method of calculating the City's proportion. Plaintiffs' [sic] do not suggest any other method and their argument that no credit should be given because the City's proportion cannot be established with mathematical precision ignores the reality of the situation. An average of the past ten years, taking into account the type of pension plan involved and the availability of the records, fairly reflects the City's proportion of funding of the disability benefits due these plaintiffs.
Finally, plaintiffs urge that since the fund pays out other types of benefits, such as widows and regular retirement benefits, the percentages relied on by the court of appeal are in error. However, even if the City had provided a breakdown of the amounts paid for each type of benefit, the percentages of contributions to the fund would remain the same. [Emphasis added.]
*1038 Mr. Nicolay, secretary/treasurer and a member of the Board of Trustees of the Fire Fighter's pension system, produced figures showing how much the City and the firemen contributed to each plan in the aggregate each year from 1965 through 1992 for the old plan, and from 1968 through 1992 for the "new" plan.[5] As all employees who retired under the old plan are exempt under Cousins from the offset provided by LSA-R.S. 23:1225C(1)(c) we need only concern ourselves with the "new" plan plaintiffs in our analysis of the City's right of offset.
For the years 1968 through 1991 the "new" plan employee contributions aggregated $13,795,367.02 and the City's contributions aggregated $32,232,158.92. In 1992 the City contributed $2,169,453.00 and the employees contributed $930,213.00.
Mr. Nicolay testified that interest earnings in the "new" plan through 1991 aggregated through 1991 amounted to $53,676,182.00. His testimony did not include interest figures for the year 1992. However, following the philosophy of Matthews we feel that the lack of complete figures for the year 1992 is not sufficient basis for denying the City's right of offset in view of the substantial contributions it incontestably made.
The City would have this Court calculate its LSA-R.S. 23:1225C(1)(c) right of offset using only the proportion of City contributions versus those of the employees for the years 1968 through 1992 without factoring in the interest. In City of Natchitoches v. Williams, 94-1411, p. 5 (La.App. 3 Cir. 5/24/95); 657 So.2d 320, 323 the credit due the employer was figured on the ratio of the employer contributions to those of the employee. But in City of Natchitoches the question of interest was apparently not raised by either party and the opinion is silent on that issue. In Matthews, supra, there apparently was no interest as it was a "pay as you go" plan, i.e., there was no accumulated corpus upon which interest could be earned. The Matthews court is likewise silent on the issue.
LSA-R.S. 23:1225C(1)(c) gives the employer a credit "in the proportion [the benefits are] funded by the employer." [Emphasis added.] We find that the use of the term "funded" instead of "contributed" was intentional and not accidental. "Funded" is not a synonym for "contributed", although contributions may be as in Matthews coincidentally coextensive with funding where they constitute the sole source of plan assets used to pay benefits. In the instant case contributions are not the sole source of benefit funds. Interest on those contributions according to the testimony of the City's own expert is a significant source, indeed the most substantial source, of benefit funds in the "new" plan. We hold that the term "funded" in LSA-R.S. 23:1225C(1)(c) includes interest. For the years 1968 through 1991 the funding for the "new" plan consisted of $53,676,182.00 in interest, $13,795,367.02 in employee contributions, and $32,232,158.92 in City contributions. It is reasonable to assume that the interest is earned in the same proportion as the contributions made by the City and the firemen, respectively. Therefore, the interest will not change the proportion, it just increases the amount of dollars to which the proportion is applied. In this case the firemen contributed 29.97% and the City contributed 70.03%.[6] The City is entitled to have its right of offset calculated on this basis.
This Court considered but rejected a formula that would have treated the interest as a separate source of funding, i.e., plan funding including the $53,676,182.00 in interest totalled $99,703.707.94 of which the City's contribution of $32,232,158.92 amounted to only 32.33%. Such a formula would, in effect, treat all interest as having been earned by the employee contributions which would be especially inequitable under the particular facts of this case where the City's contributions were more than twice those of the *1039 firemen. This analysis only reinforces our conclusion that when the legislature used the phrase "funded by the employer" the term "funded" is broader than "contributed" and logically includes the interest earned on the city's contributions.
The hearing officer found that the City had not borne its burden of proving its proportion:
[The City] would be allowed an offset based on what it contributed to each of the claimants' retirement disability plans for the period during which each claimant is not fully vested. But [City]'s witness on this issue, Bernard Nicolay, could not compute the amount of contribution made by [City]. He stated that an actuary would be needed, and no actuary has been procured to provide the contribution numbers. In other words [City] has not met its burden. [Emphasis added]
As the City's aggregate contribution is clear from the record, we assume that when the hearing officer stated in his reasons that Bernard Nicolay could not compute the amount of contribution made by the City the hearing officer must have meant that Nicolay was not capable of determining how much of the City's aggregate contribution was contributed for the account of any specific plaintiff in this case. It was not necessary that the City do so. The pension plan is clearly not a defined contribution plan where a separate account is kept and invested for each fireman who then receives as his retirement whatever has accumulated in his account at the time he retires which can vary according to how much was contributed for his account and how well his account was invested. Instead, both the "old" and the "new" plans are defined benefit plans in which the firemen are promised a pension calculated as a fixed percentage of their pre-retirement compensation based on their years of service regardless of how poorly plan assets are invested. If plan contributions and the earnings thereon are not sufficient to pay the employee his promised retirement the City, must fund the shortfall. The payments to each employee are made from the aggregate of plan assets and are not deducted from any separate account set aside for any particular fireman.
In the "defined benefit" plan, the employer promises to pay the employee, upon the occurrence of certain conditions, stated benefits based upon the length of the employee's service. The contributions of the employer and employee to the fund which secures this promise are based upon actuarial computations, but they are not otherwise related to the particular benefits payable or to the length of any particular employee's service. [Emphasis added.]
Sims v. Sims, 358 So.2d 919, 923 at fn. 5 (La.1978).
Note that the emphasis in the defined benefit plan is on the fact that neither the contributions of the employer nor those of any particular employee are related to the benefits payable to any particular employee. To say that a particular employee was factored into the actuarial computation of the sum contributed to the pension fund is not the same as saying that any particular amount of money was contributed for the "account" of any particular employee. The employee's pension benefit in a defined benefit plan is not the aggregate of contributions made on behalf of an employee plus any earnings, interest, or appreciation thereon accounted for separately for each employee. Such a plan would be a defined contribution plan:
In the "defined contribution" plan, the employer promises to pay the employee, upon the occurrence of certain conditions, stated benefits from a sum compromised of contributions to a trust for the employee's account. The ultimate value of the "pension" or payment to the employee, therefore, is directly related to the total of the sums contributed by the employer and sometimes, by the employee as well. [Emphasis added.]
Id.
As Chief Justice Sanders explained concerning the nature of a defined benefit pension plan in his concurring opinion in T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834, 857 (La.1975):
In the retirement plan, separate employee accounts are not maintained. The employer's contributions are to the total pension *1040 fund, determined by actuarial calculations. No portion of the contribution is allocated to a specific employee. [Emphasis added.]
Mr. Nicolay testified that the City determined how much each of the plaintiffs had contributed to the pension plan and once that amount had been paid out in disability benefits the City then stepped in and offset in full without any proportionality, apparently on the theory that the employee had received full credit for his contribution.
It is true that under this method the employee would be given the full benefit of his contribution, with the added advantage of receiving it on the front end.[7] However, that is not what LSA-R.S. 1225C(1)(c) and Matthews mean by "the proportion funded by the employer." As counsel for plaintiffs so ably pointed out on cross-examination, rather than using "the proportion funded by the employer" in calculating the offset, the City has instead used "the contribution that the firemen didn't make." This makes a big difference in the result because much more money was going into the two plans than just the contributions made by the firemen and the City. Millions of dollars in interest were earned on the combined contributions to the "new" plan over the years. Additionally, Mr. Nicolay testified that from 1965 to 1990, $11,014,122.00 was contributed into the "old plan" from a tax on fire insurance. In effect, the approach taken by the City treats all plan income and contributions from outside sources as though contributed by the City. The statute and the Supreme Court both call for the offset to be calculated based on the proportion contributed by the employer.
The reliance by the hearing officer on Vallery v. State Through Dept. of Health & Hospitals, 605 So.2d 1380 (La.App. 3 Cir. 1992), writ denied, 609 So.2d 225 (La.1992), was misplaced. Vallery was a school employee who took disability retirement through the Louisiana State Retirement System. Vallery received a benefit that was "equivalent to the regular retirement formula without reduction by reason of age." Vallery, 605 So.2d at 1382. The Vallery court held that the benefits, therefore, had both a retirement component and a disability component, making it incumbent on the employer to prove the disability component and the proportion the employer funded.[8] In the instant case, where the employees were not fully vested in the new fund, their disability benefits were not "equivalent to the regular retirement benefit" as in Vallery. It is this equivalency that the Supreme Court directs us to seek:
[W]e construe 1225 C as inapplicable to a disabled employee who is eligible for retirement with the same amount of benefits under both the disability benefit plan and the tenure-based retirement plan, especially when the latter controls the amount of benefits payable.
Cousins, 608 So.2d at 981.
The most important factors to be considered when comparing a disability plan with a retirement plan in order to determine whether the employee's disability pension should be treated as a retirement pension for purposes of the offset are: dollar or economic equivalency of benefits; identity of years of service formulae in computing benefits; identity of source of pension benefit funding, i.e, do the disability and pension benefits come out of the same pool or are they drawn from segregated accounts; and the identity of pension benefits contributions, i.e., whether the contributions to the pension fund made by the employer and the employee are earmarked to distinguish between retirement and disability benefits. See also Rapp, p. 53-58 (La.App. 4 Cir.1996); 681 So.2d at 457-60.
Ultimately the money paid out to the employee, not the money paid in by the employee is to be categorized. City of Natchitoches v. Williams, supra, 657 So.2d at 323. In City of Natchitoches, the Third Circuit found that the burden of proof is the same regardless of whether the plan is actuarially sound and expressly rejected the conflicting *1041 viewpoint that same court had previously expressed in Vallery, Nugent v. Dept. of Health & Human Res., 617 So.2d 1347 (La.App. 3 Cir.1993), writ denied, 624 So.2d 1226 (La.1993), and Spinks v. Dept. of Health & Human Resources, 605 So.2d 1384 (La. App. 3 Cir.1992). In addition to our natural instinctive reluctance to use as precedent a decision that has since been repudiated by the very court that originally rendered it, our own independent analysis of the reasoning in Vallery and similar cases leads us to reach the same conclusion as was reached by the Third Circuit as expressed in City of Natchitoches. Thus it was error for the trial court to determine based upon the authority of Vallery that the City was required to have an actuary explain the nature of its contributions. Once the City showed that the benefits paid out were disability benefits and not tenure based retirement benefits, the City must show only the proportion of its contribution to the fund. A breakdown as to each individual is not required and is not appropriate in a defined benefit plan. The City's witness, Mr. Nicolay, was qualified, competent, and knowledgeable. His testimony and evidence were sufficient to carry the City's burden of proof. The services of an actuary may be necessary to help the City decide how much it needs to contribute to the firemen's defined benefit plan, but once that amount has been determined by the actuary and the contribution made, actuarial testimony as to the amount contributed after the fact is not required. A witness need only be competent to testify as to the amount contributed by the City to the fund and to supply evidence from which the City's proportion of funding may be determined. Mr. Nicolay was qualified to give such testimony and did so.
Plaintiffs rely on Dupre v. City of New Orleans, supra at p. 9, 648 So.2d at 509, wherein this Court held that the burden was on the City to provide a breakdown of its funding for each individual employee, and composite figures representing total funding are insufficient:
However, this exhibit merely shows the total sum contributed by all employees to the fund and the total sum contributed by the City for all members of the fund. No showing was made at trial or in the record as to the City's contribution to each individual fireman's pension plan.
The employer has the burden of proving the amount of credit to which it is entitled under R.S. 23:1225 C(1). [Emphasis added.] Matthews v. City of Alexandria, 619 So.2d 57 (La.1993). The City did not satisfy its burden of proof at the hearing on remand.... The clear wording of that statute [LSA-R.S. 23:1223C(1)(c)] and the jurisprudence establish that the City's burden of proof includes proving the proportion of the disability plan funded by the City for each of these plaintiffs.
Dupre's application of Matthews is incorrect. It is true that the Supreme Court in Matthews placed the burden on the employer to prove the proportionate funding, but Matthews specifically permitted the employer to bear its burden by the use of composite figures in no way broken out as to individual employees, i.e., in Matthews the court specifically upheld proof that showed only the City's overall funding.
Secondly, contrary to Dupre, the "clear wording of the statute" does not say that the employer must provide a breakdown on an employee by employee basis. LSA-R.S. 23:1225C(1)(c) provides for an offset for "[b]enefits under disability benefit plans in the proportion funded by the employer." The statute does not specify how the "proportion funded by the employer" is to be calculated.
Where an actuarially determined defined benefit plan is involved, only overall funding proportions have any meaning. Such plans are funded on an overall basis, i.e., the pool as a whole is funded, not individual accounts for each employee as would be the case in a defined contribution plan. Earnings on employer contributions are not individually allocated in a defined benefit plan. Benefits are paid out of a pool based on a formula unrelated to how much may have been contributed by or on behalf of any individual employee. Employer contributions are intended to meet plan obligations as a whole, not to fund any individual employee's particular benefits. *1042 The fact that the actuary may factor in each employee in making projections of plan funding needs is not the same as saying that a certain amount was contributed for each employee. An actuary tries to project the needs of the group as a whole, which is not the same as the sum of each individual risk. The projections are modified every time a new contribution amount is determined in order to take into account the amount by which actual plan experience varied from the previous projection. Some firemen may retire early, some late, some will be disabled, some will quit, some will be terminated and some new ones will be hired, and some years the plan investments will perform either better or worse than projected. All of these deviations affect pool funding. As even the most skilled actuary does not have a crystal ball such deviations from projections are absolutely certain to occur. But it does not matter how much the experience of any individual fireman deviates from projections. It is only the performance of the pool that counts. The benefits of each individual are funded by the pool, not by funds accumulated, set aside, segregated, or accounted for separately for that individual.
A contrary interpretation would be detrimental to the potentially disabled because plan funding is an ongoing process. If the formula suggested by Dupre is carried to its logical conclusion it would ultimately result in a much higher allocation of plan funding to the disabled (who are not exempt under Cousins) as increasingly greater proportions of employer funding would have to be allocated to cover the disability payout at a time when employer contributions are reduced to zero. In other words, were we to follow through on the reasoning in Dupre the result is ever increasing offsets against the disabled. In essence, Dupre leads to a costly result for the category of disabled persons. We find that the application of the Matthews formula which would require the City to show only its overall funding proportion at the time the pension benefits commence to be the most equitable. Trying to determine individual allocations when dealing with an actuarially determined pooled fund will mean incessant litigation every time another contribution to the fund is made based on each year's new set of actuarially determined calculations which must inevitably result in an ever decreasing proportion of funding allocable to the disabled employee no longer making contributions. We read Matthews as prescribing calculations based on overall pool funding proportions instead of separate individual calculations, and that proportion is fixed when the fireman begins receiving pension benefits. We adopt this method for defined benefit plans and reject the approach previously adopted by this Court in Dupre. Therefore, pursuant to the requirements for overruling previous opinions of this circuit, this opinion has been submitted to all twelve judges of this court and they have voted unanimously to overrule Dupre v. City of New Orleans, 94-1185, p. 9 (La.App. 4 Cir. 12/28/94), 648 So.2d 503, to the extent that it is inconsistent with this opinion.
IT WAS ERROR FOR THE HEARING OFFICER TO CONCLUDE THAT THE RIGHT OF OFFSET IS NOT EFFECTIVE UNTIL THE DATE OF JUDICIAL DEMAND
Citing Cross v. Travelers Ins. Co., 619 So.2d 610 (La.App. 2 Cir.1993) the hearing officer in its reasons for judgment stated, "[The] law ostensibly only allows offset prospectively from the date of judicial demand." In this case that would mean that the City was entitled to an offset only from August 23, 1993, the first date on which the City plead the right of offset.
The hearing officer is half right. Very soon after having decided Cross, the Second Circuit explained that where the employer voluntarily pays benefits without the necessity of resort to the courts, the Cross rule does not apply, and the employer may unilaterally claim the offset without first seeking court authority. Louisiana Ins. Guar. Ass'n v. Cloud, 627 So.2d 758, 760 (La.App. 2 Cir. 1993). See also: Bellard v. South Louisiana Contractors, Inc., 563 So.2d 1319 (La.App. 3 Cir.1990); Duke v. Rapides Sr. Citizens Center, 94-621 (La.App.3.Cir. 12/7/94); 647 So.2d 648; Hebert v. CIGNA, 93-1400 (La.App. 3 Cir. 5/25/94); 637 So.2d 1221.
However, we agree with the hearing officer that the offset may be taken only prospectively. *1043 An employer who has been voluntarily paying full benefits for some period of time may not retroactively assert that right of offset at the point in time when he finally decides to execute that right. In this case it appears that the City used an approach that effectively not only circumvented the requirement that the offset be prospective only, but also violated the rule that to the extent that benefits under disability benefit plans are used in calculating the offset, only "the proportion" of those disability benefits funded by the employer be used in the calculation. LSA-R.S. 23:1225C(1)(c); Matthews v. City of Alexandria, supra, 619 So.2d at 60.

SUPPLEMENTAL EARNINGS BENEFITS ANALYSIS
As amended and effective in July, 1983, LSA-R.S. 23:1221(3) provided for SEB as follows:
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at the time of injury, supplemental earnings benefits equal to seventy-four percent of the difference between ninety percent of the average monthly wages at the time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10). [Emphasis added.]
The law of SEB in this form would apply to the claims of Joseph Jevic, Don Lindsey, Patrick McGittigan, and Joseph Williams, all of whom had claims arising during the period between July, 1983 and January 1, 1986, the effective date of the following amendment:
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at the time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment....
This amendment applies to the claims of the balance of the plaintiffs.
Applicable to all plaintiffs as being in effect continuously throughout the relevant time are the following two subparagraphs of LSA-R.S. 23:1221(3):
(d) The right to supplemental earnings benefits pursuant to this paragraph shall in no event exceed a maximum of 520 weeks, but shall terminate: (iii) when the employee retires [emphasis added] or begins to receive old age insurance benefits under Title 2 of the Social Security Act, whichever comes first; however, the period during which supplemental earnings benefits may be payable shall not be less than 104 weeks.
(f) Any compensable supplemental earnings benefits loss shall be reported by the employee to the insurer or self-insured employer within thirty days after the termination of the week for which such loss is claimed....
In determining eligibility for Supplemental Earnings Benefits, the burden initially is on the plaintiffs to show that they are unable to earn wages equal to ninety percent or more of the wages they earned before they sustained job related injuries. Rapp, supra at p. 6, 681 So.2d at 438. It was error for the hearing officer to place this initial burden on the City in reliance upon Hebert v. Grey Wolf Drilling Co., Inc., 611 So.2d 674, 677 (La.App. 3 Cir.1992). Rapp, supra at p. 5, 681 So.2d at 438. Once the employee's burden is met, the burden of proof then shifts to the employer who must show that the claimant is physically able to perform a certain job and that that job was offered to the employee or that job was *1044 available to the employee in the employer's community or reasonable geographic region. Id., quoting from Herty v. City of New Orleans, 94-1960 p. 5 (La.App. 4 Cir. 4/13/95); 654 So.2d 785, 788.
The City cites Comeaux v. Sam Broussard Trucking, 94-1631 (La.App. 3 Cir.5/31/95); 657 So.2d 449, in support of its contention that the plaintiffs failed to make the initial prima facie showing of entitlement to SEB. This is a fact based question, and the facts in Comeaux reveal that it has little relevance to these consolidated cases:
In the instant case, the hearing officer concluded that claimant was not entitled to supplemental earnings benefits because he had presented no evidence that his work-related injury left him unable to earn ninety percent of his pre-injury wages. In support of this conclusion, the hearing officer noted that claimant admitted that he had earned approximately $4,000 as an investigator for a law firm after his work injury in December of 1991, that employer had made a light-duty position available to claimant which claimant left after a single day on the job, and that claimant had made no attempt to apply for other jobs. [Emphasis added.]
* * * *
This court has previously held that an employee is not entitled to supplemental earnings benefits when an employee has been released by his treating physician to engage in light duty work and has refused his employer's offer of a light-duty position.

Comeaux, p. 9, 10; 657 So.2d at 455.
In the instant case the City introduced no evidence that it had offered any light duty alternatives to any of the plaintiffs.
The City contends that the plaintiffs failed to prove what their average monthly wages were as defined by LSA-R.S. 23:1021(10), citing Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). The hearing officer stated in his reasons for judgment that: "This issue is not important to the great majority of claimants since their wages under any calculation are high enough so that they are entitled to full SEB compensation, even if their earning capacity was deemed to be minimum wage rather than zero." We find no fault with this reasoning. It is not necessary for the employee to establish the precise amount of his compensation where a showing is made that his compensation must have been at least equal to or greater than the amount minimally necessary to qualify that employee for the amount claimed. Although the plaintiffs in the instant case may not have proved to the penny exactly how much their wages were, they did show that at a minimum they were entitled to the maximum benefits based on their wages. This is sufficient. It is not necessary that they prove the exact amount by which they exceeded the minimum necessary to qualify for the maximum benefit as long as they show that they did, indeed, exceed that minimum.[9] The City offered nothing to contradict the testimony of the plaintiffs concerning their wages. There is nothing in the record that tends to cast doubt upon the testimony of the plaintiffs in this regard.

TEMPORARY TOTAL DISABILITY (TTD) BENEFITS
Effective July 1, 1983, LSA-R.S. 23:1221(1) provided for TTD Benefits as follows:
(1) Temporary total. For injury producing temporary total disability of an employee to engage in any self-employment or gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
*1045 Effective January 1, 1989 this provision was amended by adding a second paragraph:
(b) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required.
This paragraph "(b)" applies only to plaintiffs Duncan, Gondrella, Perkins, Schwarkhart, Varnado, Squires, and Wagner. The claims for temporary total disability benefits for all other plaintiffs fall under the law as it existed between 1983 and the end of 1988.
This part of the workers' compensation law was again amended effective January 1, 1990, but that amendment lies outside the time frame relevant to these plaintiffs.[10]
In his reasons for judgment the hearing officer found:
For those who are not employed, defendant has provided no rehabilitation as required under La. R.S. 23:1226. Those claimants are entitled to full supplemental earnings benefits (SEB).
Assuming only for purposes of argument that the City had an obligation to provide rehabilitation to some or all of the claimants, the failure of the City to provide such rehabilitation is not a basis for awarding SEB to those claimants.

ATTORNEY'S FEES AND PENALTIES
The trial court awarded the plaintiffs as a group $204,000 in attorney fees plus 12% penalty for all back compensation benefits due based on findings that the City had acted in an arbitrary and capricious manner and did not evaluate any of the claims in good faith. The City says that this was error, but offers in support of that contention nothing other than the fact that the burden of proof is on the plaintiffs. In his reasons for judgment the hearing officer found that:
Defendant has never formally admitted liability to the claimants under worker's compensation. Therefore, it has the apparent right to dispute each claim, but this still must be done in a reasonable, good faith manner.
The record makes it clear that the City made no serious attempt to investigate any of these claims even though it had knowledge of sufficient facts to put it on notice of the necessity to do so, apparently choosing instead to rely entirely upon its overly optimistic expectation that plaintiffs would be unable to bear their burdens of proof.
An employer cannot choose to remain in deliberate ignorance of facts that would justify a claim by failing to investigate the claim and then rely on that ignorance as justification for a good faith refusal to pay claims.
Sterling v. Orleans Parish School Board, 96-0107 p. 11 (La.App. 4 Cir. 6/26/96); 679 So.2d 167, 174.
Additionally, during the course of the consolidated proceedings after all but nine plaintiffs had testified 46 [11] of the plaintiffs were sent the following letter:
We have been instructed by Milton Osborne, City Attorney, to stop all disability and medical benefits. If you have any questions call your attorney.
Without further explanation benefits were terminated for the following 46 plaintiffs: Barattini, Blondeau, Alexander, Alline, Arnold, Baldwin, Buisson, Casrill, Conrad, Daret, Dillenkofer, Dudenhefer, Dufrechou, Duncan, Ehrardt, Eiermann, Fradella, Francis, *1046 Gallagher, Gondrella, Hennegan, Lawrence, Hughes, Jevic, Ladner, Lassalle, Leblanc, Lindsay Marcade, Marque, Martin, Gittigan, Meyer, Montalbano, Palisi, Perkins, Raschke, Renard, Rodrigue, Sanders, Serpas, Smith, Stewart, Varnado, West, and Williams.[12]
The plaintiffs were given no explanation for the terminations of benefits. When asked to explain the termination of medical benefits the attorney for the City informed the hearing officer that it was done to prevent the blanket paying of medical bills many of which the City felt might turn out to be unwarranted. This explanation is inadequate. This blanket termination of benefits can best be characterized as arbitrary and capricious consistent with the findings of the hearing officer.
Our review of the record indicates that the conduct of the hearings below was extraordinarily onerous from the perspective of the plaintiffs' attorney. Clearly, the hearing officer took this into account when he calculated the award of attorney fees. To the extent that the attorney fees awarded below might arguably exceed what would normally be warranted, we note from the record that the reason that the conduct of the trial was so onerous was that the City made the trial unnecessarily protracted.
The same cannot be said for the conduct of the City on this appeal. The City raised a number of relevant issues on appeal and prevailed on several of them. We, therefore, do not feel that additional attorney fees are warranted in connection with this appeal.
STATEMENT OF FACTS AND ANALYSIS RELEVANT TO EACH PLAINTIFF

1. JACK ALEXANDER
Jack Alexander testified that he was an apparatus operator with the fire department for twenty-one years, a job that he said entailed "quite a bit" of lifting. He was hired on January 29, 1968 and became eligible for retirement under the "new system" on August 3, 1991 when he reached age fifty. He is a high-school graduate, but has no college training. He was in the U.S. Army Reserve until 1969.
Alexander twisted his knee on July 1, 1988 while fighting a fire. He was in good health prior to the accident and had never before sustained an on the job injury. He never went back to work as a fireman.
Alexander sought medical treatment from Dr. Ruel, an orthopedic surgeon. He declined Dr. Ruel's recommendation of knee surgery, fearing that he might experience the same unsatisfactory result as had his wife.
He testified that he had been advised not to return to firefighting because his knee could give way on a ladder, endangering his life and that of others.
Alexander stated that he had been a mechanic prior to becoming a fireman, but his knee would prevent him from returning to that type of work.
The City makes much of the fact that Dr. Ruel's report dated March 19, 1991 shows no instability in Alexander's knee. This is not significant. Dr. Ruel had noted that there was no instability from the outset when he first examined Alexander in 1988 and he found him unable to work. What is significant about Dr. Ruel's report of March 19, 1991 is his stated opinion that Alexander's "condition is unchanged in regard to his left knee," which means that he was still unable to work. The City also argues that Dr. Ruel's report dated February 14, 1991 indicated that Alexander could bowl. What that report actually said was that Alexander "complained of discomfort in the knee aggravated with activities such as bowling." Dr. Ruel concluded that Alexander should remain out of work and that his "condition may even worsen if he develops degeneration of the medial compartment of his joint." Dr. Ruel opined that:
"I do think that he can work at a job that would allow for him to sit and stand at will and avoid carrying objects. Activities such as squatting, climbing and rotatory movements of the leg should also be avoided. I *1047 am sure there are jobs available that could fit his need." [Emphasis added.]
Dr. Ruel's report dated July 19, 1988 stated that Alexander was unable to work until reexamined. Dr. Ruel's report of October 14, 1988 stated that he was not fit for duty. In Dr. Ruel's opinion Alexander had a torn medial meniscus. Because Alexander would not agree to an operation Dr. Ruel reported that he could not allow Alexander to return to firefighting. Dr. Ruel recommended that he take medical retirement. On September 18, 1989 Dr. Ruel reported that:
This patient remains disabled because of a torn medial meniscus in the left knee. He will in all likelihood undergo degeneration of the medial compartment with time.
Based on the foregoing, and the City's failure to introduce any countervailing evidence, we cannot say that the finding of the hearing officer that Alexander was temporarily totally disabled from the time he was injured in July of 1988 until he went on disability pension in January of 1989 was manifestly erroneous.
He started receiving a disability pension in January of 1989, prior to the time he would have been eligible for retirement. He received compensation until June of 1990 at which time his benefits were reduced because the City offset his pension benefits against his compensation benefits. He was receiving 52½% of his salary, i.e., 2½% for each year of employment, and was fully vested in his retirement. Alexander testified that retirement benefits are calculated according to the same formula. His testimony is consistent with the formula set forth in LSA-R.S. 11:3384.
Alexander received the same amount of disability pension he would have received when he retired, but he started receiving it much sooner. Therefore, he not only received approximately twenty months of payments (eighteen months prior to the time the offset went into effect) because of disability in addition to the payments for which he qualified in the form of regular retirement at the time he left the Fire Department. By the mere fact of receiving the money sooner it was a greater benefit.
Alexander's benefits must be distinguished from those of Willie L. Johnson in the companion case of Rapp v. City of New Orleans, supra at pp. 56-57, 681 So.2d at 460. In Rapp the hearing officer found that Johnson's benefits had been adjusted so that they were the actuarial equivalent of what he would have received had he waited until his normal retirement date. No such finding was made in this case and Alexander's own testimony asserts that he received the full 52 1/2% benefit. There is no evidence of any actuarial adjustment having been made. Therefore, his benefit will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has a right of offset against Alexander, but that it has not exercised that right properly. He has continued to receive the reduced benefit of thirty-five dollars and sixty-seven cents instead of the five hundred and twenty-four dollars every two weeks he had originally received prior to the pension offset. Therefore, we find it appropriate to remand this case to the trial court for a calculation of the City's right of offset in accordance with this opinion.
Alexander contends that he earned $33,000.00 the year before he was injured, but he gave no testimony concerning compensation. However, he did testify that he was receiving a pension of $1401/month based on 52½% of his salary. This would indicate compensation of $32,023.00. His documentary evidence consisted only of medical reports, a report of first injury and a New Orleans Rosenbush Claims Services, Inc. Worker's Compensation benefits calculation form dated April 19, 1989. The benefits calculation form shows compensation of $538.75 per week at the time of injury which is $28,015.00 on an annualized basis. 90% of $28,015.00 is $25,213.50. The question then boils down to: Did Alexander make out a prima facie case of entitlement to SEB because of his inability as a result of his on the job injury to earn 90% of his pre-injury compensation?
We find that Alexander's proof that he has only a high-school education and the restrictions on sitting, standing, carrying, squatting, climbing and rotatory movements of the leg *1048 indicated by Dr. Ruel are sufficient to establish a prima facie case that Alexander is unable to earn 90% of $28,015.00 or $25,213.50.
Based on the foregoing, and the failure of the City to introduce any countervailing evidence, we cannot say that the hearing officer's award of maximum temporary total[13] and supplemental earnings benefits in the amount of $263.00 per week was manifestly erroneous.
There is no statement from a doctor that Alexander cannot work in any capacity. There is no reason to believe he cannot do sedentary or light work.
The hearing officer stated at the conclusion of Alexander's testimony:
Now, concerning the lighter duty work, there's a clear standard that once an employee shows he's incapable of earning ninety percent of his pre-injury wage, or has a physical disability that prevents him from going back to his old job and earning ninety percent of his wage, then the burden shifts to the employer to provide rehabilitation, which is usually guided by Louisiana revised statute 23:1226.
The hearing officer noted that the City offered no evidence of any attempt to provide rehabilitation to Alexander. The City's right of offset is not contingent upon an offer of rehabilitation. Plaintiffs do not contend otherwise on appeal.
The hearing officer also noted that the City had introduced no evidence of offset other than Alexander's testimony that his benefits had been reduced. On this appeal it is uncontested that the City did offset the benefits of Alexander and the other plaintiffs.
The city contends that Alexander is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. When LSA-R.S. 23:1221(3)(d)(iii) speaks of retiring it is not referring to the failure to work because of disability. Allen v. City of Shreveport, 93-2928 (La.5/23/94); 637 So.2d 123. It is referring to the worker who has no intention of returning to work regardless of disability. Id. The fact that a worker may receive some form of pension or retirement benefits in connection with his retirement from a job because of disability does not constitute retirement under 23:1221(3)(d)(iii). Id.; Breaux v. Travelers Insurance Co., 526 So.2d 284 (La.App. 3 Cir.1988). Where a worker has retired from a heavy work duty job such as the firefighter plaintiffs in these consolidated cases, but is still willing to take on light duty employment within the scope of the limitations imposed by their disabilities, then that worker is said not to have withdrawn from the work force and is not considered to have retired under the statute. A worker retires under LSA-R.S. 23:1221(3)(d)(iii) when: (1) the worker withdraws from the work force; or (2) the worker draws old age social security benefits, whichever comes first. Allen, supra. This is a question of fact reviewable on appeal under the manifest error standard of review.
At the time of trial Alexander was not on any medications. He has made no attempt to find employment since the time that he was injured. Alexander explained that other than his experience with the Fire Department, the only other jobs for which he considered himself qualified involved lifting which he could no longer do as a result of his disability. On cross-examination when asked if he considered himself retired he responded, "No, I don't consider myself retired other than being disabled." The City offered no other evidence to prove that he had retired. Thus we find the facts concerning Alexander to be closer to those found in Glynn v. The City of New Orleans, 95-1353 (La.App. 4 Cir. 4/3/96); 672 So.2d 1112, where the plaintiff was found not to have retired than to Lytle v. City of New Orleans through the New Orleans Fire Department, 96-0039 (La.App. 4 Cir. 9/11/96); 681 So.2d 12, writ denied, 96-2466 (La.12/13/96); 692 So.2d 372, where this Court found that the plaintiff had withdrawn from the work force. We find that the City has failed to carry its burden of showing that the implicit finding of the hearing officer that Alexander had not *1049 withdrawn from the workforce was manifestly erroneous.
The hearing officer awarded Alexander TTD benefits of $263.00 per week from July 1, 1988 when he was injured and ceased working through January 17, 1989 after which time he went on pension and was awarded SEB. In view of medical reports declaring Alexander unable to work during the period covered by the TTD benefits, and the failure of the City to offer any countervailing evidence we find no manifest error in the hearing officer's award of TTD benefits to Alexander.

2. PAUL JOSEPH ALLINE
Alline worked for the City Fire Department from 1961 when he was discharged from the Navy until May of 1988 when he stepped in a hole and twisted his left knee and injured his back while fighting a fire at a landfill. Therefore, he came in under the "old" plan and no offset of his benefits is permissible under Cousins.
His only other job experience was of a mechanical nature that he testified he was no longer capable of doing as a result of his injury. He was a fire captain when he was injured and was fifty-three at the time of the trial.
He testified that his job required heavy lifting and climbing at times.
He took a disability pension in August of 1988. Alline received compensation until the end of February of 1989 when the City offset. He received a letter telling him that his compensation benefits would be cut off at the end of February, 1989 because of the disability pension offset.
Dr. Guidry was his treating physician.
A report dated August 11, 1988, from Dr. Charles W. Krieger, Jr. stated that Alline's ability to return to light duty work was, "Undetermined at the present time."
Alline testified that at the time of the accident, "I was making somewhere in the forty thousand dollars a year.... We was paid on a twenty-six week basis."
He testified he now earns two hundred dollars a month or less since the accident, but his tax return showed an income from wages, salary and tips of $4,199.00 derived from doing occasional golf cart maintenance. This job allows him the flexibility of working only when he feels able to do so. The only medicine he was taking at the time of the trial was Naprosyn which he said he was taking two to four days a week depending on how much his back was bothering him. He testified that he could not do any repeated bending or lifting of "weight of any consequence." Standing or sitting for long periods was painful.
Alline stated that he is still seeing Dr. Guidry. He is not being billed for Dr. Guidry's medical services so he assumes that the City is paying the bill. The City contends that Alline's claim to medical reimbursement has prescribed, but has offered no evidence in support of that contention. Instead, the City argues that Alline has offered no recent medical bills and that his testimony of ongoing treatment is inadequate. It is the City's contention that if there were more current medical treatment it would have shown up in the discovery from the Rosenbush claims agency. The City failed to call anyone from Rosenbush or any other witness to confirm the fact that there had been no payments within the three year prescriptive period. Moreover, the information furnished by Rosenbush was furnished in 1990. This creates no presumption that Alline did not get reimbursed for medical treatment subsequent to that date. At the time Rosenbush furnished that information Alline's claim had not prescribed. In effect, the City argues that the burden is on Alline to disprove prescription. We disagree. The burden is on the City to prove prescription. The City has failed to do that.
Dr. Guidry wrote that:
Due to the nature of Mr. Alline's work, he has been advised, by me, to avoid any future bending, lifting, climbing, pulling, or pushing.
Alline was referred to Dr. Gordon Nutik by the City who examined him on September 28, 1988. Dr. Nutik agreed with the recommendation that the patient retire from firefighting because of his back. Dr. Ruli wrote *1050 that he concurred with Dr. Guidry's opinion and recommended that Captain Alline be considered totally and permanently disabled from engaging in fire duty. However, Dr. Nutik noted that walking would be a good exercise for Alline. The only inference that may be drawn from Dr. Nutik's report is that regardless of Alline's fire fighting disability he was not totally disabled at the time he saw Dr. Nutik.
Alline did not testify concerning his educational background. However, the answers to interrogatories introduced by the City show that Alline had only a high-school equivalency degree, an Associates Degree in "Fire Tech" from Delgado and a stint in the United States Navy. Alline's "Fire Tech" education at Delgado in 1980 may be presumed to be of little value to Alline now that he is no longer able to work as a fireman, and the City has failed to show otherwise. He established a prima facie case of his inability to find employment within the range of his disability that would enable him to earn at least 90% of his pre-injury income. At this point the burden shifted to the City to show what kinds of jobs he could do. The City failed to offer any countervailing evidence on this issue. Therefore, Alline has established his entitlement to SEB benefits.
Based on the foregoing and the City's failure to offer any countervailing evidence we cannot say that the hearing officer was manifestly erroneous in awarding Alline temporary total disability benefits at the maximum rate of $262.00 per week for the short period of time between when he was injured in May of 1988 until he went on disability pension on August 17, 1988. This is borne out by Dr. Krieger's report of August 11, 1988 stating that Alline's ability to return to light duty work was undetermined at that time. For the same reasons we find no manifest error in the hearing officer's similar award for SEB thereafter.[14] The approximately $4,200.00 in earnings shown on Alline's tax return were not sufficient to alter the SEB award.

3. GERALD A. BARATTINI
Barattini was hired by the Fire Department in 1962 and worked there for twenty-seven years prior to his injury. Therefore, he came under the "old" plan and no offset is permissible under Cousins.
Prior to that time he "sold cars, did a little income tax work which didn't work out, and I worked as an [sic] civilian employee for the Air National Guard for approximately three or four years." He also testified that he sold boats. He twisted his left shoulder moving fire equipment on December 11, 1987. On October 14, 1988, Dr. Ruel recommended that Barattini retire as a fireman because of his shoulder problems. Dr. Ruel opined that at some time in the future an operation on the shoulder might be indicated.
In his November 2, 1992 report Dr. Ruel noted that on October 29, 1991 Barattini had increasing symptoms in his left shoulder and on December 26, 1991 he had "persistent symptoms in the left shoulder." The same complaints were again noted on March 27, 1992 and on June 16, 1992. Dr. Edmund Landry observed in a report dated August 5, 1988 that Barattini had acute tendonitis at the left elbow and "has a chronic tendonitis of the left shoulder following his past injury.... He is unable to work at this time...."
Barattini testified that he could not do a job involving work with his knees and arms. Dr. Landry's reports dated August 21, 1988 and September 27, 1988 make no further mention of elbow problems and none of his reports make any mention of knee problems.
The oldest report in the record from Dr. Ruel is dated October 3, 1988, and describes the results of an examination of September 26, 1988. This report refers to an injury to Barattini's left shoulder and the ensuing problems affecting that shoulder. No mention *1051 is made of the injury's affecting any other part of his body, nor is any mention made of any problems related to any other part of his body whether injury related or otherwise. Reports of examinations by Dr. Ruel on December 12, 1988 and January 30, 1989 note some tenderness of the biceps tendon. Dr. Ruel's most recent report shows that at examinations taking place between October 29, 1991, through June 16, 1992, most "of his complaints were in the biceps tendon groove of the left shoulder...." But Dr. Ruel also noted that: "He was getting ready to go skiing in Colorado."
Barattini testified that he had been making between twenty-eight and thirty thousand as a fireman prior to his retirement. 90% of the low end of that range, the figure that would be most favorable to the City, is $25,200.00.
His benefits were cut off on August 18, 1989 because of offset.
Based on Barattini's undisputed testimony that he had only a high-school education and that he had failed at sales jobs in the past, we conclude that Barattini presented a prima facie case of entitlement to SEB, i.e., it is reasonable to assume that Barattini will not find light duty or sedentary work that would pay him $25,200.00 per year. At this point the burden shifts to the City to show otherwise. In view of the City's failure to offer any countervailing evidence we must find for Barattini on the question of SEB with a basis of zero.
Barattini admitted on cross-examination that Dr. Landry had said that he could return to work as a fireman, but Barattini felt that he could not. We cannot say that the hearing officer was manifestly erroneous in preferring Dr. Ruel's diagnosis of disability and Barattini's testimony to that of Dr. Landry.
Although we cannot say that the hearing officer was manifestly erroneous in concluding that plaintiff could no longer work as a fireman and was entitled to SEB, the record will not support a finding of temporary total disability. Evidence in the record that can withstand a manifest error review on the question of returning to plaintiff's regular job as a fireman is insufficient to create an inference of total disability where the burden to do so is on the plaintiff, even in the absence of countervailing evidence from the City. The plaintiff admitted that he could do work that did not involve heavy manual or physical labor in spite of the fact that he presumably could not earn 90% of his former compensation doing so. The record will not support an inference of total disability for any period of time. Therefore, it was error for the trial court to award Barattini TTD benefits from the date he last worked in December of 1987 until he was placed on disability pension on December 22, 1988. His SEB award of $262.00 per week was in the same amount as his TTD benefits.
He also admitted that he has not looked for any type of work since he injured his shoulder. The city contends that Barratini is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. Barattini testified that although he had had sales jobs in the past, they had never worked out which is why he became a fireman in the first place. He has only a high-school education. The hearing officer apparently found Barattini to be a credible witness. The City called no witnesses to contradict his testimony and evidence. Barattini's testimony persuades us only that he can no longer work as a fireman and that he cannot reasonably expect to find work earning 90% of his former compensation. However, Barattini's failure to seek any kind of employment for several years during which he was not totally disabled compels us to conclude that he withdrew from the workforce. Lytle v. City of New Orleans through the New Orleans Fire Department, 96-CA-0039 (La.App. 4 Cir. 9/11/96); 681 So.2d 12. Therefore, it was error for the hearing officer to award Barattini more than 104 weeks of SEB.

4. MAURICE ROBERT BLONDEAU
Blondeau was hired by the Fire Department under the "old" plan in September of 1961. He worked for the Fire Department for over 20 years until April of 1987. Therefore, under Cousins the City has no right of offset.
*1052 Blondeau twisted his back while removing burglar bars from a burning home in April of 1987. Dr. Ruel's initial report dated May 5, 1987, found "minimal sprain to the low back." Dr. Daniel Seltzer's examination of June 22, 1987, revealed "multiple abnormalities in his MRI scan." After running additional tests, Dr. Seltzer concluded in his report dated January 4, 1988 that Blondeau "would be a poor candidate for return to work which involves heavy lifting and manual activity." Dr. Seltzer also felt that Blondeau would have difficulty returning to work as a firefighter and that retiring would be a good alternative for him. The City argues that Dr. Ruel told Blondeau he could return to work because Blondeau testified to that effect, but none of Dr. Ruel's reports found in the record bear this out. We do note that Dr. Ruel's initial reports noted nothing of great significance, but his report dated November 22, 1987 after reviewing the results of an MRI, implied the possibility of greater problems and recommended that further tests be done. Blondeau retired after twenty-six-and-a-half years with the fire department.
Blondeau was fifty-nine at the time of trial. He testified that the City had never refused to pay any of his medical bills. He said that he had paid many of them himself in order to avoid the paper work of claims forms, not because the City refused to pay.
Blondeau testified that he last saw Seltzer in February of the year of trial. The City argued that his claim for medical reimbursement had prescribed, but failed to cross-examine him on this issue when it had the opportunity to do so. We find that the City has failed to carry its burden of proof in regard to this exception of prescription for the same reasons assigned in connection with Alline.
Blondeau testified that he has fished all of his life and now runs a family fishing boat. He said that he made a net profit in 1992 of $12,000.00 from fishing. He testified that the physical demands of his fishing activities were minimal:
I do some fishing but I got them boys to help with me anything heavy. All I do is run the boat.
Dr. Seltzer's reports through the end of 1987 classify Blondeau as having a "no work" status. The hearing officer awarded Blondeau TTD benefits at the maximum rate of $261.00 from the date he last worked when he was injured in April of 1987 until he was placed on disability pension on December 27, 1987, and SEB thereafter at the same rate. Blondeau testified that for some time prior to his injury, in addition to being a fireman he was also a commercial fisherman. He further testified that within a month of his injury he was back at work as a commercial fisherman, although perhaps on a more limited scale as a result of his injury. Therefore, the hearing officer's award of TTD benefits to Blondeau was manifestly erroneous.
The form filled out by New Orleans Rosenbush Claims Service, Inc. shows that Blondeau's average weekly compensation rate was $525.90, or approximately $27250.00 annually. Blondeau testified that the figure should be closer to $30,000.00 but he was unable to be any more specific. Blondeau's contention in brief that he was earning over $35,000.00 per year is not supported by his own testimony. The hearing officer made no specific finding on this issue. Assuming the figure most favorable to the City which can be supported by the record of $27,250.00, the burden was on Blondeau to establish that he could not find a job within the limitations of his disability that would pay him at least 90% of $27,250.00 or $24,525.00.
Blondeau's 1988 tax return shows earnings of $25,138.00 from an unnamed employer, $2,500.00 from the Flamingo Hilton, and $6,170 which, although it is not specifically designated as such on the tax return, was acknowledged by Blondeau's attorney at trial as attributable to the fishing business. As Blondeau's 1988 tax return shows earnings which in the aggregate exceed what he had been earning as a fireman, we are forced to find that he failed to carry his burden of proving for the year 1988 that he was unable to earn at least 90% of his pre-injury earnings which is a prerequisite for entitlement to SEB.
Blondeau's 1989 tax return shows earnings of only $10,043.00 which were acknowledged *1053 to be attributable to his fishing business. Similarly his 1990 return shows earnings of $9,906.00, and his 1991 return shows earnings of $12,303.00. The record indicates that he had earnings of $8,453.00 for 1992.
Mr. Blondeau did not testify as to his educational background or other job experience; however, the answers to interrogatories introduced by the City show that he had only a high-school education and had served in the Marine Corps. By showing that he had only a high-school education and no special job skills Blondeau established a prima facie case that he could not find light duty employment within the range of his disability that would pay him at least $24,525.00, which is 90% of his pre-injury earnings, for the years following 1988.[15]
The only question is whether his earnings in 1989, 1990, 1991, or 1992 were sufficient to deprive him of the right to receive SEB at the maximum rate for those years as was awarded by the hearing officer. For the year 1989 SEB would be calculated on the difference between $24,525.00 and his actual earnings of $10,043.00 or $14,482.00. For the year 1990 SEB would be calculated on the difference between $24,525.00 and his actual earnings of $9,906.00 or $14,619.00. For the year 1991 Seb would be calculated on the difference between $24,525.00 and his actual earnings of $12,303.00 or $12,222.00. For the year 1992 SEB would be calculated on the difference between $24,525.00 and his actual earnings of $8,453.00 or $16,702.
Based on 66.67%[16] of these figures the maximum to which Blondeau would be entitled would be: In 1988, $-0-; in 1989, $9,655.14; in 1990, $9,746.49; in 1991, $8148.00; and in 1992, $11,135.22. The hearing officer's award of $261.00 per week on an annualized basis equals $13,572. To the extent that the hearing officer's award exceeds the figures determined by this Court to be the maximum SEB amounts permissible, those awards are reduced accordingly.

5. ROBERT BUISSON
Buisson injured his back while changing a tire on a fire truck on February 2, 1987. He retired on May 17, 1987 after having worked for the Fire Department for over twenty-three years. He was originally hired on December 14, 1963 under the "old" plan. Therefore, under Cousins the City has no right of offset.
On May 18, 1989, Dr. Gordon Nutik reported that:
I did not feel that this patient was capable of working in his job as a fireman and I felt that he would be restricted from any moderate to heavy lifting, climbing or excessive stooping.
Subsequent reports by Dr. Nutik noted no material improvement in Buisson's condition.
The record contains copies of reports from Dr. Edmund Landry indicating that he examined Buisson several times throughout 1987 and again on December 1, 1988. On all such occasions Dr. Landry noted that Buisson was unable to return to work as a firefighter because of his back injury. He expressed no opinion about what other kinds of work Mr. Buisson might be physically able to do.
The record also contains reports of Dr. Thomas H. Grimstad showing "mild airways obstruction without obvious response to bronchodilators." There is nothing in Dr. Grimstad's reports that would suggest that these pulmonary symptoms were serious enough to be disabling. The City stated that it was paying medical bills for Buisson in connection with the lung condition. However, Buisson testified that:
Well, [Dr. Grimstead] never came out and said I couldn't work, but I never did ask him. But he knows thatHe says he can see in the X-rays that I have emphysema and I shouldn't work, I don't think.
Prior to becoming a firefighter, Mr. Buisson did welding and plumbing work but he *1054 maintains that he hasn't looked for work for fear of hurting his back. His education did not go beyond the second year of high-school and the only training he had was in "heavy work." He testified that he was one of the few firemen who had never even had any formal fire training.
The City offset his pension in April or May of 1988, reducing his compensation to $32.14 every two weeks. Buisson estimated that he was earning $500.00 per week prior to the time that he was injured. Buisson was fifty-nine years old at the time of trial.
The hearing officer apparently believed Buisson's testimony concerning his inability to work. Although this is a close case, we find that the medical records were sufficient to establish a prima facie case of Buisson's disability as a fireman, and his own testimony, lack of education and training in the absence of any countervailing evidence from the City was sufficient to establish a prima facie case of his inability to find other employment paying at least 90% of his pre-injury income. Once the burden of proof shifted to the City and the City failed to produce any evidence of any jobs paying any amount, much less 90%, of Buisson's pre-injury income, Buisson is entitled to have his SEB calculated on a basis of zero. His compensation clearly exceeded the amount minimally necessary to entitle him the maximum level of benefits.
The hearing officer awarded him TTD at the maximum rate of $261.00 per week from the time he was injured in February of 1987 through the time he was placed on disability pension on May 17, 1987. Thereafter, the hearing officer awarded him SEB in the same amount. The City has failed to show that the hearing officer's finding of temporary total disability for the period of approximately two and one-half months from the date of injury on February 2, 1987 through May 17, 1987 was manifestly erroneous.

6. WILLIAM F. DILLENKOFFER
Dillenkoffer worked for the Fire Department from July of 1957 until he was disabled in September of 1987. He took a pension in late December of 1987. He worked thirty-and-a-half years as a fireman. Dillenkoffer testified that the City was paying for both his prescriptions and medical treatment. He said that his compensation was approximately sixty-four thousand dollars as a fireman. He testified that his benefits would have been the same whether based on retirement or disability. Under Cousins the City would not be entitled to an offset.
On June 15, 1987, Dr. Charles B. Moore wrote a report stating that:
According to the tests that were performed, I would have to say that we have no significant evidence to suggest that Mr. Dillenkoffer is at risk from his heart as far as working.
I would think that it is reasonable for him to continue with his normal job requirements, but I would caution him to be cautious about his carbohydrate and fat intake. I would also suggest that he probably needs more exercise as well.
A report by Dr. Jack P. Ruli dated January 12, 1987, describing the results of an examination performed on October 6, 1987 noted premature heart beats which needed investigation. Dr. Ruli advised Dillenkoffer to give up smoking and to reduce the fat content of his diet. Dr. Ruli suggested the possibility of an underlying cardiac problem which could lead to serious arrhythmias when subjected to the stresses of fire duty in his report dated June 9, 1987.
In his last reports dated June 29, 1993 and August 2, 1993, Dr. Ruli no longer noted any irregular heart beats. The most persistent concern expressed by Dr. Ruli over the years was for Dillenkoffer's cholesterol levels, but he never suggested that any type of disability was implied as a result.
Dillenkoffer worked in a hardware store from the age of seventeen until he was twenty-one. He was in the armed services off and on from 1958-1961. He testified that his job was supervisory in nature and did not require heavy lifting, but might require climbing many steps.
Dillenkoffer started having chest pains and bronchitis in 1986. Dr. Ruel laid him off work temporarily, but he went back to work in January of 1987. Tests done later in 1987 *1055 at Ochsner revealed blockage in the heart. Dillenkoffer retired from the Fire Department in December of 1987. The record contains the following testimony by Dillenkoffer:
Q.... Did Dr. Ruel say you could go back to any type of work at all, or he said no work?
A. He said fire duty.
Q. Okay. Have you gone back to work at all since that time?
A. No, I haven't.
The city contends that Dillenkoffer is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. Dillenkoffer testified that he has not looked for any type of employment since retiring and has not been told that he is totally disabled. He did not explain why he had never sought other employment after leaving the Fire Department. The City introduced a copy of his tax return, but unlike the tax return referred to in Lytle, supra, Dillenkoffer's tax return does not show that he has retired. He did not testify that he considered himself to be retired. On the other hand, in responses to interrogatories from the City he stated that: "Since my retirement, I have not sought or intended to seek employment." We find that when Dillenkoffer retired from the Fire Department he withdrew from the work force.
Moreover, in view of his failure to present any evidence concerning his educational background and his failure to establish that he was disabled from nonfire fighting types of employment we find that he has failed to establish a prima facie case of inability to find employment providing at least 90% of his pre-injury income in order to qualify for SEB benefits.
Nor is there anything in the record to establish that there was any period of time during which Dillenkoffer qualified for TTD status. Therefore, we must reverse the awards of SEB and TTD benefits to Dillenkoffer.

7. ROBERT H. DUDENHEFER
Dudenhefer worked for the Fire Department for thirty years under the "old" plan. Therefore, under Cousins the City has no right of offset.
Dudenhefer also injured his back in April of 1987 which Dr. Seltzer considered as disabling him from employment as a fireman. Dudenhefer experienced shortness of breath in May of 1987 and took a disability pension in December of 1987. Dudenhefer testified that no doctor said that he cannot return to some work. He does some work on a family farm that he said involved no heavy lifting and was done just for tax purposes. At the time of his retirement he was making twenty-four hundred dollars per month which is more than enough to qualify him for the maximum TTD benefits and SEB benefits of $261.00 per week awarded him by the hearing officer, assuming he met the other criteria for qualification.
In a report dated June 23, 1987 Dr. Bruce Iteld stated that Mr. Dudenhofer had "no significant coronary artery disease" and that "the chest pain syndrome was not life-threatening, nevertheless, it may at times be disabling and debilitating as well as annoying." Dr. Iteld recommended early retirement and other less stressful employment. He concluded that Dudenhefer was "not at risk for sudden death from cardiac causes but nevertheless over a prolonged period of time chest discomfort syndrome may psychologically alter the patient's condition in view of the debilitating nature of the symptoms."
The record contains a radiologist's report from Dr. H. Denny Taylor to Dr. Daniel Seltzer, but it expresses no opinion as to whether any of the images of Dudenhefer's back revealed anything of a disabling nature.
Dr. Seltzer's reports showed that Dudenhefer sustained lumbar strain while pulling a fire hose. He reported that Dudenhfer's CT and MRI scans showed multi-level discogenic disease in the lumbar and cervical spine. On December 21, 1987, Dr. Seltzer reported that Dudenhefer was "not a candidate for return to work as a fire fighter."
Dudenhefer testified that he is still seeing Dr. Seltzer. The City contends that his claim for medical benefits has prescribed because he offered no recent medical records. We find that the City failed to carry its *1056 burden in regard to this exception of prescription for the same reasons assigned in connection with Alline.
After finishing high school, Dudenhefer attended 3 years of college, but did not graduate. In view of his lack of education and the nature of his disability, he has succeeded in establishing a prima facie case that he is unable to find employment earning at least 90% of his pre-injury income. At this point the burden shifts to the City to show the existence of jobs within the range of Dudenhefer's disability. The City offered no evidence in this regard. Therefore, the record supports Dudenhefer's claim to SEB calculated on a basis of zero.
The hearing officer awarded Dudenhefer TTD benefits of $261.00 per week for the period commencing with his injury in April of 1987 until he went on pension on December 28, 1987. SEB was awarded at the same rate picking up where the TTD benefits stopped.
Dr. Seltzer's reports on Dudenhefer list three categories of work capability: "Regular Duty"; "Light Duty"; and "No Work." His reports through January 7, 1988 all place Dudenhefer in the "No Work" category.[17] The City introduced no countervailing evidence. Therefore, we find no manifest error in the hearing officer's award of TTD benefits.
The city contends that Dudenhefer is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. The City did not produce any documents showing that Dudenhefer had retired. Dudenhefer testified that he does some farming. The burden is on the City to show that the hearing officer was manifestly erroneous in his implicit finding that Dudenhefer had not withdrawn from the workforce. The City failed to carry this burden.

8. JOHN F. DUNCAN
Duncan started work with the Fire Department on September 15, 1964 under the "old" plan, and was a Captain at the time he hurt his shoulder fighting a fire in December of 1989. He was fifty years old at the time. Therefore, under Cousins the City has no right of offset.
Duncan testified that his job sometimes required heavy lifting. He said that he thought that the City was paying his medical expenses. Prior to becoming a fireman he sold dental supplies. He also had an electrical contracting business on the side while he was a fireman. On occasion he was an expert witness and an investigator in fire related lawsuits. He continues to do this on an infrequent basis.
He made approximately thirty-eight thousand dollars as a fireman in the last year he worked in that capacity. His workers' compensation benefits ceased after seven or eight months after he took his pension. He has earned only nominal amounts since his retirement, including several hundred dollars in real estate transactions as well as occasional opportunities to testify as an expert. He said that he could not return to work because he could not do heavy lifting. He did not mention any other limitations. No doctor has told him that he is totally disabled.
In a report dated May 22, 1990, Dr. Ruel opined that Duncan had acromial impingement syndrome and recommended that he retire from the fire department. In a report dated November 26, 1991, Dr. Ruel noted:
I had a rehab conference on him on September 30, 1991 and essentially the discussion involved the patient's ability to do light work with no overhead lifting or repetitive use of his left arm.
The record contains a rehabilitation form signed by Dr. Ruel showing that Duncan could sit for six hours a day intermittently, stand for four hours a day intermittently, drive for two hours a day intermittently and *1057 walk without any limitations. He could occasionally lift 50 pounds from the ground, 40 pounds from knee height and 40 pounds from overhead. He could bend and squat frequently, and he could kneel, climb, twist, balance, and push/pull occasionally.
Dr. Nutik felt that Duncan had an element of subacromial impingement about the left shoulder. He could not predict how long it would take to resolve. He noted that Duncan was asymptomatic about the left knee and felt that this was consistent with a resolved strain about the left knee.
The report of radiologist Dr. Robert C. Baird, III showed no abnormalities.
Duncan gave no testimony or other evidence concerning his educational background. The record showed experience in a number of fields involving light duty work. The only conclusion that can be drawn from the record is that he is capable of light duty work. Without knowing his educational background it is impossible to know for what type of jobs he might qualify. Duncan failed to make a prima facie showing of his inability to find employment within the range of his disability that would pay him at least 90% of his pre-injury compensation. He, therefore, is not entitled to SEB benefits.
Dr. Ruel's reports through the date that Duncan was placed on disability pension indicate that he advised Duncan not to work. Therefore, in the absence of any countervailing evidence from the City we find that Duncan has made a sufficient showing of entitlement to TTD benefits. Consequently, we sustain the hearing officer's award of TTD benefits to Duncan.

9. EDWARD EIERMANN
Eiermann injured his back in October of 1988 while pulling a fire hose. He worked for the Fire Department for twenty-four years. He was hired on December 6, 1964 under the "old" plan. Therefore, under Cousins the City has no right of offset.
He was forty-eight at the time of the trial. He testified that his medical expenses had been paid.
He started taking his disability pension of $1,833.00 in February of 1989.
Prior to becoming a fireman he was a tack welder at Avondale and had a high-school education.
Dr. Ruli's report of February 6, 1989 found Eiermann to be permanently and totally disabled from being a fireman. Dr. Ruli's report noted Dr. Jackson's recommendation that Eiermann avoid any heavy lifting and bending because it may aggravate his weakened lumbar spine. However, Dr. Jackson's report of January 1, 1989 states that Eiermann should consider getting back into some type of activity that would not put a strain on his back. This is a clear indication that Dr. Jackson did not feel that Eiermann was totally disabled. Dr. R.T. Ribando's report of January 11, 1989 was similar to that of Dr. Jackson.
Eiermann testified that he continues to see Dr. Ribando, but that he has not seen him "since last year." The City claims that Eiermann's claim for medical benefits has prescribed. For the same reasons assigned in connection with Alline we find that the City has failed to carry its burden in regard to this exception of prescription.
Eiermann failed to introduce any evidence of his educational background. As it is clear from his own medical evidence that he is not totally disabled, he has failed to establish a prima facie case that he is unable to find employment that would pay him at least 90% of his pre-injury income. Therefore, we must reverse the hearing officer's award of SEB.
All of the medical evidence suggests that Eiermann is capable of employment that does not put undue strain on his back. There is nothing in the record to show that this was not the case for any period of time. Therefore, we find the award of TTD benefits by the hearing officer to Eiermann is not supported by the record. Accordingly, we reverse that award.

10. ED GALLAGHER
Gallagher worked for the Fire Department for twenty-one years, commencing in June of 1967, but he was given credit for previous *1058 employment with the City from 1966. He was hired under the "old" plan. Therefore, under Cousins the City has no right of offset.
Gallagher was born on August 31, 1943. He had to lift heavy loads as part of his job. He pulled his back on a fire truck in July of 1988. He made thirty-six thousand dollars the year prior to his injury. The City has been paying his medical expenses. Gallagher was fifty years old at the time of trial.
Gallagher testified that he could no longer work as a fireman. He also said that in his mind he could not work in any other capacity. He testified that he applied to be "fire prevention or state fire marshall" but was never hired. He has made no other attempts to find employment. He said that his back bothered him every two or three weeks, but sometimes did not bother him in the intervals.
In several reports rendered in 1988, Dr. Russell Levy recommended that Gallagher give up firefighting because of his heart and back injuries. In his report on his examination of Gallagher on August 10, 1988, Dr. Levy stated that he had asked Gallagher to seriously consider going into some type of retirement and look for a lighter type job.
In a report date stamped "Dec 20 1989", Dr. Levy stated:
This chronic back pain is continuing to give him problems off & on and I think it will for the rest of his life. Certainly he is disabled from ever going back to work as a fireman with this. This combined with his heart condition will probably prevent his going back to gainful employment.
In a report dated August 31, 1992 Dr. Levy stated:
The patient is certainly disabled from ever returning to work as a captain in the New Orleans Fire Department. Sedentary work at times is certainly within his capability. However frequent absenteeism may be a problem with the long term nature and intermittent flare ups of this lumbar spine injury.
In a report dated September 15, 1988, Dr. Gordon Nutik recommended that Gallagher take early retirement and consider retraining for lighter work.
In a report dated October 6, 1988, Dr. Jack Ruli opined that Gallagher was permanently and totally disabled from engaging in fire duty. In a report dated January 29, 1990, Dr. Ruli said that he considered Gallagher to be "totally and permanently disabled from engaging in gainful employment." (Emphasis added.)
There is no evidence in the record concerning Gallagher's educational and training background. However, the medical reports are sufficient to establish disability and to shift the burden to the Fire Department to show that he is capable of working at a job that would pay at least 90% of his pre-injury compensation. The City produced no countervailing evidence. Therefore, we find that Gallagher has succeeded in establishing his entitlement to SEB.
The hearing officer awarded Gallagher TTD benefits in that same amount as the SEB ($262.00 per week) for the period from the date of his injury in July of 1988 through the date he was placed on disability on August 2, 1988. The aforementioned medical evidence supports this finding.

11. FRANCIS PAUL LASALLE
Mr. Lasalle commenced work for the Fire Department on January 22, 1963 under the "old" plan. He sustained a number of on the job injuries that resulted in his eventual retirement from his job as a fire captain on a pump. Lasalle was fifty-three at the time of the trial. His final injury occurred on December 25, 1987, when he "wrenched the knee sideways and it popped again." He never went back to work after that. Therefore, under Cousins the City has no right of offset against his compensation.
He earned forty thousand dollars in the year prior to his retirement. His compensation was cut off on March 1, 1989.
Lasalle has had no surgery since his last accident and the City has been paying for his medical expenses. He testified that he could no longer do fire fighting work because of the hundred and ten pounds of equipment the job required him to carry. He also testified *1059 that: "Steps really do me in, I can't climb steps." He also testified that he was "on a disability pension with lung disease and knees." He attributed the lung problems to "scar tissue from fires and stuff."
A report from Medical & Vocational Rehabilitational Consultants, Inc. notes that Lasalle has a high-school diploma, military experience in the Army Reserve, and holds a valid Louisiana chauffeur's license.
Dr. Victor Chisesi's report of March 24, 1988 stated that he felt that Lasalle could perform a more sedentary job and also do some lifting. Dr. Chisesi stated that Lasalle had 12 to 14 injuries to his knees as a result of firefighting.
Dr. Jack Ruli's report of April 1, 1988 stated that Lasalle should be considered totally and permanently disabled from engaging in fire duty. Dr. Henry Philibert's report of May 4, 1988 noted that Lasalle had a chronic lung infiltrate in the right chest cage in particular.
Lasalle testified that he continues to see Dr. Chisesi and has seen him as recently as August 15, 1993. The City contends that Lasalle's claim for medical benefits has prescribed. For the same reasons assigned in connection with Alline we find that the City has failed to carry its burden regarding this exception of prescription.
It is reasonable to conclude that with only a high-school education and the ability to do only light duty work Lasalle is unable to find employment earning at least 90% of his pre-injury compensation pay. Therefore, we find that Lasalle was successful in presenting a prima facie case of entitlement to SEB. As the City failed to offer any countervailing evidence of any kind of employment at any level of compensation, Lasalle is entitled to have his SEB calculated on a basis of zero.
The hearing officer awarded Lasalle TTD benefits in the sum of $262.00 per week for the period from his date of injury on December 25, 1987 until the date he was placed on disability pension on May 24, 1988. The hearing officer awarded SEB to Lasalle for the period commencing with the expiration of the TTD benefits. We find that the record supports the award of TTD benefits only through March 24, 1988 when Dr. Chisesi found Lasalle capable of sedentary employment. Therefore, we amend the judgment of the hearing officer to provide for TTD benefits only through March 24, 1988 with SEB benefits to commence from that date.

12. GEORGE FRANCIS
Francis originally filed separate claims for heart and low back injuries. The claims were consolidated. Francis testified that he had injured his back on several occasions. The back injury which is subject to this suit occurred on the job in July of 1988. The heart condition was claimed in August of 1988. At that time he had been working as a fireman for twenty-six years under the "old" plan. He was fifty-five at the time of trial. Therefore, under Cousins the City would have no right of offset.
The City does not contest Dr. Brian Nacarri's report of February 23, 1990 declaring Francis to be permanently and totally disabled as a result of his heart condition. The medical records support the awards of both SEB and TTD benefits.
Francis testified that he saw Dr. Nacarri as recently as three months prior to trial. The City contends that Francis' claim for medical benefits has prescribed. For the same reasons assigned in connection with Alline we find that the City has failed to carry its burden regarding this exception of prescription.
Francis earned forty-eight thousand dollars the year before he retired.
The city contends that Francis is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. As evidence of this the City points to the fact that Francis shows himself as retired on his tax returns.[18] However, *1060 in the context of the record as whole we find that he has "retired" only from the Fire Department, and that only because of his disability. Unlike the fireman in Lytle, Francis did not testify that he has made no attempt to find other employment. Moreover, the inference to be drawn from the record is that any failure to seek other employment can be attributed to the severity of his disability. Inability to work because of the work related injury is not what is meant by "retirement" in LSA-R.S. 23:1221(3)(d)(iii).

13. PETER GONDRELLA, JR.
Gondrella was hired by the fire department on June 29, 1967 under the "old" plan, and last worked on May 24, 1989. Therefore, under Cousins the City has no right of offset. Gondrella was born on July 8, 1941.
He fell off a ladder at a fire in May of 1989, dislocated his hip, hurt his back and sustained some nerve damage which he described as a "dead spot in my leg." He made either forty-one or forty-two thousand dollars during the year leading up to the injury.
Gondrella testified that he can see an orthopedist, but he cannot see his chiropractor "until it's okayed by workman's comp, and they can't okay it because the files are tied up in this court." Gondrella further testified that:
"I can't stand or sit for long periods; I can't stoop without having something to hold on to pull myself up. I can't lift anything heavy.... I don't have the range of motion to bend over."
Gondrella notes on his tax return that he is retired.
Gondrella testified that he tried to find other work within the scope of his physical limitations. He was under medical care at the time of the trial which caused prospective employers to reject him. He testified that the only thing that he is trained for is physical labor. He testified that he has not looked for employment in the fast food industry because he can neither stand nor sit for long periods of time. The City introduced no evidence to contradict Gondrella's testimony on the question of his employability, nor does the City challenge his medical condition.
Based on Gondrella's testimony that he has tried unsuccessfully to find other employment within the scope of his disability and that he is trained only to do physical labor, we find that he has made a prima facie showing that he is unable to find employment earning at least 90% of his pre-injury compensation. He established his right to SEB. As the City failed to put on any countervailing evidence showing the availability of employment at any level of compensation, Gondrella is entitled to have his SEB calculated on a basis of zero.
The hearing officer awarded him TTD benefits of $267.00 per week from May 24, 1989, when he last worked until he was placed on disability pension on October 16, 1989 and from October 17, 1989 he was awarded SEB at the same rate. The medical evidence contained in Dr. Winters's reports shows no material improvement in Gondrella's condition during the period for which he was awarded TTD benefits. After reviewing the record we cannot say that the hearing officer was manifestly erroneous in making the award of TTD benefits. The City introduced no countervailing evidence.

14. JAMES HENNEGAN[19]
Hennegan was fifty-one years old at the time of the trial. He was hired on August 14, 1968 under the "new" plan. As a chief he directed other firemen, but he did not fight fires himself and the only equipment he had to carry was a radio and a hand light. He added that there were times when he had to carry a tank. Climbing, stooping and bending were all part of his job. On September 2, 1988 as he was responding to a fire alarm he experienced chest pains. He went to the Mercy Hospital intensive care unit and ceased work for the Fire Department.
*1061 Hennegan was born on June 18, 1942. He was not yet fifty years old and, therefore, he was not eligible for retirement at the time he started receiving his Fire Department pension on March 17, 1989. Therefore, his benefits will not be considered a retirement pension exempt from the right of offset under Cousins. We find that the City has the right of offset against Hennegan, but that it has not employed the proper methodology in the exercised of that right. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Hennegan testified that he is restricted from climbing because of his heart condition and he had to discontinue the part time construction work he had been doing for the fire department.
In his last year of working for the Fire Department he made thirty-eight thousand dollars.
Hennegan started college in 1989 and said at the trial that he was attending Delgado full time taking respiratory therapy. Immediately after leaving the fire department he got certificates from Jefferson Vo-Tech School in commercial electricity and programmable motor controllers, but his inability to climb ladders or tolerate physical labor of the type required in those fields has prevented him from pursuing employment in those fields. Since leaving the fire department he has experienced angina pains on several occasions and he has had fluid build up in his ankles causing them to "swell up to the size of golf balls." The swelling was attributed to his heart condition. He stated that the City has continued to pay for his medical expenses.
At the time he took disability retirement he was not qualified for regular retirement. He testified that he has returned to school in order to go into some other line of work. Hennegan also testified that neither of his doctors told him that he was permanently and totally disabled from all types of work.
At the time of his accident he was not eligible for regular retirement, but he became eligible subsequently. He testified that he had been with the department for twenty years at the time of the accident. The City produced no evidence to the contrary. Dr. Jack Ruli's report of September 12, 1990 opined that Hennegan was totally and permanently disabled from fire duty, but that he could do sedentary or clerical work. No one disputes that opinion.
Hennegan testified that Dr. Ruli continues to treat him. The City contends that Hennegan's claim for medical benefits has prescribed. We find that the City has failed to carry its burden of proving this exception of prescription for the same reasons assigned in connection with Alline.
Considering Hennegan's unsuccessful efforts to acquire skills in other areas of employment compatible with his disability, which efforts he continues to pursue through his education, the fact that he can no longer do heavy work, and his lack of a college diploma, we find that Hennegan has successfully made a prima facie case of his inability to find employment earning at least 90% of his pre-injury income. The City has offered no countervailing evidence of potential employment at any compensation level, much less at 90% of his pre-injury compensation level. Therefore, Hennegan has proven his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week for the period from the date he last worked until the time he was placed on disability pension on March 17, 1989. The medical evidence supports this finding.
The city contends that Hennegan is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. The City noted that he listed himself as retired on his tax return. In the context of the record as a whole it is reasonable to conclude as the hearing officer must have done that Hennegan's tax return meant only that he considered himself retired from the Fire Department because of his disability. At the time of trial Hennegan testified that he was studying respiratory therapy at Delgado. The following exchange took place when Hennegan was cross-examined on this issue:

*1062 Q. But you're not permanently and totally disabled from doing other kind [sic] of work, huh?
A. That's why I'm going back to school, so I can go back to doing employment and becoming productive again.
Hennegan's testimony that he was exerting a good faith effort to get back into the workforce is uncontradicted. We, therefore, find no manifest error in the hearing officer's implicit finding that Heenegan had not withdrawn from the workforce.

15. LAWRENCE HENDRICKSON
Hendrickson went to work with the Fire Department in August of 1967 under the "old" plan where he worked for twenty-one years before his last day of work on December 24, 1988. Therefore, under Cousins the City has no right of offset.
He has a high-school education and an "associate in fire technology." He was born on December 22, 1939. Hendrickson was injured in December of 1987[20] when he fell off a fire ladder, spraining his back and shattering both of his wrists.
Hendrickson testified that he has continued to see Dr. Ruel since the accident, most recently in June or July immediately preceding the accident. Hendrickson was making forty-two thousand dollars at the time of his injury. At the time of trial he was doing part time work for Proctor and Gamble earning approximately $180 per week. He makes sure that their products are straight on the Schwegmann grocery shelves and that the tags are up. Dealing with the shelf stock requires only very light lifting, in the two to three pound range. He has no lateral movement in his right wrist and required an operation on his left wrist at the time of trial. The City was continuing to pay for his treatment.
In the report of his March 21, 1991 examination of Hendrickson, Dr. Ruel stated that: "He remains disabled as a fireman." In the most recent report from Dr. Ruel dated June 10, 1993, Dr. Ruel continued to note wrist problems. He also noted that Hendrickson was taking Motrin "and I gave him another prescription." However, Dr. Ruel expressed no opinion about disability at that time.[21]
It is reasonable to assume that his education beyond high-school, i.e., "associate in fire technology" is of little value to him now that he can no longer pursue his career as a fireman. Considering his disability and lack of useful education, we find that Hendrickson has established a prima facie case of his inability to earn at least 90% of his pre-injury income. The City failed to offer any countervailing evidence of employment opportunities available at any level of compensation, much less at 90% of his pre-injury compensation level.
The hearing officer awarded him TTD benefits from the time he ceased working until he was placed on disability pension on August 17, 1988. Because for the nature of his injury and treatment we find no error in this award.

16. LUCIEN LEBLANC
LeBlanc went to work for the Fire Department in October of 1962 or 1963 under the "old" plan, and continued working there for over twenty years until August of 1987. Therefore, under Cousins the City has no right of offset.
The City does not contest the fact that LeBlanc was injured in August of 1987 when he fell and twisted both knees. He completed high-school and has taken some college courses in the field of industrial safety and fire technology. He was fifty-five at the time of the trial. He was earning forty thousand dollars at the time he was injured.
*1063 LeBlanc testified that his last visit to Dr. Ruel was in June or July of 1993. The City contends that Dr. Ruel's medical records indicate that he last saw Leblanc on July 30, 1991, implying that LeBlanc was either in error or untruthful. However, the City's contention is contradicted by a report from Dr. Ruel dated June 27, 1992 which states that he had examined Leblanc on June 16, 1992. At that time Dr. Ruel prescribed two pain killers to help LeBlance deal with his knee problems. The City failed to cross-examine LeBlanc concerning this alleged inconsistency and produced no countervailing evidence to support its contention. There is nothing in the record that would cause this Court to doubt Leblanc's testimony that he saw Dr. Ruel in 1993.
The City continues to pay for LeBlanc's medical treatment.
At the time of trial he was averaging 25 to 30 hours per week at eight dollars an hour driving a delivery truck for his nephew's business. He testified that he had taken the job out of necessity to pay his terminally ill wife's medical bills. He further testified that he has to take pain pills to do so and no one experiencing his kind of pain would work unless compelled to work by necessity. He testified that Dr. Ruel had advised against doing work like this that aggravated his knee.
In his report of July 19, 1988 Dr. Ruel recommended that LeBlanc retire from fire duty.
In view of the medical testimony, LeBlanc's lack of a college degree or other valuable non-firefighting job training, and his current compensation level, we find that he has made a sufficient prima facie showing that he is unable to earn at least 90% of his pre-injury compensation. Therefore, in the absence of any countervailing evidence from the City, LeBlanc proved his entitlement to SEB.
In view of the nature of his injuries, his treatment and surgery, we find that the record also supports the hearing officer's award to him of TTD benefits from the date he last worked in August of 1987 until he was placed on disability pension on August 27, 1988.

17. RONALD HUGHES
Hughes started work with the Fire Department on March 31, 1963 under the "old" plan and continued working there for over twenty-four years until April of 1987. Therefore, under Cousins the City has no right of offset.
The City does not contest on appeal the fact that Hughes injured his left knee when he fell and twisted it while fighting a fire on March 16, 1987. Hughes testified that he had an eleventh grade education and that he had last seen Dr. John McLachlan in the January preceding the trial. The City continuously paid for his treatment. He testified that he has developed degenerative arthritis, that he has no cartilage in his knee, and that his knee swells "all the time."
Hughes testified that he has not returned to work as a fireman because he cannot climb, lift heavy objects, stand for long periods, and that if he walks much his knee gives way. He estimated his prior earnings to be between $35,000.00 and $40,000.00 per year prior to his injury.
Hughes attributed his lack of success in obtaining other employment to his limited formal education. The last effort he had made to find employment was six or seven months prior to trial, at which time he applied unsuccessfully for a casino job he had seen advertised in the newspaper. On cross examination he explained that he had never applied for fast food or convenience store jobs because of the requirements for physical work, lifting, walking and standing that his knee could not tolerate. At the trial the attorney for the City suggested that a job as a parking lot attendant might allow him to sit, but Hughes had never applied for such a job. The City made no attempt to show that any such jobs were available, and it is safe to assume that no such job would offer compensation anywhere approaching 90% of Hughes's pre-injury compensation.
Finally, Hughes testified that no one had told him that he was totally disabled from doing any kind of work.
In his report dated April 26, 1987, Dr. John McLachlan stated that Hughes's decision *1064 to retire from firefighting "is a reasonable decision in view of the patient's occupation."
Dr. McLachlan concluded that:
I would estimate at the present time that on the basis of the loss of his medial meniscus, the chondral defect of the femur, and the chondral defect of the patella that a fifteen percent permanent physical impairment of the lower extremity has resulted.
I feel that Mr. Hughes will be improved subsequent to his recent surgery. He should be capable of sedentary-type work. He will require intermittent treatment and may in the future require additional surgical procedures.
In his report of July 13, 1987, Dr. McLachlan noted that the anticipated lessening of Hughes's degree of disability had failed to occur. There were several subsequent written reports from Dr. McLachan in the record, the last dated July 23, 1990. All of those reports noted continued complaints of pain and degeneration in the knee, and none noted any lessening of disability. The City's brief implies that the last time that Hughes actually consulted Dr. McLachlan was on September 12, 1989, but we find that Hughes's testimony that he saw Dr. McLachlan as recently as January prior to the trial is believable even in the absence of a medical report for that date. The City made no effort to introduce any evidence to the contrary at the trial. The City contends that Hughes' claim for medical benefits has prescribed. We find that the City failed to carry its burden of proving this exception of prescription for the same reasons assigned in connection with Alline.
Considering Hughes's testimony concerning his lack of even a high-school education and his inability to perform heavy work, we find that he has made a prima facie case of being unable to obtain employment at a compensation level equal to at least 90% of his pre-injury income. The City failed to offer any countervailing evidence of employment opportunities that would pay 90% of Hughes's pre-injury income. The suggestion by the City that Hughes should seek employment as a parking lot attendant was not supported by any evidence of potential compensation from such a source. Therefore, Hughes succeeded in proving his entitlement to SEB calculated on a basis of zero.
The hearing officer awarded Hughes TTD benefits from the date he last worked until he was placed on disability pension on April 17, 1987, approximately one month later. We cannot say that the hearing officer's finding of temporary total disability for such a short period of time was manifestly erroneous.
The city contends that Hughes is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. The City based this contention on the fact that Hughes refers to himself as retired on his tax return. However, Hughes' testimony on cross-examination makes it clear that what he put on his tax return was not intended to mean the same thing the City means when it uses the term "retired" as a term of art:
Q. Now, on your income tax return, you have putbeen putting in the block where they say occupation, retired; is that correct?
A. I'm retired from the Fire Department only. That was my occupation.
Q. Right.
A. My career, yes; I'm retired from the Fire Department.
Q. Right, but you just put retired on your income tax return?
A. That's all you can put.
In view of this testimony and the discussion of Hughes's efforts to find other employment discussed above, we find no manifest error in the hearing officer's implicit determination that Hughes had not withdrawn from the workforce.

18. JOSEPH JEVIC, JR.
Jevic went to work for the Fire Department on January 5, 1965 and continued working there until August of 1986, a period of over 20 years. Therefore, under Cousins the City has no right of offset.
*1065 Jevic injured his knee on the job, eventually requiring a total knee replacement in 1987. He has not worked since August of 1986, and has made no effort to find any kind of work. He testified that he had additional surgery for a rejected prosthetic device used in his knee replacement in 1992, but there are no medical records in support of that contention. The trial court made no finding disparaging Jevic's credibility, and we find nothing in the record to cause this Court to do so.
Jevic testified that he made between $32,000.00 and $33,000.00 per year prior to the time he stopped working. He also testified that he continues to take Vicodin two or three times a day.
When asked why he had not attempted to obtain other employment, Jevic stated:
A. Between the surgery and the rehabilitation, I did try [to] go to school for computers, which right after I did take that, I wound up back into the hospital again. And I have been doing nothing but trying to get back on my feet from these surgeries.
Q. But I've got your doctor's report here, Mr. Jevic and not one [of] these doctors say that you are totally disabled from doing any kind of work.
A. No, sir, I'm totally disabled from performing fire fighting duties.
Q. Okay, but as far as other work, thereyou could probably do it?
A. I'm disabled from the fire department, yes, sir.
The medical reports in the record expressed no opinion regarding the degree of Jevic's disability, other than Dr. Ruli's opinion dated October 7, 1986 that "Joseph Jevic, Jr. is totally and permanently disabled from performing fire duty." However, the nature and frequency of treatments and operations and complications arising from those operations over the years are such as to leave no doubt that it is highly unlikely that Jevic could perform anything but sedentary work.
Jevic testified that he is currently being treated by Dr. Melvin Parnell whom he had seen most recently during May prior to trial. He testified that the City paid for all of his treatments. The City elicited no contrary testimony on cross-examination. The City contends that his claim for medical benefits has prescribed. We find that the City has failed to carry its burden in regard to this exception of prescription for the same reasons assigned in connection with Alline.
Jevic offered no evidence of educational background or other training or lack thereof. However, in view of the ongoing and debilitating nature of his treatments and surgeries we find that Jevic succeeded in proving a prima facie case of his entitlement to the benefits awarded to him through the date of trial. The City failed to offer any countervailing evidence. Naturally, should Jevic become able to work in the future, nothing in this judgment precludes the City from pursuing whatever remedies it may have to challenge Jevic's right to continued payments.

19. JERRY LADNER
Ladner last worked for the Fire Department in August of 1987. Prior to that time he had held the rank of captain. He started with the fire department in March of 1961 under the "old" plan. Therefore, under Cousins the City has no right of offset. He injured his knee in training school in the course and scope of his employment. He was born on March 9, 1934 and testified at trial that he had, "Twelve years of high [school]."
He testified that Dr. Ruel had recommended surgery but that he did not want to submit to it. He last saw Dr. Ruel in June of 1993, but had not seen him for some time prior to that visit because Dr. Ruel had told him that short of surgery there was really nothing that he could do for him. Ladner gave the following testimony on cross-examination:
Q..... Have you attempted to go back to work since you left the fire department?
A. No, sir.
Q. Dr. Ruel didn't say you were totally and permanently disabled from doing anything, right?
A. No, sir.
Q. He just said you couldn't work as a fireman?

*1066 A. Could not be a fireman.
In his report dated April 12, 1988 Dr. Ruel stated:
[Ladner] is not in favor of operative intervention, and has decided to apply for retirement which I feel is medically indicated.
The City's brief states that "the record ... indicates that [Ladner] last saw Dr. Ruel for treatment in April of 1988", but there is a copy of a report from Dr. Ruel in the record dated June 14, 1993 stating that he examined Ladner on May 20, 1993 and that Ladner "had an appointment to see me on June 10, 1993, which was not authorized", but which we infer was kept anyway. Dr. Ruel concluded that report by expressing the following opinion:
This patient will continue to have ongoing problems with both knees and will need periodic evaluation and observation.
We can reasonably infer from the record that Ladner can do only light duty work as a result of his injuries. As he has only a high-school education he has succeeded in establishing a prima facie case of his inability to obtain employment earning at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut his prima facie case. Therefore, Ladner has established his entitlement to SEB to be calculated on a basis of zero.
The hearing officer awarded Ladner $261.00 per week for TTD benefits from August 3, 1987, the day he was injured and ceased working until he was placed on disability pension on May 18, 1988. Thereafter, he was awarded SEB at the same rate. The medical evidence indicates that Ladner cannot return to work as a fireman. The medical evidence does not suggest that he was totally disabled at any time. Ladner did not testify that he was totally disabled at any time. The record indicates that his knee injuries make climbing steps difficult, precluding the further pursuit of his career as a firefighter, and that he experiences difficulty getting up from a seated positionnothing more. We find no basis in the record for the hearing officer's award of temporary total disability benefits to Ladner.
The city contends that Ladner is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. Ladner has made no attempt to find employment since he gave up his career as a fireman. There is no evidence that he is making any attempt to obtain skills that could potentially lead to employment. When asked what his normal day was like he said, "Well, not much of nothing." He admitted that he shows himself as retired on his tax return, but did not attempt to explain it away unlike other plaintiffs in these consolidated cases. We find that he has effectively withdrawn from the work force. Lytle, supra. Therefore, we find that he is limited to 104 weeks of SEB.

20. JOHN V. MARCADE, JR.
Marcade last worked for the Fire Department on October 15, 1988 when he held the rank of Lieutenant. He started with the Fire Department on September 23, 1961 under the "old" plan. Therefore, under Cousins the City has no right of offset.
He did administrative work, but he also fought fires.
While fighting a fire in October of 1988 he experienced chest pains. He testified that in addition to his heart problem he has three spurs in his neck[22] as a result of a ceiling having fallen in on him while fighting a fire about a year before his heart problem arose. The City continued to pay for his treatment up until August 2, 1993. He testified that when he called to find out why his claims subsequent to that date had not been paid, he was told that it was because the City attorney had his records and his claims could not be paid without those records. He said that he had two prescriptions for his neck and three or four for his heart. He fills his prescriptions every two months. On this basis, it is impossible to tell from the record whether there was any material delay in paying his claim at the time of trial, as the *1067 trial date was only slightly more than two months past August 2, 1993.
Prior to his injury Marcade said that he was making $36,000.00 per year.
Marcade has an associate of science degree in fire technology from Delgado. He was born on April 6, 1939.
He testified that he is getting a regular retirement pension, but that he is entitled to disability. He testified that he cannot return to firefighting because of his heart condition. He received compensation for approximately six months before he was cut off.
He made only one attempt to get a job since he left the fire department and that was in 1990. He testified that when he told the prospective employer that he had a heart problem they did not want to hire him.
In his report of September 25, 1989, Dr. Robert Ruel stated that:
This patient has been examined on multiple occasions since my last report dated November 28, 1988. As you recall, Mr. Marcade has cervical spondylosis and is not working as a fireman because of neck discomfort. A CAT scan of the cervical spine was performed at Humana Hospital on February 22, 1989. The test indicated bilateral lateral spinal stenosis at C4-5 and C5-6....
If he were to put his hands overhead, he would experience numbness in his arms....
Mr. Marcade is disabled, unable to work as a fireman.
It is apparent that Marcade could be expected to do no more than light duty work, if that. In view of his physical limitations and the fact that his degree from Delgado can be presumed to have but little value outside of his career as a fireman, we find that he has succeeded in proving a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City offered no countervailing evidence. Therefore, Marcade has established his entitlement to SEB calculated on a basis of zero.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from October 15, 1988, the date he last worked until he was placed on disability pension on April 23, 1989. The hearing officer awarded SEB at the same rate to commence immediately following the expiration of the TTD benefits. The medical records do not provide much detail, but in view of Marcade's combination of orthopedic and cardiac problems and the failure of the City to introduce any countervailing evidence we cannot say that the hearing officer was manifestly erroneous when he awarded TTD benefits to Marcade.
The city contends that Marcade is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. Marcade has only made the one attempt described above to find work since he left the Fire Department. However, Marcade explained this by saying:
Well, if you can tell me somebody that wants to hire me with my heart problem, I'll go see about working for them. Because as soon as you tell somebody, I have heart trouble; you're a liability, they can't handle you. They can't insure you so they can't handle you; you cannot get a job. Now, if you can tell me somebody that's going to hire me
The City failed to respond with any evidence of available jobs for someone in Marcade's position. The City offered no documentary evidence, no tax return, tending to show that Marcade had retired. We find no manifest error in the implicit finding of the hearing officer that Marcade has not withdrawn from the workforce.

21. CHARLES MARQUE
Marque ceased working for the Fire Department on April 7, 1988[23] when he started experiencing chest pains after 31 years with the Fire Department under the "old" plan. Therefore, under Cousins the City had no right of offset.
*1068 He has only a ninth grade education. He had open heart surgery (a triple bypass). He last saw his heart doctor approximately two months prior to the trial and sees him at least four times a year.
He testified that he made approximately $30,000.00 per year prior to his retirement as a fireman.
Marque's attorney elicited the following testimony from him:
Q. What about with reference to your heart condition? Does that give you any problems now?
A. Right now, not really. I have been going to [Dr. Bernstein] regularly. I go walking every day.
Q. Did he restrict you from going back to work at strenuous activities?
A. I can't do anything too strenuous anymore I've noticed, you know, around the house; cutting grass and so forth, I get fatigued.
Q. Did the doctor restrict you from doing those types of things?
A. He didn't restrict me. He didn't tell me, but I justI can only do so much and I have to quit.
Q. Okay, what did he tell you you couldn't do?
A. Really he didn't tell me I couldn't do anything; he just told me to do what I could.
Dr. Marc Bernstein's report dated July 1, 1988 states that:
[Marque] underwent a three vessel coronary artery bypasses [sic] on May 12, 1988.... However, on a visit immediately post operatively in the office, he was noted to have a large left pleural effusion in which the patient had to under go a thoracentesis. He had been progressing nicely however, I have recommended to him that he not engage in any strenuous or physical activity and because of this I feel he should not return to work.
In another report that is undated, but obviously of a much later date, Dr. Bernstein observed:
In July of 1990 the patient under went cardiac testing which revealed marked abnormalities standard with carotid artery disease. Mr. Marques then under went left carotid endarterectomy. In October of this year Mr. Marques had an ultrasound of carotid which revealed high grade stenosis on the right. He then under went carotid endarterectomy on the right. His current diagnosis is coronary artery disease, coronary artery bypass grafts.
Both this undated report by Dr. Bernstein and another similarly undated report note continued complaints of increased shortness of breath on exertion and numerous cardiac complaints from which we may reasonably conclude that Marque's condition is chronic.
Marque testified that he continues to see Dr. Bernstein at least four times per year and last saw him about two months prior to trial. The City contends that Marque's claim for medical benefits has prescribed. For the same reasons assigned in connection with Alline we find that the City has failed to carry its burden of proving prescription.
In view of the fact that Marque does not have a high-school education and the serious nature of his heart condition, we find that he has succeeded in proving a prima facie case of his inability to find a job earning at least 90% of his pre-injury compensation. As the City failed to offer any evidence to rebut Marque's prima facie case, we find that he has successfully established his entitlement to the SEB awarded him by the hearing officer.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week for the period from April 8, 1988, the date he last worked, until July 17, 1988 when he was placed on disability pension. He was awarded SEB benefits at the same rate to commence as soon as the TTD benefits ceased. Because of the severity of Marque's condition and the seriousness of his operation we cannot say that the hearing officer was manifestly erroneous in finding that he was temporarily totally disabled for at least the period of time encompassed by the TTD award.
The city contends that Marque is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn *1069 from the workforce. Marque described a normal day:
Now I goin the morning I go to the Chalmette Battle Field and I walk for an hour or so of exercise. The doctor recommended that. Then I come home and fool around the house, take my wife shopping if she has to go. And then watch T.V. in the evening.
Marque testified that he had no intention of looking for a job, "Not unless I have to. I mean right now I'm getting along on my disability." We find that the only reasonable conclusion to be drawn from Marque's own testimony is that he has withdrawn from the work force. Lytle, supra. As long as his disability payments are adequate he has no intention of returning to work even if a compatible job should present itself. If he can walk for an hour every day for exercise, he can look for work. He offered no excuses to the contrary. Therefore, he is only entitled to 104 weeks of SEB.

22. JOHN NIEHUES
Niehues was injured on May 26, 1988 after having worked for the Fire Department since April 28, 1957 under the "old" plan. Therefore, under Cousins the City has no right of offset.
He made several attempts to return to work, but by November of 1988 found that as a result of the May injury he could no longer work. He testified that he had a year and a half of high school at Holy Cross and about a year at Delgado. He never finished high school. He was a fire apparatus operator, a job requiring much heavy lifting, prior to retirement.
Niehues injured his neck and lower back when he slipped and fell while fighting a fire. He saw Dr. Ruel at the time and he continues to see him. Prior to his injury he was earning approximately $34,000.00 per year.
He testified that Dr. Ruel had advised him not to do any heavy lifting or to make any sudden movements, which prevents him from returning to work as a fireman. Niehues was born on September 24, 1935.
Niehues testified that he has made no attempt to look for work since he retired from the fire department. He admitted that he was not totally disabled, but went on to explain:
Q. So, you never intend to work again in your life?
A. No, I can't tell you that. I mean, I don't know what would come up. I mean, as it stands now, thatwhen I go shopping with my wife, my back hurts. If I stay aroundI've got to go and sit on a bench in the hall. I mean, there's onlywho's going to hire me and ask me to work while my back is not hurting, while my neck is not hurting?
In his report dated November 21, 1988, Dr. Robert Ruel recommended that Niehues apply for medical retirement. In his report dated February 7, 1993 which is the most recent found in the record, Dr. Ruel noted complaints of discomfort in his neck especially when sitting as well as continued lower back complaints. Dr. Ruel expressed no further opinion concerning the extent of Niehues' disability, but it can be inferred that jobs involving standing or sitting for long periods, or heavy lifting should be ruled out at the very least. That does not leave many opportunities for someone without a high-school diploma. We can safely assume that were Niehues to be able to obtain some form of work within the range of his limitations that any such job would pay substantially less than 90% of his pre-retirement income. Therefore, we find that Niehues has succeeded in proving a prima facie case of his entitlement to SEB. As the City has failed to produce any countervailing evidence Niehues has established his right to SEB calculated on a basis of zero.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from the date he last worked [24] up until the time he was placed on disability pension on December 28, 1988, a period of a little over one month. There is no evidence in the record of total disability. The medical records indicate disability in connection with Niehues's strenuous job as a fireman. Niehues *1070 testified that he could no longer work as a fireman. But his testimony does not permit the inference that he was at any time totally disabled. The record does not support the hearing officer's award of TTD benefits.
The city contends that Niehues is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. Niehues explained that when he put "retired" on his tax returns it meant that he was receiving a disability pension. He gave the same explanation for the doctor's reports describing him as retired. He explained that he has made no attempt to find work because he thought no one would hire him because of his disability. These facts are remarkably similar to those of Lytle where this Court rejected such explanations. Therefore, we find that Niehues has withdrawn from the workforce and is only entitled to 104 weeks of SEB.

23. FRANK PALISI
Palisi last worked for the Fire Department on December 16, 1988 at which time he was a captain. He started with the Fire Department on July 25, 1963 under the "old" plan. Therefore, under Cousins the City has no right of offset. Palisi's job involved a lot of heavy lifting. On December 16, 1988 while fighting a fire he was hurt when something fell on him, again when he slipped and fell, and again when he strained his neck while handling the water hose. He testified that as a result he can neither stand nor sit for long periods, and he frequently has trouble bending over. At the time of trial he was taking no prescription drugs, but he was taking Ibuprofen. Palisi testified that the City paid his medical expenses.
Prior to his injury Palisi was earning between $36,000.00 and $37,000.00 per year.
Palisi testified that in 1991 he had applied to a hardware store for a part-time job and that later that same year he applied to Home Depot. Neither would hire him because of his back condition.
Palisi testified that he is currently under the care of Dr. Schiavi whom he last saw about two months prior to the trial. He said that he was still taking muscle relaxants which was the purpose of his most recent visit to Dr. Schiavi.
Mr. Palisi gave the following testimony on cross-examination:
Q. No doctor has told you that you are unable to engage in any gainful employment or self-employment for wages, have they?
A. They've never told me that, no.
Q. And you don't believe that that's the case, right? You can do something?
A. Oh, I'm sure I can.
Q. Have you ever appliedyou've not applied at McDonalds or Burger King or any of those places to work?
A. No, sir, I haven't.
Q. Was there any reason.
A. No, sir, there's no reason.
Palisi testified that he hoped to find a job after the case was over. He testified that he did bench presses once or twice a week with about forty pounds because he could do them lying on his back.
Palisi finished high school and went on to Delgado for two years where he studied a course in safety engineering and firefighting and another in fire technology. It would seem that those courses taken at Delgado long ago would be of little value to Palisi outside of his job at the fire department.
In his report dated February 15, 1989, Dr. Jack Ruli recommended that Palisi be considered totally and permanently disabled from engaging in fireduty. Dr. Schiavi indicated in his report dated February 2, 1989 that if Palisi continued to do the kind of heavy work required at the Fire Department he risked additional problems and possible disc rupture. The most current report in the record from Dr. Schiavi states that:
Impression was cervical spondylolysis, degenerative disc disease of the lumbar spine with some reactivation of symptomatology.
The patient seemed to be doing well taking Aspirin. He was given some muscle relaxants and advised to use heat to the back. I see no change in his status from the last report.
*1071 The City contends that Palisi's claim for medical benefits has prescribed. Palisi testified on cross-examination that he had been to Dr. Schiavi as recently as two months prior to trial. The City offered nothing to rebut this testimony. We find that the City has failed to carry its burden of proving its exception of prescription for the same reasons assigned in connection with Alline.
The most reasonable conclusion to be drawn from the record is that any future employment that Palisi might undertake would be limited to light duty. In view of the fact that the two years of courses he took at Delgado after high school can be presumed to be of little value outside of his career as a fireman, we find that he has succeeded in proving a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City offered no countervailing evidence to rebut this prima facie case. Therefore, we find that Palisi has established his entitlement to SEB calculated on a basis of zero.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week, the same amount as his award for SEB. The medical evidence does not support a finding of total disability for any period of time. Dr. Ruli's report stated that Palisi was disabled from "fireduty" but did not imply total disability. We infer from Dr. Schiavi's report dated February 2, 1989 that Palisi's injury did not prevent him from doing light work:
I recommended he resume the therapy and refrain from doing any type of heavy work. Since there is no available light duty [with the Fire Department] he will be kept off of work until he improves enough to return to regular duty.
Palisi testified that he could no longer work as a fireman, but he did not testify that he was totally disabled. The record does not support the hearing officer's award of TTD benefits.
The city contends that Palisi is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. The burden was on the City at the hearing to show that Palisi had withdrawn from the workforce, and on appeal the burden is on the City to show that the hearing officer was manifestly erroneous in reaching the implicit finding that Palisi had not withdrawn from the work force. The City relies on the facts that Palisi's efforts to find employment were limited and he showed himself as retired on his tax return. Regarding his tax return Palisi testified that, "I don't consider myself retired but what other word could I put on my income tax? No longer employed." However, in view of Palisi's admission that he was capable of some kind of work and his failure to explain why he apparently has made no attempt to find suitable employment we find that he has withdrawn from the workforce. Therefore, Palisi is eligible for only 104 weeks of SEB.

24. DONALD PERKINS
Perkins started working for the Fire Department on November 12, 1962 under the "old" plan. He ceased working for the Fire Department on June 7, 1989 after injuring his knees fighting a fire in his capacity as a captain. Therefore, under Cousins the City has no right of offset.
He had injured his knees on the job several times previously. Perkins testified that he had seen Dr. Victor P. Chisesi, the only physician who had treated him for his knee problems, in the month prior to the trial. On that occasion Dr. Chisesi gave him a cortisone shot in his right knee and two cortisone shots in his left knee and opined that he might require a total left knee replacement within the next two to three years.
Prior to the accident Perkins was earning approximately $37,000.00 dollars.
Perkins testified that he can neither sit nor stand for long periods, he cannot kneel and he cannot climb ladders.
In his report dated July 20, 1989, Dr. Chisesi stated in pertinent part:
Mr. Perkins has been under my care since June 7, 1989, when he re-injured his knees while fighting a fire. His diagnosis is medial collateral ligament syndrome of both knees and osteoarthritis of the knees, the left greater than the right.
* * * *

*1072 Because of his present condition, he cannot stoop, climb, bend, or crawl with ladders. I feel my patient is unfit for future fire duty.
The most reasonable conclusion to be drawn from the record is that Perkins is fit only for light duty. He attended only one year of college. Therefore, we find that he has proved a prima facie case of his inability to find employment that would pay him at least 90% of his pre-injury income. The City failed to offer any countervailing evidence to rebut this prima facie case. Thus Perkins has established his right to SEB.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week commencing on June 7, 1989, the date he was injured and ceased working, through August 18, 1989, the date he was placed on disability pension. We find no manifest error in the award of TTD benefits for this short period of time.
The city contends that Perkins is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. The only evidence offered by the City is that Perkins's tax return shows him to be retired. However, we do not give much weight to this evidence in the absence of corroborating evidence. We note that in general when the plaintiffs in these consolidated cases have shown themselves as retired on their tax returns they mean only that they have retired from their chosen profession of fire fighting as opposed to having withdrawn entirely from the workforce as contemplated by LSA-R.S. 23:1221(3)(d)(iii). We give greater weight to the fact that when questioned Perkins testified that if he could find work he was capable of doing he would take it. The City offered no proof of the existence of such jobs. The City offered no proof that Perkins had not attempted to find other work. Perkins did not testify that he had, but neither did he testify that he hadn't. The mere designation of "retired" on Perkins's tax return is not sufficient in itself to carry the City's burden of showing that Perkins has withdrawn from the work force. We find no manifest error in the implicit finding of the hearing officer that Perkins has not withdrawn from the work force.

25. PAUL RASCHKE
Raschke was born on January 13, 1949. He has only a high-school education. He last worked for the Fire Department on December 20, 1988 when he injured his neck in his capacity as a captain, which was a physically demanding job requiring heavy lifting. He started work with the Fire Department on January 14, 1968 under the "new" plan. He has not worked in any capacity since the date of his injury.
Raschke is not old enough to retire under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Raschke, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Raschke testified that his injury had deteriorated from a herniated disc to extruded disc, very close to the nerve running to his arm. He has bad headaches and any strenuous activity inflames and enlarges the injured area causing it to impinge on the nerve "and then my [left] arm goes dead." He experiences constant aches and pains that interfere with sleep and he experiences discomfort either sitting or standing. He cannot do any significant lifting and at least twice a day "I have got to get off my feet completely and lay down with a little round pillow under my neck to take the weight of my head off of my neck or the disc becomes inflamed and my arm goes numb and I start getting severe headaches."
He testified that he has made no attempt to look for employment since he was injured because he knew of no job that would accommodate the limitations imposed by his injury, especially his need to lay down twice a day to take the pressure off of his neck. He sees Dr. Ruel regularly, every month or two.
Dr. Ruel's report of February 18, 1989 states that:

*1073 A CAT scan of the cervical spine was performed on January 31, 1989, and demonstrated a large disc herniation at C5-6 on the left side.... I recommend that he apply for medical retirement.
Dr. Ruel noted on more than one report that Raschke was opposed to surgical intervention. Dr. Ruel's last report in the record dated August 13, 1990 prescribed intermittent cervical traction twice weekly in addition to heat packs and ultrasound.
The City contends that Raschke's claim for medical benefits has prescribed. Raschke testified that he is still seeing Dr. Ruel. On cross-examination he stated that he sees Dr. Ruel on an average of once every two months. Raschke did not claim any unpaid medical expenses. The City offered nothing to rebut this testimony. We find that the City has failed to carry its burden regarding this exception of prescription for the same reasons assigned in connection with Alline.
Prior to his injury he was earning approximately $33,000.00.
The most reasonable conclusion to be drawn from the record is that Raschke is limited to light duty work at best. That coupled with his limited education is sufficient to prove a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut Raschke's prima facie case. Therefore, Raschke has succeeded in establishing his right to SEB calculated on a basis of zero.
The hearing officer awarded Raschke TTD benefits in the sum of $267.00 per week from December 20, 1988, the date he last worked until he was placed on disability pension on April 17, 1989. Thereafter he was awarded SEB at the same rate from the date the TTD benefits were to terminate. The extent of his disability as described previously is such that we cannot say that the hearing officer was manifestly erroneous in awarding TTD benefits.

26. EUGENE RAVAIN
Ravain last worked for the Fire Department in May or June of 1988. He started with the Fire Department on September 2, 1962 under the "old" plan. Therefore, under Cousins the City has no right of offset.
He had two years of college at Delgado where he studied fire technology. He was born on June 29, 1938 and was fifty-five years old at the time of the trial. He was a district chief at the time he ceased working for the fire department. He stopped working because of injuries he sustained in the Cabildo fire on May 11, 1988 when a ceiling collapsed on his head, causing injury to his neck. He tried to continue working for approximately two weeks afterwards, but his condition got progressively worse until he had to quit work on either June 3 or June 4, 1988.
Ravain saw Dr. Nutik first and then switched to Dr. Ruel whom he was continuing to see at the time of trial. Ravain testified that Dr. Ruel told him:
... if I didn't do anything at a fire except just raise my head and look at a fire for a while, I would have problems with my neck.
As a district chief his job frequently entailed heavy lifting and climbing.
In 1990 Ravain got a job as a seasonal park ranger with the National Park Service. He works as a fee collector in the Great Smoky Mountains for six months out of the year. The job requires no physical effort. He merely collects fees and explains park rules and regulations. At the end of each season he has no guarantee that he will be rehired the following season. He makes $8,000.00 per year. Ravain stated that he cleared the job with Dr. Ruel prior to taking it. He further testified that he does hike in the mountains.
In 1989 he attempted to get a law enforcement commission but could not get a medical clearance to do so.
He testified that at the time of trial the City had ceased paying for his medical expenses.
The most recent report by Dr. Ruel found in the record is dated February 26, 1990 and states that:

*1074 On examination, his lateral bending motion was severely restricted to both right and left sides. Extension was likewise restricted. There was no muscle spasm and no radicular pain in the upper extremities. X-rays of the cervical spine showed marked narrowing of the C5-6 disc space with posterior narrowing. He remains disable[d] and unable to work.
This report is consistent with all prior reports from Dr. Ruel commencing in 1988.
Ravain testified that at the time he ceased working for the fire department that he was making $3,472 per month, or $41,664.00 per year.
The most reasonable conclusion to be drawn from the record is that Ravain is limited to light duty work. His two years at Delgado are presumably of little value to him outside of his career as a fireman. Therefore, we find that he has proved a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut his prima facie case. Ravain has succeeded in establishing his entitlement to SEB. However, it is necessary to remand Ravain's claim to the hearing officer for purposes of calculating the extent to which Ravain's benefits should be reduced, if at all, in view of his earnings as a park ranger.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from the date he last worked until he was placed on disability pension on December 27, 1989. Dr. Ruel's reports indicate that Ravain was no longer able to work as a fireman. His reports do not imply that he was totally disabled at any time. On the stand Ravain was asked:
Q. Dr. Ruel, does he recommend you not work; or restrict activities.
A. Restrict my activities, yes.
Ravain did not testify that there was any period of time during which he was totally disabled. The record does not support an inference of total disability for any period of time. Therefore, it was error for the hearing officer to award TTD benefits to Ravain.
The city contends that Ravain is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. The fact that he has obtained a job as a park ranger as described above shows that the City's position on this issue is without merit.

27. JOHN RENAUD
Mr. Renaud has only a high-school education. He stopped working for the fire department on September 21, 1987 following a heart attack he suffered at a fire on that date. He was born on December 12, 1938 and started with the fire department on September of 1962 under the "old" plan. Therefore, under Cousins the City has no right of offset.
Renaud was classified as a fire fighter, a job requiring heavy lifting, climbing, bending and stoopingin short it is a very physically demanding job. He was treated at the time of his heart attack by Dr. Rolston whom he continues to see about every three months. Renaud testified that the City was paying for his treatment by Dr. Rolston up until a month before the trial.
He said that his doctor has restricted him from firefighting and limited him to those activities that he feels that he can do comfortably. He said that during the month prior to trial he had undergone an angiogram and a balloon surgery because he had been complaining of chest pains. At the time of trial he had unpaid medical bills of $12,176.00 and $26.63 for the cardiovascular surgeon; $3,660.00 from Dr. Rolston for the angioplasty; $75.00 and $25.00 for cardiologists; $223.49 for anesthesia; and $340.00 from Dr. Rolston's office. He also testified that he had $23.00 of unreimbursed prescription bills, but he did not have receipts.
Mr. Renaud testified that he was unable to return to any type of work.
In his report dated March 25, 1988 Dr. William Rolston stated, "Because of the demonstration of significant coronary artery disease and its progressive nature, I consider him to be permanently disabled from his regular firefighting duties." That is the most recent medical report found in the record, *1075 but there are substantial itemized billings from as recent as September of 1993 from which the persistence of significant cardiovascular problems is clearly indicated.
Based on the record, it is not reasonable to expect Renaud to return to heavy duty employment. This, coupled with his limited education is sufficient to establish a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut his prima facie case. Therefore, Renaud has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from September 21, 1987, the date he last worked until he was placed on disability pension on August 17, 1988. Because of the severity of his cardiovascular condition and Renaud's uncontradicted testimony that he was unable to return to any kind of work, we cannot say that the hearing officer was manifestly erroneous in finding that Renaud was temporarily totally disabled.
The city contends that Renaud is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. The City bases its contention on the following testimony elicited from Renaud on cross-examination:
Q. Mr. Renaud, we've examined your income taxes and on the box on your returns where it asks for occupation, you indicated that you're retired, is that correct?
A. That's right.
Q. And you have, in fact, retired?
A. That's right.
Q. You have no intention of going out and doing any kind of work, is that correct?
A. That's correct.
However, Renaud went on to explain what he meant:
Q. Mr. Renaud, do you think you can go back to work doing anything?
A. I doubt it.
Q. Why won't you go back to work?
A. Well, when I have chest pains shortness of breath, I have to lay down.
Q. Are you able to go back to work doing anything?
A. No, sir.
Q. What's the reason you won't be going back to work?
A. Because of my heart condition.
Q. All right. If you could go back to work, you would?
A. Right.
In view of his ongoing treatment, the apparent severity of his cardiovascular problems, and the fact that he has no education beyond high school, we find that the hearing officer's implicit determination that Renaud's failure to find other employment was attributable to his disability rather that a voluntary withdrawal from the workforce is not manifestly erroneous.

28. HAROLD RODRIGUE
Rodrigue finished high school and obtained an associate degree in fire technology from Delgado. He ceased working for the Fire Department in July of 1988 because he twisted his neck and hurt his back while fighting a fire. He testified that he felt that it was an aggravation of an injury he had sustained several months previously when he fell out of an attic during a fire.
He started with the Fire Department on March 3, 1963 under the "old" plan. He was a district chief at the time he ceased working in July of 1988. Therefore, under Cousins the City has no right of offset.
On occasion, even as a district chief he would have to do such physical things as climb in attics and carry equipment.
From the time he was injured he has seen Dr. Russell Levy. On August 17, 1988, after treating Rodrigue for eleven months, Dr. Levy concluded that Rodrigue "not be fighting fires for a living at this time, but could do something very light where he is not looking up and making a lot of rapid movements all of the time." The City contends that Rodrigue's claim for medical benefits has prescribed. Rodrigue testified that he continues to see Dr. Levy once or twice a year. He gave essentially the same testimony on cross-examination. The City offered no evidence *1076 to rebut his testimony. We find that the City has failed to carry its burden of proving this exception of prescription for the same reasons assigned in connection with Alline.
Rodrigue testified that he was unable to return to work as a fireman. Since he stopped work as a fireman the only employment that he has had was part time for a few weeks at Major Video, earning four dollars an hour. He gave up that job because of neck and back pain. He has made no attempt to find employment since that date.
He stated that all of his medical bills have been paid by the City.
The most reasonable conclusion to be drawn from the record is that Rodrigue is capable of light duty employment only. It is also reasonable to assume that his degree in fire technology from Delgado is of little value to him outside of his career as a fireman. In view of his limited useful education and physical limitations we find that he has proved a prima facie case of his inability to earn at least 90% of his pre-injury income. The City failed to offer any countervailing evidence to rebut this prima facie case. Therefore, he has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from the date he last worked in July of 1988 until he was placed on disability pension on August 11, 1988. In view of the severity of his injury and the fact that he was placed on a codeine based pain killer, we cannot say that the hearing officer's finding of total disability for such a short period of time was manifestly erroneous.
The city contends that Rodrigue is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force. The City bases this contention on the fact that Rodrigue has not looked for work since he left Major Video. The record also reflects the fact that he described himself as retired on his tax return. However, he explained that when he did so he intended only to indicate that he was receiving a pension as his source of income. The City offered no other documentary evidence of his retirement. Implicit in his testimony is a denial of the intention to withdraw from the work force. He testified that "if something would come up, I would try to do it." The City offered no evidence that Renaud had rejected suitable available employment. This is a close case, but the facts favoring the City fall short of those found in Lytle. Where it is such a close case and the burden of proof was on the City, we cannot say that the hearing officer was manifestly erroneous in viewing the facts as he must have in implicitly finding that Rodrigue had not withdrawn from the workforce.

29. RAYMOND SCHWARKHARDT
Schwarkhardt was born on October 19, 1935. He earned a GED from the U.S. Army and an associate degree in fire science and technology from Delgado.
He ceased working on March 28, 1989 because of a back injury he sustained while fighting a fire in his capacity as senior deputy chief. He started working for the Fire Department on May 28, 1961 under the "old" plan. Therefore, under Cousins the City has no right of offset.
Schwarkhardt testified that his medical bills had been paid, but that he estimated that he had $150.00 of unreimbursed prescription bills. However, it appears from the record that he may not have submitted those bills for payment and he did not produce any copies of them. He has continued to see Dr. Ruel since the accident, but he has never returned to any kind of work:
I had gone for some therapy and I didn't see any change, you know. The pain is still there; I wake upI go to bed with pain, I wake up with pain. It's notit doesn't go away. It originates from my hip all the way down to my feet.
Schwarkhardt testified that he was in pain even as he testified. He said that he could not return to work as a fireman and that Dr. Ruel had directed him not to do so. He further testified that he did not feel that he could hold any kind of a job because of his constant pain and that Dr. Ruel had neither told him that he could do non-fire fighting work or that he could not. He takes Tylenol *1077 every day, including the day of the trial as well as other medication on occasion.
He said that he sees Dr. Ruel four or five times per year, the most recent occasion being in August or September prior to trial.
In his report dated May 4, 1989, Dr. Jack Ruli said that he agreed with Dr. Ruel's findings of back problems and concurred with his recommendation that Schwarkhardt retire as a fireman and be considered totally and permanently disabled from engaging in fireduty.
In addition to recommending that Schwarkhardt retire from fire fighting, Dr. Ruel's reports noted discomfort while walking, standing, sitting and driving. The most recent report from Dr. Ruel found in the record dated January 30, 1990 recommends that he continue to apply heat as necessary and avoid lifting, and prescribes a pain killer to be taken only when needed.
Schwarkhardt was making between $48,000.00 and $49,000.00 annually at the time he stopped working.
The most reasonable conclusion to be drawn from the record is that Schwarkhardt is limited to light duty employment at best. His education at Delgado in fire technology is presumably of little practical value to him outside of his career as a fireman, which leaves him with little more than his GED. In view of his educational and physical limitations we find that he has proved a prima facie case of his inability to find employment that would pay him at least 90% of his preinjury earnings. The City failed to offer any evidence to rebut this prima facie case. Therefore, he has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from March 28, 1989, the date he last worked until he was placed on disability pension on May 28, 1989. SEB at the same rate were awarded from the date the TTD benefits terminated. Our review of the record reveals nothing to persuade us that the hearing officer was manifestly erroneous in finding that Schwarkhardt was entitled to TTD benefits for this brief two month time period.
The city contends that Schwarkhardt is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce by failing to seek other employment since the time he left the Fire Department.
Schwarkhardt testified as follows on cross-examination:
Q. You get retirement?
A. I've got the disability pension.
Q. Right. And how much do you get a year?
A. It's about thirty-four hundred a month?
Q. Okay. Have you tried to work since you left the Fire Department?
A. No, sir.
Q. Is there any reason you haven't tried to work since you left the Fire Department?
A. Yes; Because I'm hurting.
Q. So, what you're saying is thatyou're talking about pain prevented you from working; is that what you're saying?
A. Going out to get a job?
Q. Just because of the pains, you didn't go out to about getting a job?
A. I didn't feel like I could hold one down.
Q. Okay. No doctor haven't told you not to go out and look for a job, have they?
A. The only doctor was Dr. Ruel, and he told me I couldn't do fire duty.
Q. But he didn't tell you to go out and look for some other job, did he?
A. No; He didn't tell me not to, he didn't tell me to.
Q. Okay. So, what, you're just retired; is that what you're telling the judge?
A. I didn't retire, I'm on disability pension.
Q. You don't intend to work no more, do you?
A. I don't feel I can work.
Q. So, are you retired?
A. I'm on disability pension.
Q. Oh, okay. With no intention of working again, right?
A. Not unless I get a new back.
*1078 In view of the above quoted testimony we cannot say that the hearing officer was manifestly erroneous in concluding that Schwarkhardt was not working because of disability rather than because he had "retired" in the sense of having voluntarily withdrawn from the workforce within the contemplation of LSA-R.S. 23:1221(3)(d)(iii). The facts in this case are not so favorable to the City on this issue as those found in Lytle. There is no documentary evidence in support of the City's position that Schwarkhardt had retired as there was in Lytle. Dr. Ruel said that he could no longer work as a fireman. Dr. Ruel did not specify what other jobs he could or could not do. Schwarkhardt said that he could not work because of disability. The hearing officer was entitled to believe Schwarkhardt. The City failed to introduce any medical or other evidence to the contrary. The City offered no evidence of the availability of jobs that Schwarkhardt could do within the limits of his disability. We find no manifest error in the implicit finding of the hearing officer on this issue.

30. LOUIS SERPAS
Serpas was born on December 20, 1947. He has a high-school education. He stopped working for the Fire Department on October 30, 1988 because he injured his neck, back and shoulders while fighting a fire in his capacity as captain. He started with the fire department on March 15, 1968 under the "new" plan. He is not yet fifty years old. He is not old enough to retire under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Serpas, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job was physically very demanding and included much heavy lifting and climbing. He continued to work, but his symptoms got progressively worse. He continued to see Dr. Edmund Landry on an intermittent basis.
Dr. Landry's most recent report expresses the following opinion:
Mr. Serpas has a degenerative disc at C5-6. He is continued on Naprosyn 500mg. twice a day. [H]e is given a prescription for Tylenol # 3 to take when needed for more severe pain. He is unable to wear a hard hat or helmet, he is unable to do latter [sic] climbing, heavy lifting or carrying. He requires frequent change of position for comfort.
Dr. Landry opined that Serpas could no longer work as a fireman. He expressed no opinion concerning Serpas' ability to do non-fire fighting jobs other than what is implicit in the very limiting symptoms he noted. On cross-examination, the only jobs suggested by the City were fast food jobs, but the City offered no evidence to support that suggestion.
At the time of his injury he was earning between $35,000.00 and $36,000.00 per year. Serpas said that he could no longer work as a fireman. He cannot use his arms above his head and he cannot lift his head back for any period of time. Later he testified that he could not work at all because of his neck and back.
Serpas consulted a surgeon, Dr. Gorvitz who recommended surgery. Because of Serpas's apprehensions about the prospect of surgery he instead went to a chiropractor.
The City contends that Serpas' claim for medical expenses has prescribed. He said that the City had paid his medical expenses, but had not paid for his chiropractor. At the time of trial Serpas was taking Naprosyn for which he said the City paid. He testified that he still sees Dr. Landry but not on a regular basis. When asked about medical bills on cross-examination, Serpas said that the City was paying all of Dr. Landry's bills as incurred, but that he had not seen Dr. Landry "in a couple of months." We find that the City has failed to carry its burden of proving this exception of prescription for the same reasons assigned in connection with Alline.
The most reasonable conclusion to be drawn from the record is that Serpas is capable of light duty employment at best. In *1079 view of his physical and educational limitations we find that he has proved a prima facie case of his inability to find employment that would pay him at least 90% of his preinjury income. The City failed to offer any countervailing evidence to rebut this prima facie case. Therefore, Serpas has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from October 30, 1988, the date he last worked until he was placed on disability pension on April 17, 1989. Dr. Landry report dated November 17, 1988 states that: "He is unable to work at this time." The report also noted the prescription of strong pain killers. In the complete absence of countervailing evidence from the City we cannot say that the hearing officer's finding of temporary total disability was manifestly erroneous.
The city contends that Serpas is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce by failing to seek other employment since the time he left the Fire Department.
Serpas testified as follows on cross-examination:
Q. You alsoare you retired now or just what's your work situation?
A. I'm retired.
Q. You're retired?
A. Yes, sir.
Q. Have you looked for a job recently?
A. No, sir.
Q. Is there any reason you haven't looked for a job?
A. I can't; I can't work.
Q. What do you mean, you can't work?
A. You know, my neck and my back; the injuries I sustained.
Q. Strains and sprains?
A. You know, I have no disc left or practically no disc left between five and six in my neck.
Q. And that prevents you from
A. Yes, sir.
Q. doing any kind of work.
A. Yes, sir.
Q. What kind of work have you tried to do?
A. I really didn't try because I just felt as if that wouldn't be aI mean, I don't know how to do anything other than be a fireman. I mean, that's what I've been doing.
I mean, I used to do a little bit of contracting work, you know, years ago, but I definitely can't do that.
In view of the above quoted testimony we cannot say that the hearing officer was manifestly erroneous in concluding that in Serpas's mind he was not working because of disability rather than because he had "retired" in the sense of having voluntarily withdrawn from the workforce within the contemplation of LSA-R.S. 23:1221(3)(d)(iii). The facts in this case are not nearly as favorable to the City on this issue as those found in Lytle. There is no documentary evidence in support of the City's position that Serpas had retired as there was in Lytle. Dr. Landry's reports did not state that there was no other employment that Serpas could do within the limits of his disability, but neither did they state that there was other available employment. Serpas said that he could not work because of disability. There is nothing in Dr. Landry's reports that directly contradicts Serpas's testimony. The City failed to introduce any medical evidence to the contrary. The City offered no evidence of the availability of jobs that Serpas could do within the limits of his disability. The City suggested employment in a supervisory capacity in the fast food industry, but offered no evidence to show either availability or Serpas's capability to do such a job within the limitations of his disability. We find no manifest error in the implicit finding of the hearing officer on this issue.

31. JOHN VARNADO
Varnado was born on August 10, 1952. He has only a high-school education. He ceased working for the Fire Department on November 27, 1989 as the result of an injury sustained on January 23, 1989 while fighting a fire in his capacity as captain. He *1080 started with the fire department on September 4, 1965 under the "old" plan. Therefore, under Cousins the City has no right of offset.
His injury occurred when he fell off of a roof and landed on his back and left arm. He stated that he never returned to work following the injury. His job was physically very demanding, involving heavy lifting and climbing.
Varnado testified that he has never really been released from medical supervision:
I'm having problems with my hips since then; they've taken bone off of both sides to put in my elbow to try to reconstruct the elbow and I really can't do much of anything.
He stated that all of his medical bills had been paid except those of Dr. Cook:
Dr. Cook was the one that tended to me when I coded in the hospital; I stopped breathing after the surgery and they called Dr. Cook in and thereafter before every surgery I go back to Dr. Cook for him to check me, and the last three or four visits, they refused to pay him.
Varnado did not produce a copy of Dr. Cook's unreimbursed bills and did not testify as to their amounts.[25]
He testified that he is in constant pain and that he cannot even help around the house much less hold down any form of gainful employment. When the City's attorney suggested that "No doctor has told you not to go out and try to do a job" Varnado responded that "Well, so far Dr. Russo has not released me from his care." Varnado testified that he has had four operations.
The gravity of Varnado's situation is apparent from the first paragraph of Dr. Courtney Russo's report dated February 21, 1989:
Since my brief report to you dated January 30, 1989, including my description of the severely comminuted fracture of the patient's elbow and forearm, the patient had some additional complications from his injury. He developed sudden acute respiratory arrest due to the smoke inhalation and also developed a Horner's syndrome on his left side.
In his report of May 5, 1989 Dr. Russo stated future operations would probably be necessary and that, "He will eventually, of course, rate a permanent disability figure."
In his report of August 31, 1989, Dr. Russo stated that Varnado had undergone bone graft surgery and that he "is still totally disabled for any type of work at this time."
In his report dated November 28, 1989, Dr. Russo recommended that Varnado undergo an ulna nerve transposition. He also noted that Varnado was still totally disabled.
On July 9, 1990, Varnado underwent surgery removing and replacing a screw under general anesthesia. In his report dated July 19, 1990, Dr. Russo recommended another bone graft operation. According to Dr. Russo's report of October 5, 1990 this was done.
In his report of October 22, 1990 Dr. Russo stated that: "The patient, of course, is still totally disabled from any type of work."
Dr. Russo's reports, the last of which is dated September 9, 1991, show increasing back complaints, continued physical therapy and use of anti-inflammatories and "no work status."
It is doubtful from the record whether Varnado is or ever will be capable of even light duty employment. In view of his obvious physical limitations and his limited education we find that he has proved a prima facie case of his inability to earn at least 90% of his pre-injury income. The City failed to offer any countervailing evidence to rebut his prima facie case. Therefore, he has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from the date he last worked until he was placed on disability pension on April 23, 1989. In view of the severity of Varnado's medical condition as discussed above and the complete *1081 lack of any countervailing evidence from the City, we cannot say that the hearing officer's finding of temporary total disability was manifestly erroneous.
The city contends that Varnado is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce by failing to seek other employment since the time he left the Fire Department.
Varnado gave the following testimony on cross-examination:
Q. Have you tried to work since you left the Fire Department?
A. I try to work all the time around the house. I can't even do that.
Q. You haven't went out and tried to look for a job and try one of the jobs in the market?
A. No.
Q. So you are retired?
A. No. I still would like to go back to work if I could physically get back to work.
Q. But you haven't gone out and tried a job to see what you could do?
A. No.
Q. No doctor has told you not to go out and try to do a job?
A. Well, so far Dr. Russo has not released me from his care.
Q. So, he told you not to go out and try to find a job?
A. No, he hasn't actually told me that, no.
In view of the above quoted testimony we cannot say that the hearing officer was manifestly erroneous in concluding that Varnado mind was not working because of disability rather than because he had "retired" in the sense of having voluntarily withdrawn from the workforce within the contemplation of LSA-R.S. 23:1221(3)(d)(iii). The facts in this case are not nearly as favorable to the City on this issue as those found in Lytle. There is no documentary evidence in support of the City's position that Varnado had retired as there was in Lytle. Although Varnado testified that Dr. Russo had not told him that he was totally disabled from all kinds of work, that is what is most reasonably inferred from his reports. Varnado said that he could not work because of disability. This is consistent with what we find in Dr. Russo's reports. The City failed to introduce any medical evidence to the contrary. The City offered no evidence of the availability of jobs that Varnado could do within the limits of his disability. We find no manifest error in the implicit finding of the hearing officer on this issue.

32. RALPH L. WEST, JR.
West was born on January 31, 1944. He started with the Fire Department on January 7, 1967 under the "old" plan. Therefore, under Cousins the City has no right of offset.
West has an associate degree from Delgado in fire technology. He last worked for the Fire Department on September 12, 1988 when he injured his back, neck and head fighting a fire in his capacity as captain. His job required heavy lifting and climbing.
Dr. Ruel is his treating physician and West continues to see him. He complains that he has had a ringing in his ears since his accident and continues to have trouble with his neck and back, but that he was told that his back is not covered by workers' compensation. West testified that an ear doctor had punctured one of his ear drums because he thought that the ringing might be caused by pressure that needed releasing.
He was making approximately $35,000.00 prior to his injury.
In a report to Dr. Donnell Gangolf dated April 21, 1989 Dr. John F. Klees stated:
Ralph L. West has been under my care for Tinnitus following a concussion injury to the head. This symptom is very stressful and disabling to him and he is unable to rest adequately and work, because of significant problems with this.
Dr. Walter Truax, a neurologist, could find no neurological explanation for either West's neck problems or the ringing in his ears.
Reports by Dr. Habig, an orthopedist, show no evidence of a ruptured disc. Dr. Habig's report of July 19, 1989 noted that:
The radiologist felt that there was some suggestion of posterior marginal spurring *1082 at C5-6 and C6-7, which is certainly possible.
In the most recent report from Dr. Habig found in the record dated August 8, 1989 he opined that:
I found no objective findings that would state unequivocally that Mr. West is not able to return to work as a fireman. I think the answer to the question of whether he can return to his occupation is based upon how much symptoms he is truly having. If he has symptoms with the type of work that is required, and he is unable to do the work because of the pain, then he is unable to return to work as a fireman. Unfortunately, I cannot answer the question any better than this.
I do not feel that Mr. West is disabled from any occupation, but only those which may cause him discomfort and do not allow him to perform that type of work.
* * * * * *
The patient's present disabling condition seems to me to be related more to an arthritic condition. The accident that he had may have aggravated this to some extent, but I feel his underlying cause is more of an arthritic condition than due to a traumatic condition.
Dr. Ruel had a CAT scan performed which revealed some hypertrophy bilaterally of the C5-6 and C6-7 facet joints but no indication of disc herniation.
Dr. Ruel reported on the result of an MRI in his report dated March 1, 1989:
The posterior aspects of the C5-6 and C6-7 disc spaces seemed narrowed. There was small marginal spurring at each of those levels.
Dr. Ruel concluded this March 1, 1989 report with the following opinion:
It is impossible to prove or disprove the patient's complaints in regard to his ears. We have no objective information that this is an entity. On the other hand, there is no concrete information that it is not. As far as his cervical spine is concerned, I feel that the MRI and CAT scan changes are minimal, but suggest that he not work as a fireman any longer because the activities that firemen participate in would continue to cause him symptomatology.
Dr. Ruel's most recent report contained in the record dated August 6, 1990 concludes that West remains disabled, unable to work.
The City contends that West's claim for medical expenses has prescribed. We find that the City has failed to carry its burden of proving this exception of prescription for the same reasons assigned in connection with Alline.
Presumably West's degree in fire technology from Delgado is of little value to him outside of his career as a fireman. The most reasonable conclusion to be drawn from the record is that he is capable of light duty employment at best. In view of his educational and physical limitations we find that he has proved a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut his prima facie case. Therefore, he has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from September 12, 1988, the date he last worked until he was placed on disability pension on April 23, 1989. Although the medical evidence supporting West's claim is not as persuasive as that of many of the other plaintiffs in this matter, in view of the failure of the City to call any medical experts of its own, we have no basis for second guessing the hearing officer's award of TTD benefits.
The city contends that West is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce by failing to seek other employment since the time he left the Fire Department. We cannot say that the hearing officer was manifestly erroneous in viewing the medical evidence as indicative of the total disability to which West testified he that he was subject.
When confronted with the fact that his tax returns listed him as retired, he responded: "I'm on pension." When asked whether he intended to go back to work he responded: "If I can get rehabilitated and get a job." *1083 From this and the medical reports the hearing officer could have reasonably inferred that West did not intend to withdraw from the workforce. In view of West's uncontradicted testimony that he is unable to work which was not inconsistent with any of his medical records and the fact that the City offered no countervailing medical evidence we cannot say that the hearing officer's implicit finding on this issue was manifestly erroneous.

33. ALBERT BALDWIN
Baldwin was born on February 13, 1948. He was hired by the Fire Department on October 11, 1971 under the new plan. He is not yet fifty years old and is not old enough to retire under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Baldwin, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Baldwin graduated from high school and studied fire technology for two years at Delgado. He was a fire apparatus operator which involved him in search and rescue, putting up ladders and all procedures involved in firefighting. Therefore, his job was physically very demanding. On May 10, 1986 he injured his back while attempting to carry a ladder up to a burning attic and fell down the stairs with the ladder. He has not worked since that day. Baldwin had previously had surgery on his back arising out of a job related injury in 1984, but he had recovered prior to his injury in May of 1986. The City has paid his medical bills in connection with the 1986 injury, but the City failed to pay his last few prescription bills. He did not have those bills with him in court and did not know the amounts involved.
Baldwin testified that he takes Motrin as an anti-inflammatory, Robaxin as a muscle relaxant, and Vicodin for pain. At the time of trial he was receiving compensation at the rate of $33.00 per week. In 1986 up until December of 1987 he said he was receiving $254.00 per week.
He testified that Dr. Kinnett had told him not to return to fire duty and that he should avoid lifting and strenuous exercises. He said that he has pain down his legs from his back injury and that he "couldn't really sit that long or can't do too much of anything." Because of his constant pain he has not attempted to find another job.
Dr. J. Donald Persich noted in his report of October 6, 1986 that Baldwin had been injured on May 10, 1986 causing his lumbar spurs to collapse resulting in nerve root pressure and pain radiating into his left leg. Dr. Persich considered Baldwin to be totally disabled at that time and felt he would never be able to return to active duty.
Dr. J. Gregory Kinnett's reports of numerous examinations of Baldwin from July 21, 1986 through July 24, 1990 confirm the existence of his back problems and the pain arising therefrom.
Baldwin's two years of study in the field of fire technology are presumably of little value to him outside of his career as a fireman. The most reasonable conclusion to be drawn from the record is that he is capable of light duty employment, if he is not actually permanently and totally disabled. In view of his educational and physical limitations we find that he has succeeded in proving a prima facie case of his inability to earn at least 90% of his pre-injury income. The City failed to offer any evidence to rebut this prima facie case. Therefore, Baldwin has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from May 10, when he last worked, until he was placed on disability pension on April 23, 1989, which is the same amount he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. In view of the medical evidence, including Dr. Persich's finding of total disability in October of 1986, along with Baldwin's testimony and the failure of the City to call any countervailing witnesses, we cannot say that the hearing officer's award of TTD benefits was manifestly erroneous.
*1084 The city contends that Baldwin is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce by failing to seek other employment since the time he left the Fire Department.
Baldwin admitted that he has not looked for work since he left the Fire Department, but when asked why he wasn't working he explained, "Because I'm disabled." His medical records support his testimony. He did not state that he considered himself to be retired. There is no documentary evidence as there was in Lytle in support of the City's position that Baldwin had retired. The City failed to introduce any medical evidence and the City offered no evidence of the availability of jobs that Baldwin could do within the limits of his disability. We find no manifest error in the implicit finding of the hearing officer on this issue.

34. ROBERT ANTHONY BOUTERIE
Bouterie was born on July 14, 1943. He was fourteen hours short of finishing college when he joined the Air Force. He injured his right knee fighting a fire in his capacity as captain on October 16, 1986, after nineteen years with the Fire Department. He started with the Fire Department in June of 1969 under the "new" plan. He was not eligible for retirement at the time he started receiving his disability pension from the Fire Department. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Bouterie, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job was physically demanding, requiring heavy lifting and climbing. He continued to attempt to work for a while after the October 1986 injury, but his knee got progressively worse until it required an operation.
He has not returned to work since, but he attempted to get some construction work but could not do the climbing required. He was hired part time for a short period but it did not work out because he was required to be on his feet too much. He was rejected from other jobs he applied for out of concern for his physical limitations. He tried working for Amway and he tried selling water purifiers but neither effort was successful.
Bouterie sees his chiropractor, Dr. Kurz, currently because he feels that Dr. Ruel has exhausted the limits of benefits he can provide by way of conventional medical treatment.
In his report of April 25, 1988, Dr. Ruel stated that:
"He has made good effort at returning to his pre-injury status, but he has missed multiple days from work because of swelling and discomfort in his knee. His symptoms may dramatically improve from one day to the next allowing him to return to work. This appears to be an uncertain situation with his knee and it is now giving-way with climbing. There is nothing more surgical to do with his knee at this time. I have recommended retirement from a medical standpoint to try to have better control of his symptoms and also from a safety standpoint in that his knee may well give-out at any time causing further injury."
In a report dated January 14, 1991 Dr. Ruel stated:
"I do feel that his knee is as good as it will be and that he had reached maximum medical improvement. He can work at some job activity that will not require prolonged standing, sitting, squatting, climbing or carrying objects weighing more than 15 to 20 pounds."
Bouterie has not been back to see Dr. Ruel in a year or two because he felt that he could do nothing further for him. Dr. Ruel disapproved of his seeing a chiropractor.
The most reasonable conclusion to be drawn from the record is that Bouterie is capable of light duty work only. He has taken many college courses, but still lacks a diploma. He testified to numerous unsuccessful attempts to obtain employment consistent with his physical limitations. We find *1085 that he has proved a prima facie case of his inability to find employment that would pay him at least 90% of his pre-injury compensation. The City failed to offer any evidence to rebut his prima facie case. Therefore, he has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $261.00 per week from the date he last worked until he was placed on disability pension on June 17, 1987, which is the same rate he awarded for SEB. In view of the substantial pain and swelling of the injured knee during the period following the accident of October 16, 1986 which eventually led to surgery in February of 1987 we find no manifest error in the hearing officer's finding that there was a period of total disability. However, we find that the record will not support a finding of total disability beyond April 28, 1987 at which time Dr. Ruel reported that he had "no pain whatsoever." At that point we must assume that Bouterie was capable of light work. Therefore, we find that Bouterie's entitlement to TTD benefits expired on April 28, 1987. After that time his entitlement to SEB begins.

35. CHARLES CASRILL
Casrill was born on December, 6, 1947. He has a GED. He last worked for the fire department on September 21, 1987 when he was injured fighting a fire in his capacity as a fire fighter. He started with the fire department in August of 1975 under the "new" plan. He is not yet 50 years old. He is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Bouterie, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job required heavy lifting, climbing, stooping and bending. He worked on the riverfront at the same time he was working for the fire department. He had to give up his work on the riverfront as a result of his fire injury.
As a result of his injury he developed constant headaches, neck pain and shoulder pain. All of his medical bills and prescription bills have been paid.
He does not feel that he can go back to work as a fireman because of his headaches. He used to play in a softball league but has given it up for the same reason. He has not tried to find any other employment because:
There's nothing out there for me to work at right now at this time. When I sit too long, I have problems and I have to lay down during the evening, during the middle of the day. Driving bothers me, anything like that.
Casrill was making approximately $27,000.00 $28,000.00 in the year prior to his disability.
In several reports Dr. Robert Ruel, Jr. recommended a fusion and discectomy, but Casrill was unwilling to undergo such an operation. On the witness stand he explained that he had an acquaintance who had similar surgery and was now worse off than she was before the surgery. In his report dated April 11, 1988, Dr. Ruel stated that:
It is my opinion that he is unfit for duty and that his condition will not improve, but will probably worsen Retirement is recommended.
In his most recent report found in the record dated August 20, 1990, Dr. Ruel stated that, "He remains disabled, unable to work."
The City contends that Casrill's claim for medical expenses has prescribed. Casrill testified that he continues to see Dr. Ruel and, in fact, had an appointment to see him during the following week. On cross-examination he testified that the last time he had been to the doctor concerning his neck was six months prior to trial. We find that the City has failed to carry its burden of proof regarding this exception of prescription for the same reasons assigned in connection with Alline.
Dr. Ruel did not specifically state what besides fire fighting he thought Casrill's disability prevented him from doing, and he did *1086 not describe specifically what his physical limitations were.
The most reasonable conclusion to be drawn from the record is that Casrill is fit for light duty employment only. His education consists of a GED. In view of his physical and educational limitations we find that he has proven a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut his prima facie case. Therefore, he has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $261.00 per week from September 21, 1987 when he last worked until he was placed on disability pension on April 17, 1988, which is the same amount he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. Based on the medical evidence, Casrill's testimony, and the failure of the City to call any witnesses, we cannot say that the hearing officer's award of TTD benefits for a period of almost six months was manifestly erroneous.

36. DONALD CONRAD
Conrad was born on August 30, 1956 and went to work for the Fire Department on October 21, 1979 under the "new" plan. He is not yet 50 years old and is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Conrad, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Conrad finished high school and took some courses in electronics at a vo-tech school, but did not receive the practical hands-on training he had expected. He injured his back in his capacity as a fire fighter on March 3, 1986. He continued to work in a non-strenuous capacity as an operator driving a truck for one or two months thereafter, while the regular operator was out on disability. Conrad testified that he was laid-off as an operator. Before he was injured he had done some ornamental iron work, but it was very strenuous work.
He was making approximately $26,000.00 $27,000.00 per year prior to the time he stopped work with the Fire Department. Since that time he has worked intermittently. Once he worked for about two weeks with an oil company as a fire watch, but had to quit when he was expected to haul wheelbarrows and shovel sand. He has also done a small amount of audio/visual work at a rate of seven to eight dollars an hour. Even if Conrad were to obtain such employment full-time year round it would pay him only approximately 60% of what he had been making as a fireman.
He testified that he does not have proper reflexes or full feeling in his left leg. His medical bills have all been paid.
Currently he occasionally works for Western Temporary Services. He said that since he left the Fire Department he has made numerous attempts to find work.
It was Conrad's opinion that his injury was indirectly responsible for his being laid off. He felt that his injury related absenteeism contributed to his poor evaluation, and that he would have been laid off as disabled regardless of his evaluation.
Dr. Andrew G. King, Associate Professor of Orthopedics, LSU Medical Center diagnosed "marked nerve root compression due to disk herniation." He recommended a discectomy. He concluded his report dated March 8, 1990 as follows:
This man despite being a workmen's compensation patient appears extremely well motivated and there were no signs whatsoever of exaggeration of symptoms. In addition, unlike degenerative spine conditions, he has an acute herniation with hard neurological signs.
In his report dated April 27, 1987, Dr. John McLachlan said that Conrad was not a fit candidate to return to work as a firefighter and that he should not do heavy labor in the future. He and Dr. Seltzer attributed Conrad's limitations to back injuries sustained as a fire fighter.
*1087 The hearing officer awarded Conrad TTD benefits of $262.00 from the date he stopped working through August 3, 1986 when he went on disability pension. The hearing officer awarded him SEB at the same rate commencing with the termination of the TTD benefits.
Conrad's testimony indicates that he remained on the payroll through August 3, 1986, the date through which he was awarded TTD benefits. Therefore, we find no period of time supported by the record for which he qualified for TTD benefits.

37. RENO JEAN DARET, III
Daret has a master's degree in School Administration and Supervision, and a B.S. from LSU Baton Rouge. He was born on February 13, 1948. Prior to working for the Fire Department he was a sixth grade teacher for the New Orleans public school system. He went to work for the Fire Department in June of 1980 under the "new" plan. He is not yet 50 years old. He is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Daret, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
While fighting a fire on May 20, 1988 he experienced problems with his neck. He was told that he had a disc problem that could result in paralysis if he were bumped unless he underwent surgery which he did on June 28, 1988. He never went back to work as a fireman. He has no unpaid medical bills. He was making $28,000.00$29,000.00 per year prior to leaving the fire department. He went back to work in January of 1991 as a public school teacher in Jefferson parish making $22,000.00. By the time of trial his compensation as a teacher had been increased to approximately $25,000.00.
He was told he could do no more heavy lifting which precluded further employment with the fire department.
It appears that Daret currently makes as much as he did prior to the injury when his National Guard pay is added to his teacher pay, so his actual claim is for the period between 1990 and 1993.
The City argues that Daret failed to explain why he did not return to teaching prior to 1991, but the record reflects that the attorney for the City failed to ask Daret that question when it had the opportunity to do so on cross examination.
In his report dated September 12, 1988, Dr. Robert E. Ruel, Jr. noted that Daret had undergone an anterior cervical discectomy and fusion at the C5-6 level on June 24, 1988.
In his report dated November 21, 1988 Dr. Ruel expressed the following opinion:
I feel that it is not in his best interest to return to work as a fireman since he has a fusion at C5-6 and additional stress loads will be applied to C4-5 and C6-7 levels. This recommendation is based on the types of activities required by a fireman such as wearing protective hat and back gear as well as having to lift overhead and pushing and pulling activities.
In his report dated August 14, 1989, Dr. Ruel states that: "We recommended that he remain out of work and that he return in three months." In the context of this report and other reports we take this statement to refer to non-fire fighting employment as Dr. Ruel addresses Daret's disability as a fireman elsewhere in this and other reports. This explains why Daret did not return to work as a teacher immediately after having been disabled as a fireman.
Dr. Gordon Nutik expressed concern that Daret was at risk for recurrent injuries at other disc levels which made any form of heavy manual labor a problem.
Mr. Daret also testified that he had all of the necessary credentials to allow him to apply for a job as a principal whereby he could expect to earn $35,000.00 to $45,000.00 per year. However, he intentionally elected to forego such an opportunity because he preferred to teach in the classroom. We, therefore, find that his right to claim compensation ceased in January of 1991 when he *1088 went back to work as a teacher but could have applied for a job as a principal.
The record supports a finding that for several months following his injury, Daret was advised against working at all. The hearing officer awarded him TTD benefits in the sum of $263.00 per week from the date he last worked until he was placed on disability pension on January 17, 1989. Thereafter Daret was awarded SEB at the same rate. The City offered no evidence on the question of temporary total disability. As the City failed to produce any evidence to the contrary, it is reasonable to assume that the teaching job acquired by Daret in January of 1991 was obtained as soon as reasonably possible after he was able to resume employment. The City has failed to show that the hearing officer was manifestly erroneous in awarding TTD benefits through January 17, 1989.
However, we do find that it was error for the trial court to award SEB beyond January 1, 1991 when he resumed work as a teacher, but should have attempted to find work as a principal.
The city contends that Daret is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force by failing to seek other employment since the time he left the Fire Department. As we have already found that it was error for the hearing officer to award SEB to Daret after January 1, 1991 this issue is moot.

38. LESTER DUFRECHOU
At the time of trial Dufrechou was a senior in college at UNO. He was born on February 15, 1950. He last worked for the Fire Department on October 1, 1988 when he injured his knee fighting a fire. He started with the Fire Department on March 4, 1974 under the "new" plan and is not yet 50 years old. He is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Dufrechou, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job was physically demanding, requiring bending, stooping, climbing, and heavy lifting. At the time he left the fire department he was making approximately $29,000.00 per year.
Dufrechou testified that he felt that he could not return to work as a fire fighter because his knee occasionally gives out. He also felt that his injured leg could not support heavy weights.
Commencing in February of 1990 he worked for about one year as a clinical associate at the Methodist Psychiatric Pavilion earning $5.00 per hour two to four days a week, eight hours a day. In the summer of 1992 he worked for about two weeks at F. Edward Hebert hospital earning $5.50 per hour.
Both jobs were strictly sedentary work. After that he worked as a member of the New Orleans Marriott security team earning $7.00 per hour.
Dr. Robert E. Ruel, Jr. performed orthoscopic surgery on August 23, 1989. Dr. Ruel had recommended such surgery on numerous prior occasions according to his reports, but Dufrechou had long been reluctant. In his report of January 3, 1989, Dr. Ruel described Dufrechou's status as follows:
He returned on December 30, 1988. A long discussion took place regarding the problem in his knee. He was not in favor at that time of proceeding with orthoscopic surgery. He felt that he wanted to wait an additional period of time. He has decided to apply for retirement from the Fire Department. The clinical diagnosis is torn medial meniscus of the right knee. As this is the clinical diagnosis and with the knee giving-way, I am unable to allow him to function as a fireman, as he may not only injure himself further, but others as well.
It is not clear from the record what benefits Dr. Ruel expected Dufrechou to derive from the surgery if successful. The most recent report in the record from Dr. Ruel is dated September 11, 1989 and refers to his most recent examination of Dufrechou *1089 as having taken place on September 1, 1989, one week after the orthoscopic surgery. Dr. Ruel stated that Dufrechou was making good progress, but that, "He is unable to work." In the context of the report, we infer that Dr. Ruel is referring to a disability arising out of a period of immediate post operative convalescence rather than any long term prognosis. However, that is not to suggest that Dr. Ruel's long term prognosis would have been any different. It is impossible to tell with any degree of certainty.
The City contends that Dufrechou's claim for medical expenses has prescribed. Dufrechou testified that he has not seen Dr. Ruel in over a year. He felt that there was nothing further he could do for him. However, it is reasonable to infer from this testimony that although he had not seen Dr. Ruel in more than one year, it had not been more than three years since he had seen him. The City offered nothing from which we could infer otherwise. We find that the City has failed to carry its burden regarding this plea of prescription for the same reasons assigned in connection with Alline.
The hearing officer apparently found Dufrechou to be a credible witness. We have no reason to believe otherwise, especially in view of the fact that the City failed to introduce any evidence to contradict his testimony. The most reasonable conclusion to be drawn from the record is that he is capable of light duty employment only. Considering Dufrechou's failure to complete college at the time of the trial, his physical limitations, and his efforts to obtain employment and education since his injury, we find that he proved a prima facie case of his inability to find employment that would pay him an amount equal to at least 90% of his preinjury compensation.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from October 1, 1988 when he last worked until he was placed on disability pension on March 17, 1989, which is the same rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated until March 4, 1990. From March 4, 1990, when he began earning $189.44, the SEB was adjusted to $239.92 per week until Dufrechou stopped working on February 1, 1991. From February 1, 1991 until November 1, 1992 his SEB was reinstated at the rate of $239.92 per week. The reinstatement of SEB for this period should have been at the rate of $267.00 per week. The hearing officer's figure of $239.92 per week appears to be an inadvertent clerical error. From November 1, 1992 until February of 1993 his SEB were reduced to $107.28 per week because Dufrechou was earning $100.00 per week during that time. As he was no longer employed after that time the hearing officer restored his SEB to the full $267.00 per week.
Considering the diagnosis of a torn medial meniscus which eventually required surgery we cannot say that the hearing officer committed manifest error in finding a period of approximately five and one-half months of temporary total disability during a time when Dufrechou was convalescing under treatment. The City failed to establish that his earnings since the date of his injury have been sufficient to reduce the amount of SEB to which Dufrechou is entitled to some amount less than the maximum which was awarded by the hearing officer.

39. BRANCH JOHN EHRHARDT
Ehrhardt graduated from Warren Easton High School and completed 42 hours of a 62 hour course in fire technology at Delgado. He was born on December 3, 1947.
He became disabled when he injured his back on May 21, 1988 while fighting a fire in his capacity as a captain. He started with the fire department on October 5, 1969 under the "new" plan. He is not yet 50 years old. He is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Ehrhardt, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
He was earning in the range of $35,000.00 to $40,000.00 at the time he was injured. He *1090 job was physically demanding, requiring heavy lifting, climbing, bending and stooping.
All of his medical bills have been paid, but he has $57.00 of prescription medicine bills still outstanding. He said he was told that he could not be reimbursed those expenses because the City had his records. He neither stated nor implied that his claim for reimbursement had either been rejected or was long overdue.
Ehrhardt testified that he has gained 60 pounds because of his back injury and that this prevents him from doing certain kinds of work. He said that sometimes the pain from his back injury radiated down his right leg, but that it was not doing so at the time he was testifying. He said that he had made no attempt to work since he left the fire department. Ehrhardt said that at some point he would seek employment, but did not know when.
Dr. Robert E. Ruel, Jr. reported that X-rays, a CAT scan, an EMG, and an MRI were all negative. Subsequent EMG studies were also within normal limits. Regardless of the fact that all tests were negative, Dr. Ruel stated the following in his report dated November 8, 1988:
On November 4, 1988, he returned. It was the first day out of bed since returning home because of headache. He continued to have tenderness about the peroneal nerve in the right lower extremity.
On a clinical basis, this patient has irritation of the peroneal nerve, right lower leg. He does not have operative lumbar disc pathology and I am not in favor of performing exploration of the peroneal nerve behind the right knee until we are able to prove on EMG that procedure is warranted. Because of this persistent tingling in the calf with massage of the peroneal nerve as well as the tenderness, I have recommended that he take medical retirement from the Fire Department as it is unsafe for him to return to fire duty activities. He also has minor posterior bulging at L5-S1 and at L4-5, which I do not feel is a problem. He will need periodic follow up examinations and possible repeat EMG studies in the future as well as exploration of the peroneal nerve if it is indicated. [Emphasis added.]
In several of his reports, including the most recent one in the record dated August 5, 1993, Dr. Ruel noted that Ehrhardt was unable to work.
The most reasonable conclusion to be drawn from the record is that Ehrhardt is capable of light duty employment only. His uncompleted course in fire technology at Delgado is presumably of little value to him outside of his career as a fireman. In view of his educational and physical limitations we find that he has succeeded in proving a prima facie case of his inability to earn at least 90% of his pre-injury compensation.
The hearing officer awarded him TTD benefits in the sum of $261.00 per week from May 21, 1988 when he last worked until he was placed on disability pension on March 17, 1989, which is the same rate he awarded for SEB. In view of Ehrhardt's testimony and the uncontested medical records we cannot say that the hearing officer's award of TTD benefits was manifestly erroneous.
The city contends that Ehrhardt is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the work force by failing to seek other employment since the time he left the Fire Department.
When asked if he had retired, Ehrhardt responded, "I'm retired from the Fire Department, right." From this the hearing officer could have reasonably inferred that Ehrhardt did not consider himself retired for all purposes. When asked if there was any reason why he hadn't looked for another job he replied: "No. Other than my injury." Dr. Ruel's report of January 3, 1989 describes Ehrhardt as "not working and retired" but the hearing officer could have reasonably inferred that Ehrhardt was retired from the Fire Department, not from employment consistent with his disability. The most reasonable conclusion to be drawn from this statement is that Ehrhardt did not seek employment because of his disability, not because he had voluntarily withdrawn from the workforce. He stated that at some time he would seek employment. Dr. Ruel's *1091 report of August 3, 1993 notes significant back pain in connection with any activity whatsoever. The record does not contain evidence of Ehrhardt's retirement comparable to that found in Lytle. The City offered neither medical evidence nor evidence of the availability of jobs within the limitations of Ehrhardt's disability. In view of the fact that the City had the burden of proof, we cannot say that the hearing officer was manifestly erroneous in rejecting the City's contention.

40. SAM JOSEPH FRADELLA, JR.
Fradella was born on June 11, 1943. He is a high school graduate. He started with the Fire Department on July 12, 1971. He was injured on May 11, 1988 when he fell down steps and experienced trouble breathing while fighting a fire. As he had less than twenty years of service at the time he elected his disability pension, he is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Fradella, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
After the incident of May 11, 1988 his physician instructed him to avoid exposure to smoke or chemical spills. This proscription precluded the further pursuit of his career as a fire fighter. Prior to the accident he was earning $29,000.00 per year. Starting in June of 1990 Fradella went to work for Exhibit Installation Specialists. He estimated that in his first year he earned $24,000.00. In 1991 he earned $22,000.00 and in 1992 he earned approximately $19,000.00. At the time of trial he had earned approximately $16,000.00 year-to-date.
Fradella testified that at the time of trial he was still having lung problems. Dr. Bernard B. Brach's report dated June 8, 1988 stated that, "It is unwise for Mr. Fradella to continue to risk his health by exposing himself to direct heavy fume inhalation situations such as fire fighting." Dr. Brach noted that Fradella displayed an asthma-like response to fume inhalation, even perfumes.
Dr. Jack P. Ruli was of the impression that Fradella had recurrent asthma as may seen by reference to his report dated October 10, 1990.
Dr. Todd W. McCune stated in his report dated December 8, 1988 that:
Therefore, the most likely conclusion seems to be that Mr. Fradella acquired his condition as a result of recurrent exposure to irritant gases.
Dr. McCune explained that whether Fradella's spells of breathing difficulty were provoked by strenuous exertion or by exposure to fumes he could not work as a fireman.
From the medical records we conclude that Fradella is disabled from pursuing any employment that would involve heavy physical exertion or exposure to fumes.
The most reasonable conclusion to be drawn from the record is that Fradella is capable of light duty employment only. In view of his educational and physical limitations as well as his good faith efforts to engage in gainful employment subsequent to leaving the fire department, we find that he has succeeded in proving a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City offered no countervailing evidence to rebut this prima facie case. Therefore, Fradella has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from May 11, 1988 when he last worked until he was placed on disability pension on July 17, 1988, which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. There is no evidence in the record of total disability at any time. There has never been any reason why Fradella could not perform work that did not involve "direct heavy fume inhalation" or heavy exertion. It was error for the hearing officer to award Fradella TTD benefits. Because his SEB and TTD benefits were fixed at the same rate the TTD benefits he received will be treated as SEB, but his SEB eligibility must be figured from *1092 the date that his TTD benefits originally commenced, i.e., May 11, 1988.
The city contends that Fradella is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. However, as noted previously, Fradella has worked for Exhibit Installation Specialists since June of 1990. The City has offered no evidence to the contrary. There is no merit to the City's contention that Fradella has withdrawn from the workforce.

41. DON W. LINDSEY
Lindsey was born on March 28, 1949. He has a high-school diploma. He started with the Fire Department on March 18, 1968 under the "new" plan. As he is not yet fifty years old, he is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Lindsey, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
He fell and injured his hand on February 18, 1984. He retired from the Fire Department on March 18, 1987 as a fire apparatus operator. He testified that he was on sick leave for about a year before that. His duties required heavy lifting and climbing.
He said that he does not believe that he can return to work as a fireman because sometimes his hand just gives out and he drops whatever he is holding. He attempted therapy for a year after his hand was operated on in hopes of being able to return to work, but his hand never recovered adequately. He stated that his bills had been paid with the exception of the last couple of months of chiropractic treatment. He was unable to estimate the amount of unreimbursed chiropractic bills he had incurred.
Lindsey has not attempted to find other employment since he left the Fire Department. He said that he does not believe that he is employable because he would have to call in sick once or twice a month because of his hand which is never fully functional even on the best days.
In his report of May 30, 1985, Dr. Robert G. Chuinard stated that "Mr. Lindsey should be considered temporarily and totally disabled until I have a chance to see him following [the EMG] examination." Surgery was performed on Lindsey's wrist on April 22, 1986. In his two most recent reports contained in the record Dr. Chuinard states that Lindsey's post-operative recovery had reached a permanent and stationary status, but it is unclear exactly what Dr. Chuinard believes that status to be. Most probably Dr. Chuinard is referring to the conclusion he stated in his report of January 15, 1987:
As long as he is required to do light activities with his wrist, he remains pain free, and has good function; however, with any heavy activity, the symptoms recur.
The most reasonable conclusion to be drawn from the record is that Lindsey is capable of light duty only. In view of his physical and educational limitations we find that he has succeeded in proving a prima facie case of his inability to earn at least 90% of his pre-injury compensation. The City offered no countervailing evidence to rebut this prima facie case. Therefore, he has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from the date he last worked[26] until he was placed on disability pension on March 18, 1987, which is the same weekly rate he awarded for SEB. The medical evidence indicates that Lindsey's condition had not stabilized during the time he received TTD benefits. In the absence of any countervailing evidence from the City we cannot say that the hearing officer's award of TTD benefits was manifestly erroneous.
*1093 The city contends that Lindsey is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. The City contends that he has not tried to work since he left the Fire Department. However, the record shows that he has not applied for a job as a cook because he could not lift pots and sometimes even a glass of water falls out of his hand. Lindsey said that he would like to work but that he did not think that he could. Lindsey did not say that he has withdrawn from the work force or retired or words to that effect. When specifically asked by the City if he were retired, Lindsey responded, "No, I'm on a disability pension, there's a difference." There is no documentary evidence in the record as there was in Lytle categorizing Lindsey as retired. The City failed to offer any evidence of the availability of jobs within the limitations of Lindsey's disability. In view of the City's burden of proof, we cannot say that the hearing officer was manifestly erroneous in deciding this issue against the City.

42. SAMUEL A. MONTALBANO
Montalbano is a high-school graduate. He started with the Fire Department on January 24, 1964 under the "old" plan, and went on disability pension on April 24, 1989. Therefore, under Cousins the City has no right of offset.
He injured his knee on November 26, 1988 while fighting a fire in his capacity as an operator tallerman on a ladder company. His duties required lifting, bending and stooping. After failed attempts at therapy he underwent orthopedic surgery. Montalbano feels that as a result of his knee injury and a subsequent heart attack, he is not employable.
His knee continues to swell and cause pain and sometimes it collapses. On cross-examination he stated that he would be disabled because of his knee injury even if he had not had a heart attack. Montalbano is not claiming disability related to his heart problems in these proceedings. He apparently filed a claim at one time for heart related disability, but subsequently dismissed it. He has not attempted to find other employment since he left the Fire Department. Prior to his injury he said that he was earning approximately $33,000.00 per year.
In his report of January 30, 1989, Dr. Robert E. Ruel, Jr. recommended retirement from the fire department. Subsequent reports noted discomfort with prolonged sitting or standing. However, the orthoscopic surgery performed on January 18, 1989 was considered successful. Dr. Ruel expressed no opinion about Montalbano's ability to engage in non-fire fighting employment other than what may be inferred from references to discomfort from prolonged standing, sitting or walking.
The City contends that Montalbano's claim for medical benefits has prescribed. Montalbano testified that he last saw Dr. Ruel in September prior to the trial. He testified similarly on cross-examination and added that prior to the September visit he had seen Dr. Ruel in the preceding January or February. We find that the City has failed to carry its burden regarding this plea of prescription for the same reasons assigned in connection with Alline.
The most reasonable conclusion to be drawn from the record is that Montalbano is capable of doing light duty employment. In view of his educational and physical limitations we find that he has succeeded in proving a prima facie case of his inability to find employment earning at least 90% of his preinjury income.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from November 26, 1988 when he last worked until he was placed on disability pension on April 24, 1989, which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. In view of Montalbano's injury and related surgery and the failure of the City to offer any countervailing evidence, we find no manifest error in the hearing officer's award of TTD benefits.

43. WARREN MARTIN
Martin has a high-school education. He was hired by the Fire Department on September 8, 1969 under the "new" plan. *1094 His last day of work was April 7, 1987 when he had severe chest pains at a fire in his capacity as fire captain. His medical records show that he was only 39 in 1987. He is not old enough to be eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Martin, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Prior to this incident he was making approximately $38,000.00 per year. His duties involved strenuous physical exertion and exposure to smoke. His artery collapsed while undergoing a balloon dilation and he had an emergency triple bypass operation.
He stated that he has some recent unpaid medical bills. He was told that because his files were with the City Attorney his current claims could not be processed. The record contains a bill from Dr. Menzer dated October 19, 1993 in the sum of $137.50 and a bill from East Jefferson General Hospital for $260.00.
Martin feels that he is unable to return to work because he still has unstable angina. He has, therefore, made no attempt to find other employment. He testified that thirty percent of his heart muscle is dead.
Dr. Gary D. Menzer's various reports confirm the existence and extent of Martin's cardiac problems and Dr. Jack R. Ruli's report dated September 23, 1987 states that Martin is "totally and permanently disabled from fire duty." It should be noted that this report was dated prior to Martin's emergency cardiac surgery.
The most reasonable conclusion to be drawn from the record is that Martin is permanently and totally disabled, especially in view of the fact that the City offered no countervailing evidence. Martin is clearly entitled to no less than was awarded him by the hearing officer.
The city contends that Martin is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. However, in view of the nature of Martin's disability we cannot say that the implicit finding of the hearing officer that Martin's failure to seek employment was attributable to his disability rather than a voluntary withdrawal or retirement from the workforce. The City failed to offer any contrary medical evidence or evidence of employment available within the limitations of Martin's disability. The City offered no documentary evidence characterizing Martin as retired as was done in Lytle.
The hearing officer awarded Martin TTD benefits at the rate of $261.00 per week from April 17, 1987 when he last worked until July 17, 1987 when he was placed on disability pension. At that point his SEB were to commence at the same rate. In view of the severity of Martin's condition, we cannot say that the hearing officer was manifestly erroneous in finding Martin totally disabled for a period of slightly over three months.

44. PATRICK MCGITTIGAN
McGittigan graduated from high school and received a few hours credit at Delgado. He was born on July 7, 1949. He commenced employment with the Fire Department on January 6, 1975 under the "new" plan. He is not old enough to be eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against McGittigan, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job required him to operate and drive the pump and assist the fire fighters in their duties. He was required to do heavy lifting, climbing, bending and stooping. He ceased working for the Fire Department on March 15, 1988 because: "I couldn't stand up; I couldn't get out of bed." McGittigan testified that he "couldn't straighten up" because his "back just went out." He testified that *1095 his back first bothered him in May of 1985 when he was moving boxes on the job. Prior to May of 1985 he had experienced no back problems. McGittigan aggravated the injury on a number of occasions after May of 1985 until he aggravated it so badly in March of 1988 that he could no longer attempt to return to work even after convalescence. He had been offered surgery as an option, but he felt that the prospects for surgical success were not sufficiently certain to outweigh the risks and pain of surgery. He mentioned a friend who had to undergo two additional back surgeries when the first one did not achieve the intended results.
At the time he ceased working for the Fire Department he was earning between $32,000.00 and $34,000.00. He testified that he could no longer perform the duties of a fireman and that it was futile to try to obtain another job because no employer wants the liability risk of a person on a disability pension.
McGittigan testified that the City had reimbursed all of his medical expenses with the exception of a few recent prescription items. Those he said had been held in abeyance because his file was in the hands of the City Attorney. He did not say how long his claim for reimbursement for prescription items had been outstanding, but that the total was: "Probably less than $100.00."
Dr. Ruel's report dated April 1, 1991 states in pertinent part:
We placed him on Robaxin as a muscle relaxant and asked that he come back in six months. I had nothing further to offer him. He remains disabled as a fireman. I do not feel that he is in need of surgical treatment. He has reached maximal medical improvement, but he may get worse with time, however, that is speculative. The prognosis is guarded and I do not think that physical therapy or a work hardening program would be appropriate for this patient. I feel that he should avoid repetitive bending, prolonged standing, frequent lifting, pushing and pulling. He should avoid repetitive movement of his feet as well as climbing. His weight restrictions should be limited to less than 50 pounds on any one occasion and that lifting should not be frequent. [Emphasis added.]
In his report dated May 6, 1991, Dr. Ruel opined that McGittigan could return to sedentary work activities.
Dr. Toussaint A. Leclerq in his report dated October 1, 1990 stated that it was his impression that McGittigan had "herniated intervertebral lumbar disc." Dr. Leclerq was also of the opinion that McGittigan's back problems could be traced to the May 1, 1985 initial injury "with a reasonable degree of medical certainty."
Dr. Gordon P. Nutik's report of May 6, 1985 expressed the opinion that McGittigan had sustained a muscle strain when injured on May 1, 1985. Dr. Nutik also noted that: "The straight leg raising tests were positive and I feel that this patient should be further observed to rule out the possibility of a herniated lumbar disc." This is consistent with Dr. Leclerq's opinion that McGittigan had a herniated lumbar disc.
Because McGittigan effectively had only a high-school education and could only do sedentary work it is more likely than not that he could not find employment that would pay him the $28,000.00 to $30,000.00 he would need to bring him above the 90% Supplemental Earnings Benefits threshold. This is sufficient to prove a prima facie case of his inability to earn at least 90% of his pre-injury income. The City failed to offer any countervailing evidence to rebut this prima facie case.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from May of 1988 when he last worked until he was placed on disability pension on July 17, 1988[27], which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. We find no manifest error in the hearing officer's award of TTD benefits for this period of approximately two months.
*1096 The city contends that McGittigan is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. He said that he took the test to get a job with the Department of Corrections, but they never called him back. When asked if he were retired he said, "Uh-huh, I'm on a pension from the New Orleans Fire Department." From this we cannot say that the hearing officer was unreasonable if he inferred, as he implicitly did, that McGittigan considered himself to be retired from the Fire Department only, not from a job that might present itself within the limitations of his disability. The City offered no evidence of the availability of such jobs. The City offered no documentary evidence showing that McGittigan characterized himself as retired as was done in Lytle. In view of the City's burden of proof we cannot say that the hearing officer was manifestly erroneous in finding against the City on this issue.

45. JERRY A. MEYER
Meyer was born on March 24, 1947. His educational background consists of a GED. He stopped working for the Fire Department in April of 1988, as a result of injuring his back on the job. He started work for the Fire Department on September 10, 1973 under the "new" plan. He is not old enough, nor did he work long enough to be eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Meyer, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
He was a fire fighter and his job required heavy lifting and climbing. Although he had a previous on the job back injury that had occurred in 1986 or 1987, he considered himself to have recovered prior to the April, 1988 injury. Meyer knew of no unpaid bills for medical treatment at the time of trial, but testified that he had submitted a claim for reimbursement of the expense of his medication about three weeks prior to the trial which had not yet been paid. He did not testify that the claim had been refused; he stated only that such reimbursement claims were normally processed much faster.
Meyer has not returned to any form of employment since he stopped working with the Fire Department, with the exception of an attempt to make some money driving a shrimp boat that he purchased jointly with a friend. He and his friend each lost $1,000.00 in this manner by they time they realized that the enterprise was not successful and sold the boat.
Meyer testified that he cannot do anything involving bending or heavy lifting. Prior to his injury he was making $28,000.00 per year. Dr. Gordon Nutik in his report dated October 6, 1988 concluded that Meyer "certainly does have adequate objective reasons to pursue his retirement from heavy labor, such as is required on the Fire Department."
Dr. Robert Ruel's reports indicate that Meyer made several attempts to return to work in the first few months following his injury, but each time his back problems flared up. In his report dated September 14, 1988, Dr. Ruel reached the following conclusion:
It is my opinion that this patient has symptomatic spondylolysis at L5-S1 bilaterally. Spondylolysis is a pre-existing condition that was aggravated by his on the job injury. I recommend that he retire as a firefighter.
None of Dr. Ruel's other reports found in the record express any opinion about Meyer's ability to perform other kinds non-fire fighting work.
The City contends that Meyer's claim for medical expenses has prescribed. Meyer testified that he continues to see Dr. Ruel twice a year, most recently in February or March prior to trial. We find that the City has failed to carry its burden regarding this plea of prescription for the same reasons assigned in connection with Alline.
The most reasonable conclusion to be drawn from the record is that Meyer is capable of light duty employment at best. In view of his educational and physical limitations *1097 as well as his good faith unsuccessful attempts to find post injury employment, we find that he has proved a prima facie case of his inability to find employment earning at least 90% of his pre-injury compensation.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from April 17, 1988 when he last worked until he was placed on disability pension on October 17, 1988 which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. Dr. Nutik's report dated October 6, 1988 shows that Meyer returned to work from June 24, 1988 through July 23, 1988. He is not entitled to TTD benefits for that period of time. Otherwise the nature and frequency of treatments he was receiving justify a finding of temporary total disability.
The city contends that Meyer is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. Meyer did not say that he had retired. After he left the Fire Department he attempted to engage in a shrimping business, but it failed. There is no evidence that he attempted to or did not attempt to find other employment. The burden of proof is on the City to show that Meyer withdrew from the workforce. There is no documentary evidence in which Meyer has characterized himself as retired. The City offered no evidence of jobs available within the limitations of Meyer's disability. We cannot say that the hearing officer was manifestly erroneous in his implicit finding that Meyer has not withdrawn from the workforce.

46. E. W. SANDERS
Sanders was born on March 30, 1951. He has a high-school education. He last worked for the Fire Department on July 6, 1986, when he fell upon and injured his wrist while on duty at the scene of a fire.
He was hired by the Fire Department on September 13, 1976 under the "new" plan. He is not old enough, nor did he work long enough to be eligible for retirement under the "new" plan. He is receiving 50% of his compensation in the form of his disability pension benefits. He would have had to work for the Fire Department for approximately another ten years in order to qualify for that level of benefits through normal retirement. Thus his disability pension is in no way equivalent to his retirement entitlement. Therefore, his disability pension will not be considered a tenure based retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Sanders, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job classification was firefighter. Sanders said that he had previously injured the wrist at a fire several years prior to the 1988 injury. He was not able to work for months after the earlier wrist injury, but eventually went back to work. Although he was eventually able to go back to work after the first wrist injury, the wrist continued to bother him. He testified that his wrist was in pain three or four days a week.
His job at the Fire Department required him to do a lot of climbing, lifting and pulling, all of which put substantial stress on his wrist. Since he left the Fire Department he has had no other job and has made no effort to find employment within the limits of his disability. Sanders testified that his medical benefits had been cut off several years earlier because he had gone for over a year without seeing a doctor. He testified that he was not permanently and totally disabled, and admitted that he could work. The injuries were to his left wrist, but he is right handed.
Sanders testified that he left work in July of 1986 because of his injury, but he was laid off in August of 1986.
In his report dated July 22, 1986 Dr. Edmund C. Landry, Jr. described Sanders as "a poor historian", meaning that Sanders had trouble remembering or getting his facts straight. However, Dr. Landry concluded his opinion by stating that:
This patient would appear to have sustained a fracture of the left carposcaphoid *1098 which required bone grafting to achieve union [as a result of one of his earlier wrist injuries]. He does have evidence of post-traumatic osteoarthritis of the left wrist. I agree with treatment with anti-inflammatory medication. He does have restriction of wrist motion and would be expected to have difficulty with activities requiring pushing and pulling with the left arm and supporting his weight on the left hand and wrist, such as in a pushup type of position.
In his opinion dated March 5, 1987, Dr. Landry estimated Sanders' disability to be a 15% permanent impairment of the upper left extremity. Dr. Raymond Kitziger in his report dated October 2, 1986 said that it was felt he was unable to work because of this. In his report dated December 16, 1986, Dr. Kitziger recommended that Sanders retire as a fireman. The City offered nothing to rebut Dr. Kitziger's report.
The City contends that Sanders' claim for medical benefits has prescribed. Sanders testified that he has not been back to Dr. Kitziger since 1986 because the City refused to pay. Sanders said that he was told that the reason that the City refused to pay was because he had gone for over a year since his last visit to the doctor. Regardless of the merits of the reason given by the City for not paying, the fact remains that Sanders admitted on the stand that he had not sought medical treatment for over three years at the time he filed this suit. Over six years elapsed from the time the "last payment of medical benefits" was made and November 13, 1993 when the plaintiffs collectively filed the amended petition claiming such benefits. The transmittal letter from Rosenbush dated November 15, 1990 stated that it included all of Sanders' medicals, the most recent of which was dated April 20, 1987. We find that Sanders' claim for medical benefits has prescribed.
A form from New Orleans Rosenbush Claims Service, Inc. shows that his average weekly wage at the time of injury on July 6, 1986 was $447.13.
The most reasonable conclusion to be drawn from the record is that Sanders is limited to light duty employment. In view of his educational and physical limitations we find that he has proven a prima facie case of his inability to find employment earning at least 90% of his pre-injury compensation.
The hearing officer awarded him TTD benefits in the sum of $254.00 per week from the date he last worked until he was placed on disability pension on August 4, 1986 which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. There is evidence of stiffness and discomfort in Meyer's left wrist and the inability to do any significant pushing, pulling or lifting with that wrist. But there is nothing in the record to support a finding that the right handed Meyer was totally disabled at any time during the period covered by the hearing officer's award of TTD benefits. It was error for the hearing officer to make such an award.
The city contends that Sanders is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. Sanders testified that he has made no attempt to return to work since he left the Fire Department in 1986. He explained that he intended to return to work, but only when he found "what I want to do." The City's attorney elicited the following testimony from Sanders on cross-examination:
Q. Okay. So, it's not because of your disability that you are not working?
A. No, it's not becausebecause I can work.
We find that after the passage of seven years without finding any pleasing form of self-employment, a matter peculiarly within the control of the plaintiff, coupled with the admission that his disability does not prevent him from working, it is only reasonable to conclude that Sanders either has made an unconscious decision not to return to the work force, or his testimony is just a euphemism for a conscious decision to withdraw from the work force. Viewing the record as a whole we find Sanders's explanation for his failure to find employment unacceptable and unreasonable. We find that Sanders's entitlement to SEB does not extend beyond 104 weeks.

*1099 47. TERRY R. SMITH
Smith was born on February 21, 1942. He has a high-school education. Smith was injured on July 29, 1988 and started drawing a pension a few weeks later, when he retired with the rank of Captain. He commenced employment with the Fire Department on March 23, 1973 under the "new" plan. As he did not have twenty years of service he is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Smith, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job required bending, stooping, climbing, kneeling and heavy lifting. Prior to his injury of July 29, 1988, Smith had several back sprains incurred while on duty but they had caused him to miss only a week or two of work each time. At the time of the July 29, 1988 back injury he was unaware of any residual problems from his previous back injuries. He stopped working on the day of the accident. Smith testified that he was making approximately $35,000.00 when he left the Fire Department.
In his report dated August 29, 1988, Dr. Raymond F. Kitziger concluded:
This individual has minor lumbar disc disease with back pain constantly made symptomatic with minor trauma. I do not feel he is a candidate for any type of surgery, at this time, but feel that his condition is such that he is unable to continue in his duties as a firefighter without increasing the [chance] of injury to himself and his associates. I feel this is permanent and I have suggested that he apply for retirement.
In his opinion dated November 8, 1988, Dr. Gordon P. Nutik agreed with the decision that Smith should retire and restricted Smith "from working in a heavy laboring type of job as a fireman ..."
The City contends that Smith's claim for medical benefits has prescribed. Smith testified that his claims for medical treatment and medication were being paid on a current basis. Smith testified that he had seen Dr. Kitziger as recently as a month and a half prior to the trial. We find that the City has failed to carry its burden regarding this exception of prescription for the same reasons assigned in connection with Alline.
The most reasonable conclusion to be drawn from the record is that Smith is capable of light duty employment only. In view of his educational and physical limitations we find that he has proven a prima facie case of his inability to find employment earning at least 90% of his pre-injury compensation. The City offered no countervailing evidence to rebut this prima facie case. Therefore, he has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $261.00 per week from July 29, 1988 when he last worked until he was placed on disability pension on September 17, 1988, which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. The medical evidence supports a finding of disability in connection with heavy duty work, but the record does not support the hearing officer's finding of temporary total disability.
The city contends that Smith is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. Since the day he left the Fire Department he has made no effort to look for work "because my back gives me problems and I don't think I can do the work." He did not say that he had retired in any sense of the word. He did not say that he would not work if the opportunity presented itself. The City offered no documents in which he characterized himself as retired. The City offered no evidence of available jobs within the limitations of his disability. We cannot say that the hearing officer was manifestly erroneously in concluding as he implicitly did that Smith has not withdrawn from the work force.

*1100 48. RAY SQUIRES
Squires was born on March 16, 1946. He was hired by the Fire Department on September 10, 1973 under the "new" plan. He testified that his educational background was "tenth grade GED." He ceased working for the Fire Department on January 28, 1989 when he injured his ankle while on duty. He was a Captain at that time. As he did not have twenty years of service he is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Squires, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
His job required him to do a lot of heavy lifting, climbing, bending and stooping. He testified that Dr. Ruel advised him not to engage in such activities as climbing ladders, an activity essential to his firefighting duties. He continues under Dr. Ruel's care. He has undergone two operations as a result of the ankle injury.
Squires was earning approximately $36,000.00 per year at the time of his accident.
Dr. Ruel's report of January 30, 1989, the day after Squires injured his ankle, shows that he applied a short leg cast with a boot and prescribed a pain killer. After numerous subsequent examinations and surgery, Dr. Ruel concluded in his report of September 25, 1989:
I think he should retire as a firefighter as it would not be safe for him to climb and he certainly could not carry objects of any significant weight.
In his report of January 1, 1991, Dr. Ruel concluded that Squires was "unable to work." Dr. Ruel's report of June 10, 1991 shows that a second surgery was performed on April 26, 1991 to relieve nerve damage.
Dr. Nutik's report of October 18, 1989 expresses the opinion that Squires was not capable of returning to his job with the Fire Department at the time he was examined. Dr. Nutik went on that Squires will most likely be restricted from returning to this job in the foreseeable future. Dr. Nutik's report also states, "The patient understood that he was beyond therapy." It is difficult to tell exactly what Dr. Nutik means by this, but in the context of the report it must be construed as an unfavorable view of Squires's prognosis.
The most reasonable conclusion to be drawn from the record is that Squires is capable only of light duty employment. He does not have a high-school education. In view of his physical and educational limitations we find that he has proven a prima facie case of his inability to find employment earning at least 90% of his pre-injury compensation. The City failed to offer any countervailing evidence to rebut this prima facie case.
The hearing officer awarded him TTD benefits in the sum of $267.00 per week from January 28, 1989 when he last worked until he was placed on disability pension on December 31, 1989, which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. In view of Squires's ongoing treatment during the period for which TTD benefits were awarded we find no manifest error in that award.
The city contends that Squires is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. The City bases this contention on the following testimony:
Q. All right. Are you retired now, or what, Mr. Squires?
A. Yes, sir.
Q. Okay. You have no intention of going back to work of any sort, is that
A. I wish I could.
This testimony taken out of context fails to take into account Squires preceding testimony:
Q. Have you looked for a job?
A. I'm still under the doctor's care right now.
Q. So, if the doctor say [sic] go look for a job, you'll do it?

*1101 A. Yes, sir. That means I'm backI can go back to work.
In reviewing Squires's testimony as a whole we find that he expressed no intention of withdrawing from the work force other than to the extent required by his disability and medical treatment. The City introduced no documents in which Squires characterized himself as retired. The City introduced no medical evidence or evidence of available jobs within the limitations of his disability and medical treatment. In view of the City's burden of proof we cannot say that the hearing officer was manifestly erroneous in finding, as he implicitly did, that Squires has not withdrawn from the workforce.

49. BURNELL STEWART
Stewart was born on September 16, 1943. He finished both high school and Delgado. He last worked for the Fire Department a day or two after August 13, 1988 when he injured his back cleaning around the fire house in his capacity as a fire fighter. He had been hired on June 13, 1977 under the "new" plan. As he did not have twenty years of service he is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Stewart, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Prior to his August 1988 injury his back was fine. His job required heavy lifting, climbing, bending, stooping and crawling.
Stewart has not returned to work as a fireman since that time, but testified that he did some part-time light duty security work for Bayou Security in 1990 or 1991. At the time he stopped working for the Fire Department he was making approximately $21,000.00 per year.
Stewart testified that he has approximately $10.00 in unreimbursed medication expenses which he attributed to the administrative holdup caused by the instant litigation. Stewart testified that he did not believe that he could return to work as a fireman because of his chronic low back problems for which he remains under a doctor's care.
Stewart testified that he loved his firefighting job, and that this is borne out by his employment record which would show that he had many years in which he did not miss a single day of work. He stated that the reason he has not returned to some other form of employment is that prospective employers are reluctant to hire someone they know is currently under the care of a physician. He had been able to work for Bayou Security for approximately two months because that employer gave him the option of sitting or standing depending on how his back felt at any given moment. It was just a temporary job and he was terminated when his particular assignment ran out.
On cross-examination Stewart testified that the City had expended a lot of time and effort trying to find him a job. He also did a lot of job prospecting on his own, but as of the date of the trial he had been unable to find employment. He further testified he hoped to find employment in the near future, subject to approval by his physician.
The City contends that Stewart's testimony is not credible because he failed to reveal in answers to interrogatories injuries sustained in a subsequent automobile accident for which he was suing the driver of the other vehicle. He also failed to mention the accident and those injuries to the physician, Dr. Ruel, who was treating him for his back problems. No mention of the accident and those injuries shows up in Dr. Ruel's reports. When initially asked if he had reported the auto accident to Dr. Ruel, Stewart said yes, but when told by the attorney for the City that Dr. Ruel made no note of the auto accident and consequent injuries, Stewart changed his story. However, Dr. Ruel's report dated August 27, 1990 states that: "He continued to have neck complaints from his motor vehicular accident and remained under the care of the other physicians who were recommended by his attorney." Stewart also failed to mention in his answers to interrogatories that he had injured his lower back in an automobile accident that occurred in 1984. *1102 He further failed to mention that he was a plaintiff in a pending class action suit arising out of an explosion.
In his report dated January 16, 1989, Dr. Ruel noted that he had recommended that Stewart retire from the Fire Department. In his report dated August 29, 1990 Dr. Ruel stated that Stewart should be discouraged from lifting, climbing, repetitive bending and rotation of the trunk, or walking while carrying objects. In the same report Dr. Ruel stated that: "I feel that he has reached maximum medical improvement."
The City contends that Stewart's claim for medical expenses has prescribed. We find that the City has failed to carry its burden regarding this exception of prescription for the same reasons assigned in connection with Alline.
Stewart has a degree from Delgado Junior College, but the record fails to reflect the nature of his studies. However, as noted previously, Stewart has made numerous but unsuccessful attempts to find employment within the scope of his physical limitations. In view of his physical limitations and his apparent good faith attempts to find employment within the scope of his physical limitations in cooperation with the City, we find that he has proven a prima facie case of his inability to find employment earning at least 90% of his pre-injury compensation. The City failed to present any countervailing evidence to rebut this prima facie case. Therefore, Stewart has succeeded in establishing his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $262.00 per week from August 15, 1988[28] he last worked until he was placed on disability pension on March 17, 1989, which is the same weekly rate he awarded for SEB from that date until September 1, 1991. From September 1, 1991 to November 1, 1991 his SEB was reduced to $58.15 per month because of wages he earned as a security guard. After November 1, 1991 when he was no longer employed his SEB was reinstated at the $262.00 per week level. The medical records show ongoing treatment, therapy and recommendations that Stewart remain out of work, supporting the hearing officer's award of TTD benefits.
The city contends that Stewart is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. It is unclear from the City's brief, but it appears that this contention is based on the Stewart's testimony that he did not feel that he could return to work because his "low back ... bothers me." However, this testimony by Stewart was in response to whether he thought he could return to work as a fireman. He was not being asked about any other type of work. As noted above he testified that the City had tried to find him a job and that he had done a lot of job prospecting on his own and would continue to do so. This testimony is uncontradicted. The City offered no documents in which Stewart characterized himself as retired as was done in Lytle. The City offered no evidence of available jobs within the limitations of Stewart's disability. The City offered no medical evidence. In view of the burden of proof on the City, we cannot say that the hearing officer was manifestly erroneous in finding, as he implicitly did, that Stewart has not withdrawn from the workforce.

50. CHARLES WAGNER
Wagner finished high school and "spent a couple of semesters in college" but never graduated. He was born on January 21, 1951 and was hired by the Fire Department on November 13, 1972. As he has not yet attained age fifty, Wagner is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Wagner, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
*1103 He was a captain at the time he last worked for the Fire Department which was on December 6, 1989. He stopped work on that day because he injured his back pulling window casings while fighting a fire. He had no previous back injury. He testified that Dr. Ruel had restricted him from heavy lifting and climbing ladders. Wagner said that it was difficult for him to stay in one position for three or four hours, either sitting or standing. His job with the Fire Department required him to perform heavy lifting and other forms of strenuous physical work and he felt that he was unable to meet the physical demands of a job with the Fire Department.
Wagner testified that he was unaware of any unpaid medical bills and that he had seen Dr. Ruel twice during 1993, the year of the trial. He has made no attempt to find other employment since the time he stopped working for the Fire Department. Wagner testified that sometimes he has to lie down for days, and then he will be fine for a while. He does not believe that he could hold down a steady job with such an unpredictable ability to work.
Dr. Robert E. Ruel, Jr. in his report of January 15, 1990 explained that he examined Wagner on December 8, 1989 because of Wagner's injury of December 6, 1989 which Dr. Ruel diagnosed as "muscular sprain to the low back." Dr. Ruel examined Wagner frequently in the ensuing weeks and directed him to return for yet another examination two weeks after his January 5, 1990 examination. Dr. Ruel expressed the hope that by the time that examination took place Wagner could return to work. During this period Wagner underwent therapy and took medication to relax his muscles and ease the pain. However, when he returned for examination on January 15, 1990, Dr. Ruel found no improvement and stated that Wagner was still unable to work. Dr. Ruel then ordered an MRI which showed some disc degeneration at L3-4, L4-5, and L5-S1.
Dr. Ruel's report of April 3, 1990 shows that Wagner experienced back pain, "If he tried to do any activity ..."
Following his examination of March 19, 1990, Wagner tried to increase his activities as recommended by Dr. Ruel, but attempts to play golf and mow his lawn only aggravated his condition. A bone scan was negative. Dr. Ruel concluded his examination of April 2, 1990 by saying:
He remain s disable [sic] and unable to work. His diagnosis is degenerative lumbar disease.
In his report of August 6, 1990, Dr. Ruel concluded:
He remains disabled, unable to work, as he appears to have chronic back sprain syndrome with some minimal lumbar disc degeneration of questionable significance.
In his report of September 30, 1990, Dr. Ruel stated:
Any lifting, carrying, twisting, walking, jumping or running caused accentuation of his complaints.
* * * * * *
Because of his symptoms, I do not think that he can function as a fireman.
In his report of October 17, 1990 Dr. Ruel recommended that Wagner retire from the Fire Department. In his report of August 14, 1991, Dr. Ruel expressed the opinion that Wagner could perform sedentary work:
I explained to him his restrictions with his low back problem but reiterated that there were certain jobs he could perform, avoiding repetitive bending, climbing, prolonged standing, prolonged sitting and lifting.
In this same report Dr. Ruel noted that Wagner did not agree with his opinion that Wagner was capable of certain kinds of employment.
The most reasonable conclusion to be drawn from the record is that Wagner is capable of sedentary employment only, at best.
The hearing officer awarded him TTD benefits in the sum of $276.00 per week from December 6, 1989 when he last worked until he was placed on disability pension on December 5, 1990 which is the same weekly rate he awarded for SEB. The SEB were to pick up from the date the TTD benefits terminated. The medical records show ongoing treatment, therapy and "no work" recommendations *1104 during the period covered by the hearing officer's award of TTD benefits. Therefore, we find no manifest error in the award of TTD benefits.
The city contends that Wagner is limited to 104 weeks of SEB under LSA-R.S. 23:1221(3)(d)(iii) because he has withdrawn from the workforce. Wagner testified on cross-examination:
Q. Why are you not working now?
A. Because my back is inured [sic] and I cannotif I sit for more than a few hours, I have to move. If I stand, I have to sit. I have to lay down. I don't know anything I can do, really, or if anyone would hire me.
Q. With a lowhave you tried?
A. No, I haven't.
Q. You have not tried to get a job?
A. No, I haven't.
Wagner went on to testify that, "I'm not totally disabled completely." He then explained further why he has not gone in search of a job:
The reason I haven't gone is because of the pain in my back. I cannotsometimes I have to lay down for days. Other times I can walk around and be fine for a while and then it will go out.
From the foregoing testimony the hearing officer could have reasonably concluded that Wagner is not working because of his disability, not because he had retired or withdrawn from the work force. The City failed to introduce any documents in which Wagner characterized himself as retired. The City introduced no medical evidence or evidence of jobs available within the limitations of Wagner's disability. In view of the City's burden of proof we cannot say that the hearing officer was manifestly erroneous when he concluded, as he implicitly did, that Wagner had not withdrawn from the workforce.

51. JOSEPH M. WILLIAMS
Williams graduated from high school and attended two years of college. He was born on March 18, 1951. He was hired by the Fire Department on September 13, 1976 under the "new" plan. He last worked for the Fire Department on December 10, 1985 when he had a heart attack while playing basketball three hours after he finished work for the day. He held the rank of firefighter at the time. The fact that he was not in the course and scope of his employment when this heart attack occurred does not deprive him of the presumption of work related causation afforded by LSA-R.S. 33:2581. LSA-R.S. 33:2581 applies to heart and lung disease that develops during the period of employment regardless of whether the fireman is on duty at the time he was stricken with the disease or infirmity.
As he has neither attained age fifty nor has twenty years of service, he is not eligible for retirement under the "new" plan. Therefore, his will not be considered a retirement benefit exempt from offset under Cousins. We find that the City has the right of offset against Williams, but that it has not exercised that right in accordance with the proper methodology. We find it appropriate to remand his case to the hearing officer for a calculation of the City's right of offset in accordance with this opinion.
Prior to his first heart attack, Williams was unaware of any previous health problems. He had a second heart attack in November of 1990 or 1991.
Williams went to the National Education Center to become a medical assistant. He was hired in November 1992 as a phlebotomist by the New Orleans Health Corporation, i.e., he draws blood from patients. He earned approximately $200.00 per week doing this work. At the time of trial he was not working at this job because of a very recent third heart attacked sustained by him on December 2, 1993. However, he intended to return to his job as a phlebotomist as soon as he was sufficiently recovered.
Williams testified that in the past he was not told by his doctors that he could not work, but that it had been difficult to find employment because of his heart condition. He testified that he did not believe that he was physically able to return to work as a fireman.
The fact that two of his heart attacks occurred subsequent to the time he left *1105 the Fire Department does not deprive Williams of the benefit of the presumption of causation afforded by LSA-R.S. 33:2581 where the condition arose during his period of employment as a fireman. Attaway v. City of Natchitoches, 94-813 (La.App. 3 Cir. 2/1/95); 651 So.2d 306.
A letter from Dr. Jack Ruli to the Superintendent of the Fire Department, William McCrossen, dated December 19, 1985, says of Williams' condition:
Due to the serious nature of his illness, he will be disabled for an indefinite period of time. His current diagnosis is ischemic heart disease with an acute myocardial infarction.
In a subsequent report dated May 6, 1986, Dr. Ruli stated that Williams was "totally and permanently disabled from performing fire duty."
The City contends that Williams' claim for medical benefits has prescribed. Williams testified that he has been seeing Dr. Mary Richards since 1991. We find that the City has failed to carry its burden regarding this plea of prescription for the same reasons assigned in connection with Alline.
The most reasonable conclusion to be drawn from the record is that Williams is capable of light duty employment only. In view of his physical limitations and the fact that he has no college diploma, we find that he has proven a prima facie case of his inability to find employment earning at least 90% of his pre-injury compensation. The City offered no countervailing evidence to rebut this prima facie case. Therefore, Williams has established his entitlement to SEB.
The hearing officer awarded him TTD benefits in the sum of $254.00 per week from December 10, 1985 when he last worked until he was placed on disability pension on August 17, 1986. Thereafter, Williams was awarded SEB at the same weekly rate until November 1, 1992 when Williams began working at the New Orleans Health Corporation making $200.00 per week. From November 1, 1992 to December 1, 1993 his SEB was reduced to $37.22 per week because of his employment income. In December of 1993 he suffered another heart attack. Therefore the hearing officer awarded SEB at the rate of $254.00 per week from December 1, 1993 until Williams returns to work at which time the SEB is to be reduced to $37.22 weekly assuming Williams is earning $200.00 per week. We find no manifest error in any of these awards.

DECREE
To the extent that our previous opinion in Dupre v. City of New Orleans, 94-1185, p. 9 (La.App. 4 Cir. 12/28/94), 648 So.2d at 508 conflicts with this decision it is overruled.[29]
The award of penalties and attorney fees is affirmed.
1. The claim of Jack Alexander is remanded for the limited purpose of calculating the City's right of offset. Otherwise the awards to Alexander are affirmed.
2. The awards to Paul Joseph Alline are affirmed.
3. The award of TTD benefits to Gerald A. Barattini is reversed. The award of SEB to Barattini is amended to limit it to 104 weeks. The balance of the judgment regarding Barattini is affirmed.
4. The award of TTD benefits to Maurice Robert Blondeau is reversed. The award of SEB to Blondeau is amended to reduce it to zero in 1988, $9,655.14 in 1989, $9,746.49 in 1990, $8,148.00 in 1991 and $11,135.22 in 1992. Otherwise the awards to Blondeau are affirmed.
5. The award to Robert Buisson is affirmed.
6. The award to William F. Dillenkoffer of SEB and TTD benefits is reversed.
7. The award to Robert H. Dudenhefer is affirmed.
*1106 8. The award of SEB to John F. Duncan is reversed. Otherwise the awards to Duncan are affirmed.
9. The award of TTD benefits and SEB to Edward Eierman are reversed.
10. The awards to Ed Gallagher are affirmed.
11. The award of TTD benefits to Francis Paul Lasalle is amended to require that such benefits not extend beyond March 24, 1988. Otherwise the awards to Lasalle are affirmed.
12. The awards to George Francis are affirmed.
13. The awards to Peter Gondrella, Jr. are affirmed.
14. The claim of James Hennegan is remanded for a calculation of the City's right of offset. Otherwise the awards to Hennegan are affirmed.
15. The awards to Lawrence Hendrickson are affirmed.
16. The awards to Lucien LeBlanc are affirmed.
17. The awards to Ronald Hughes are affirmed.
18. The awards to Joseph Jevic, Jr. are affirmed.
19. The award of TTD benefits to Jerry Ladner is reversed. The award of SEB to Ladner is amended to limit it to 104 weeks.
20. The awards to John V. Marcade, Jr. is affirmed.
21. The award of SEB to Charles Marque is amended to limit it to 104 weeks. Otherwise the awards to Marque are affirmed.
22. The award of TTD benefits to John Niehues is reversed. The award of SEB to Niehues is amended to limit it to 104 weeks.
23. The award of TTD benefits to Frank Palisi is reversed. The award of SEB to Palisi is amended to limit it to 104 weeks.
24. The awards to Donald Perkins are affirmed.
25. The claim of Paul Raschke is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Raschke are affirmed.
26. The claim for SEB benefits of Eugene Ravain is remanded to determine whether it should be reduced in any manner because of his earnings. The award of TTD benefits to Ravain are reversed.
27. The awards to John Renaud are affirmed.
28. The awards to Harold Rodrigue are affirmed.
29. The awards to Raymond Schwarkhardt are affirmed.
30. The claim of Louis Serpas is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Serpas are affirmed.
31. The awards to John Varnado are affirmed.
32. The awards to Ralph L. West, Jr. are affirmed.
33. The claim of Albert Baldwin is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Baldwin are affirmed.
34. The claim of Robert Anthony Bouterie is remanded for the purpose of calculating the City's right of offset. The award to Bouterie of TTD benefits is amended to require that such benefits not extend beyond April 28, 1987. Otherwise the awards to Bouterie are affirmed.
35. The claim of Charles Casrill is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Casrill are affirmed.
36. The claim of Donald Conrad is remanded for the purpose of calculating the City's right of offset. The award of TTD benefits to Conrad is reversed. Otherwise the awards to Conrad are affirmed.
37. The claim of Reno Jean Daret, III is remanded for purposes of calculating the City's right of offset. The award of SEB to Daret is amended to require that it cease effective January 1, 1991 when he went back *1107 to work as a teacher. Otherwise the awards to Daret are affirmed.
38. The claim of Lester Dufrechou is remanded for the purpose of calculating the City's right of offset. The award of SEB to Dufrechou at the rate of $239.92 per week from February 1, 1991 until November 1, 1992 is amended to increase the rate for that period of time to $267.00 per week in order to correct what appears to be merely an inadvertent clerical error in the hearing officer's judgment. Otherwise the awards to Dufrechou are affirmed.
39. The claim of Branch John Ehrhardt is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Ehrhardt are affirmed.
40. The claim of Sam Joseph Fradella, Jr. is remanded in order to calculate the City's right of offset. The award to Fradella of TTD benefits is reversed. Otherwise the awards to Fradella are affirmed.
41. The claim of Don W. Lindsey is remanded in order to calculate the City's right of offset. Otherwise the awards to Lindsey are affirmed.
42. The awards to Samuel A. Montalbano are affirmed.
43. The claim of Warren Martin is remanded in order to calculate the City's right of offset. Otherwise the awards to Martin are affirmed.
44. The claim of Patrick McGittigan is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to McGittigan are affirmed.
45. The claim of Jerry A. Meyer is remanded for the purpose of calculating the City's right of offset. The award to Meyer of TTD benefits is amended to show that he is not entitled to such benefits from June 24, 1988 through July 23, 1988 when he returned to work. Otherwise the awards to Meyer are affirmed.
46. The claim of E.W. Sanders is remanded for the propose of calculating the City's right of offset. The award of medical benefits to Sanders is reversed because of prescription. The award of TTD benefits to Sanders is reversed. The award of SEB to Sanders is amended to limit it to 104 weeks.
47. The claim of Terry R. Smith is remanded for the purpose of calculating the City's right of offset. The award of TTD benefits to Smith is reversed. Otherwise the awards to Smith are affirmed.
48. The claim of Ray Squires is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Squires are affirmed.
49. The claim of Burnell Stewart is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Stewart are affirmed.
50. The claim of Charles Wagner is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Wagner are affirmed.
51. The claim of Joseph M. Williams is remanded for the purpose of calculating the City's right of offset. Otherwise the awards to Williams are affirmed.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED IN PART.

ORDER
REHEARING DENIED
The application for rehearing of Gerald Barattini, Maurice Blondeau, William Dillenkoffer, John Duncan, Edward Eirerman, Jerry Ladner, Charles Marque, John Niehues, Frank Palisi, Jack Alexander, James Hennegan, Paul Raschke, Burnell Stewart and Joseph Williams is denied.
The hearing officer may correct errors in calculation in his judgment at any time. LSA-C.C.P. art. 1951(2).
NOTES
[1] This may be because there is more factual information available in this case from which the distinctions between the claims of the plaintiffs becomes more obvious. The instant case involved over fifty mini-trials on the merits, whereas Rapp had not progressed beyond the summary judgment stage at the time it was decided by this Court.
[2] We make no ruling on the question of whether the City could acquire through prescription the right to retain the benefit of previously improperly credited offsets as it is not properly before this Court.
[3] In Rapp, a summary judgment case, this Court remanded the prescription question because the record was not sufficiently well developed to permit this Court to make an informed decision.
[4] Those firemen hired prior to January 1, 1968 were enrolled in what is known as the "old" plan which required only that a fireman have twenty years of service to qualify for retirement. Those firemen hired thereafter were enrolled in the "new" plan which, in addition to twenty years of service, required that a fireman attain fifty years of age in order to qualify for retirement.

Bernard Nicolay testified for the City that the "old" plan was funded on a "pay-as-you-go" basis and that the new fund is funded "on an actuarial basis."
In its brief the City contends that the cut-off date between the "old" and "new" plan is January 1, 1967. However, Bernard Nicolay who was the City's witness testified that the date is January 1, 1968. Mr. Nicolay's testimony is consistent with this Court's finding in Nicolay v. City of New Orleans, 546 So.2d 508, 510-511 (La.App. 4 Cir.1989), writ denied, 551 So.2d 1324 (La. 1989):
The fund actually consists of two separate retirement plans: the "old system", which covers firefighters who began their employment prior to January 1, 1968; and the "new system", created in 1968 by R.S. 33:2101, which covers all firefighters employed after December 31, 1967 as well as those employed before 1968 who have elected to come under the new system. [Emphasis added.]
* * * * * *
Since its creation, as mandated by section 2117.3, the new system has been funded in a way that the annual contributions made by the city are sufficient not only to pay anticipated benefits for that year, but also to build up the fund so that in a predetermined number of years, the Fund will be able to operate without any further employer contributions. Conversely, the old system has always been maintained on a "pay as you go" basis, which means that the size of the City's annual contribution is determined solely by the amount necessary to pay anticipated benefits for that year. From an actuarial standpoint, therefore, the old system has an "unfunded liability", and therefore, the City's annual contribution will have to continually increase as more members become eligible to receive retirement benefits and fewer members are paying into the system. [Emphasis added.]
Therefore, this Court accepts the date of January 1, 1968 as the transition date between the "old" and "new" plans.
[5] The "new" plan commenced in 1968.
[6] We recognize that not all firemen in the "new" plan were in it for the same years. However, as dollars paid out in benefits cannot be traced to any particular year's contribution or contributor, using these general proportions is the most practical way of dealing with this complex problem, similar to the practical approach taken by the Supreme Court in Matthews.
[7] Under present value calculations the sooner a dollar is received the more it is worth to a recipient.
[8] Just as the Supreme Court expressly refused to endorse the Vallery reasoning in Matthews, 619 So.2d at 61, this court likewise withholds its endorsement of that reasoning.
[9] For example, if a plaintiff's maximum benefit were based on wages of $2,000 per month, it is pointless to argue over whether plaintiff's wages were actually $2,500 per month or $3,000 per month. The uncontradicted credible testimony of such a plaintiff that he made approximately $2,500 per month or approximately $3,000 per month would in either case more than suffice in spite of its imprecision.
[10] The amendment effective in 1990 required the plaintiff to prove his disability by "clear and convincing evidence" and required the plaintiff to apply for an extension if he sought to collect temporary total disability benefits beyond six months.
[11] Plaintiffs' brief states that such letters were sent "to all but 2 of the Palisi" group. However, this is inconsistent with the statement made by plaintiffs's attorney at the hearing held on December 20, 1993. At that hearing the plaintiffs's attorney stated that letters had been received by all but five of the plaintiffs, i.e., 46 out of 51. This statement is consistent with the 46 letters we find in the record.
[12] Within the body of this opinion we refer in many instances to testimony by the plaintiffs that would normally lead to a finding that the City had not terminated benefits. Such testimony is superseded by the letters from Rosenbush where the above named plaintiffs are concerned.
[13] The award of TTD benefits was for the period beginning with his injury on July 1, 1988 through the time he started receiving his disability pension.
[14] Where the SEB are in the same amount as and commence immediately following the expiration of the TTD benefits, it might at first appear that the date that the TTD ends and the SEB begins is of no consequence. This is true only on the front end. But SEB is limited to a maximum period of 104 weeks or 520 weeks depending on the circumstances. To allow plaintiffs TTD benefits for an excessive period would have the effect of impermissibly extending the period during which plaintiffs would be entitled to SEB on the back end.
[15] The City failed to cross-examine Blondeau about the amount of his earnings. We, therefore, have no basis for assuming that Blondeau had any earnings subsequent to 1992 that might reduce the amount of SEB to which he is entitled.
[16] LSA-R.S. 23:1221(3) as amended effective January 1, 1986.
[17] With the exception of the report dated August 21, 1987 which fails to designate a category. We find that the most reasonable inference to be drawn from this omission is that it arose through oversight and inadvertence. There is no reason to believe that Dudenhefer would not have been in the "No Work" category at the time of the August 21, 1987 report when he was in that category in reports immediately preceding and following the August 21, 1987 report.
[18] The City made much of the fact that many of these claimants testified that they had indicated on their tax returns that they were retired. We are satisfied that this meant only that they were retired in the sense that they were disabled and receiving disability pensions, not that they had voluntarily withdrawn from the work place and retired as one would do at the end of one's career.
[19] The hearing officer's judgment uses the spelling "Hennigan," however, all of the exhibits and his attorneys documents refer to him as "Hennegan."
[20] The record initially says "78" instead of "87", but it is clear from the context of the transcript that "78" is a transposition error and that "87" is the correct year.
[21] The City argues that the most recent date of a medical examination of Hendrickson by Dr. Ruel as shown by the medical records in evidence was March 16, 1989, thereby implying that Hendrickson was either mistaken or untruthful in his testimony. The record does not support this allegation. Moreover, the City failed to cross examine Hendrickson on this issue and failed to introduce any countervailing evidence.
[22] Marcade refers to this variously as a neck or back injury.
[23] At one point in his testimony Marque refers to May 7, 1988 instead of April, but we conclude that this was just a slip of the tongue.
[24] We fix November 20, 1988 as this date based on a report dictated by Dr. Ruel on that date.
[25] The hearing officer agreed to hold the record open to permit Varnado to supply Dr. Cook's medical bills subsequent to the trial. Apparently this was done because we find them in the record. However, the bills show no outstanding balance due. They have no evidentiary value without testimony to explain what amounts, if any, shown on the statements might need to be reimbursed to Varnado.
[26] For lack of any more precise evidence in the record, we fix the date Lindsey last worked as April 22, 1986, the date, according to Dr. Chuinard, that he "underwent exploration of his right wrist and transfer of the extensor carpi radialis longus tendon into the distal pole of the scaphoid bone."
[27] The judgment gives the year as "1987", but it is obvious from the record that this must be a typographical error as the year was clearly "1988."
[28] The record indicates that he may have worked for a day or two after his injury of August 13, 1988. Based on the record we have fixed August 15, 1988 as the most reasonable date to assume Stewart stopped working.
[29] Pursuant to the requirements for overruling previous opinions of this circuit, this opinion has been submitted to all twelve judges of this court and they have voted unanimously to overrule Dupre v. City of New Orleans, 94-1185, p. 9 (La.App. 4 Cir. 12/28/94), 648 So.2d at 508, to the extent that it is inconsistent with this opinion.